WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
Tel. (212) 510-0538
By:     Michael T. Driscoll
        Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                  :
In re                                             :    Chapter 11
                                                  :
ASHLEY RIVER CONSULTING, LLC,                     :    Case No. 14-13406 (MG)
                                                  :
            Debtor.                               :
                                                  :
-------------------------------------------------------X
                                                  :
In re                                             :    Chapter 11
                                                  :
EMERALD INVESTMENTS, LLC,                         :    Case No. 14-13407 (MG)
                                                  :
            Debtor.                               :
                                                  :
-------------------------------------------------------X

**MOTION OF THE UNITED STATES TRUSTEE FOR
THE ENTRY OF AN ORDER DIRECTING THE
<u>APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     FACTUAL BACKGROUND ........................................................................................2
        A.      General Background ...........................................................................................2
        B.      The Ashley Case .................................................................................................3
        C.      The Emerald Case ...............................................................................................3
                i.      Emerald's Interest in ARP II .....................................................................3
                ii.     The Dissociation Provision of the
                        Operating Agreement of APR II ...............................................................4
                iii.    The Decade-Long Dispute Between Emerald
                        and Kriti over ARP II ...............................................................................5
        D.      The Disputed Valuations of ARP II ....................................................................8

III.    DISCUSSION ................................................................................................................9
        A.      Section 1104(a) of the Bankruptcy Code ............................................................9
        B.      The Appointment of a Chapter 11 Trustee is in the Interest
                of Creditors Pursuant to Section 1104(a)(2) .......................................................9
                i.      The Main Issue in These Cases is to Determine the Fair
                        Market Value of ARP II..........................................................................10
                ii.     The Lack of Trust and Confidence in Debtors' Management
                        Will Hinder Reorganization and Lead to Increased Costs .....................11

IV.     CONCLUSION ............................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

In re Adelphia Commc'n Corp., 336 B.R. 610 (Bankr. S.D.N.Y. 2006) ..........................9

In re Euro-American Lodging Corp., 365 B.R. 421 (Bankr. S.D.N.Y. 2007) ............................9, 10

In re Ionosphere Clubs, Inc., 113 B.R. 164 (Bankr. S.D.N.Y. 1990) ...............................9

In re Sharon Steel Corp., 871 F.2d 1217 (3d Cir. 1989).....................................................9

In re Taub, 427 B.R. 208 (Bankr. E.D.N.Y. 2010) ....................................................9, 10

Schuster v. Dragone (In re Dragone), 266 B.R. 268 (D. Conn. 2001).......................................9, 10

**Legislative History**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977) ...................................................10

124 Cong. Rec. H11, 102 (daily ed. Sept. 28, 1978); S17,419 (daily ed. Oct. 6, 1978)................10

**Statutes**

11 U.S.C. § 1104(a) ..............................................................................................9

11 U.S.C. § 1104(a)(1).............................................................................................9

11 U.S.C. § 1104(a)(2).....................................................................................1, 9, 10

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

William K. Harrington, the United States Trustee for Region 2, hereby files this Motion for the Entry of an Order Directing the Appointment of a Chapter 11 Trustee under 11 U.S.C. § 1104(a)(2) for Ashley River Consulting, LLC ("Ashley") and Emerald Investments, LLC ("Emerald" and together with Ashley, the "Debtors").  The United States Trustee asserts the appointment is in the interests of creditors and other interests of the estate.  In support of this Motion, the United States Trustee respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

The United States Trustee moves for the entry of an order directing the appointment of a Chapter 11 trustee pursuant to section 1104(a)(2) of the Bankruptcy Code.  The facts and circumstances of these cases demonstrate that a Chapter 11 trustee is necessary to protect the interests of creditors.  One of the Debtors, Emerald, owns a seventy-percent interest in an entity that owns a yacht club along the Ashley River in Charleston, South Carolina.  The thirty-percent owner of the property is Emerald's former business partner, Kriti Ripley, LLC ("Kriti").  Emerald and Kriti have been engaged in a decade-long battle over the entity and now highly dispute the value of the yacht club.  The valuations of this property range from nearly $8 million to in excess of $30 million – the latter a price that would pay all creditors and return money to equity.  Thus, determining the fair market value of the property is the central issue of these cases.

Without an independent fiduciary, this task will be complicated because Kriti – not unjustifiably – will not likely trust the Debtors' valuation of the property.  An arbitration panel as well as a New York state court have determined that Emerald and its principal, Stuart Longman ("Longman"), had previously engaged in wrongdoing in their dealings with Kriti over the subject of the property.  A Chapter 11 trustee would be able to restore confidence of creditors and

1

quickly make an assessment of the fair market value of the property. The appointment of a trustee would avoid duelling appraisals and contested valuation hearings and, thus, would reduce the cost to the estates. Accordingly, for the reasons discussed in greater detail below, the United States Trustee moves for the appointment of a Chapter 11 trustee.

## II. FACTUAL BACKGROUND

**A.     General Background**

1. On December 15, 2014, the Debtors each commenced voluntary cases (the "Petitions") under Chapter 11 of the Bankruptcy Code. Case No. 14-13406, ECF Doc. No. 1; Case No. 14-13407, ECF Doc. No. 1.

2. The Petitions were each signed by David A. Thomas, Manager of the Debtors. Case No. 14-13406, ECF Doc. No. 1; Case No. 14-13407, ECF Doc. No. 1.

3. On December 29, 2014, Longman, in his capacity as the Trustee for the Gayla Longman Family IRR Trust, filed identical declarations (the "Longman Declaration") in each of the Debtors' cases. Case No. 14-13406, ECF Doc. No. 6; Case No. 14-13407, ECF Doc. No. 8.

4. The Debtors are currently acting as a debtors-in-possession pursuant to section 1107 of the Bankruptcy Code.

5. No official committee of unsecured creditors has been appointed in these cases.

6. No joint administration order has been entered in these cases.

**B.     The Ashley Case**

7. Thomas owns a twenty-percent interest and Emerald owns an eighty-percent interest in Ashley. Case No. 14-13406, ECF Doc. 5.

8. On December 29, 2014, Ashley filed its Schedules and Statement of Financial Affairs. Case No. 14-13406, ECF Doc. Nos. 7, 8.

2

9. According to the Schedules, Ashley's sole asset is an agreement by and between Ashley and Emerald for the "Redemption of Financial Interests" (the "Redemption Agreement") in Ashley River Properties II, LLC ("ARP II"). Case No. 14-13406, ECF Doc. No. 8.

10. The value of the Redemption Agreement was not disclosed in the Schedules. Id.

11. Schedule F lists $1,183,681 in general unsecured claims owed to Emerald. Id. Ashley listed other general unsecured creditors with contingent, unliquidated, and/or disputed claims. Id.

C.  **The Emerald Case**

12. The Gayla Longman Family IRR Trust is the sole owner of Emerald. Case No. 14-13407, ECF Doc. 7.

13. On December 29, 2014, Emerald filed its Schedules and Statement of Financial Affairs. Case No. 14-13407, ECF Doc. Nos. 9, 10.

14. According to the Schedules, Emerald's assets consist of a checking account, its seventy-percent membership interest in ARP II, and the Redemption Agreement with Ashley. Case No. 14-13407, ECF Doc. No. 10.

15. The value of these assets was not disclosed in the Schedules. Id.

16. On February 20, 2015, Emerald filed Amended Schedules that listed previously undisclosed ownership interests in (i) four parcels of land each valued at $2,500 in Palatka, Florida: 8 Horseshoe Court East, 23 Horseshoe West, 23 Secretariat Place, and 26 Secretariat Place; and (ii) a 2006 Chevrolet Silverado 2500, valued at $7,000. Case No. 14-13407, ECF Doc. No. 31.

    i.  **Emerald's Interest in ARP II**

17. Emerald owns a seventy-percent interest and Kriti owns a thirty-percent interest

3

in ARP II.  Longman Decl., at ¶ 7.

18.     ARP II owns real estate known as the Ripley Light Yacht Club and Condominiums (the "Yacht Club").  Id. at ¶ 5.

19.     The Yacht Club, which is located along the Ashley River in Charleston, South Carolina, is currently developed for 87 boat slips; however, in 2012 it received approval from the Army Corps of Engineers to expand with 186 additional boat slips.  Id.

20.     Emerald and Kriti, via their interests in ARP II, have owned the Yacht Club since 2003.[1]  Id. at ¶ 6.

### ii.    The Dissociation Provision of the Operating Agreement of ARP II

21.     On December 29, 2003, Emerald and Kriti executed a document entitled, "Operating Agreement of Ashley River Properties II, LLC (the "Operating Agreement").  ECF Doc. No. 23, Ex. A.

22.     Longman signed the Operating Agreement on behalf of Emerald.  Id.

23.     Pursuant to the Operating Agreement, the occurrence of certain events would trigger the dissociation of ARP II.  See Operating Agreement, Art. X, § 10.1.

24.     One of the triggering events of dissociation occurs "[i]f the Member files a voluntary petition for bankruptcy, is adjudicated a bankrupt or has a bankruptcy petition filed against him or it which is not dismissed within (90) days."  Id. § 10.1(b).

25.     In the event of dissociation, the dissociating member would be deemed to have made an offer of its interest to ARP II.  Id. § 11.3(a).

---

[1] There appears to be a factual disagreement between the Debtors and Kriti and ARP II on the issue of whether ARP II was initially owned solely by Emerald.  For example, according to the Longman Declaration, "[a]t its inception, ARP II was wholly owned by Emerald."  Longman Decl., at ¶ 6. On the other hand, Kriti and ARP II state,"Kriti and Emerald have at all times been the only members of Ashley River II."  ECF Doc. No. 22.  This seemingly minor factual issue suggests that parties will not likely agree on the major issues – such as the appraised value of ARP II – in the absence of a Chapter 11 trustee.

26. If ARP II did not accept this offer by written notice within thirty days, the offer would be deemed rejected. Id.

27. In this event, the non-dissociating member would then have the opportunity to purchase the dissociating member's interest under the same terms as was offered to ARP II. Id.

28. Pursuant to the Operating Agreement, the purchase price upon dissociation would be determined by the "Appraised Value" of the membership interest. Id. § 11.3(b).

29. The Appraised Value would be determined by the "Fair Market Value," which was defined as:

> the cash equivalent price at which property would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under the compulsion to buy or sell and both having reasonable knowledge of relevant facts. The hypothetical buyer and seller are assumed to be able, as well as willing, to trade and are assumed to be well-informed about the property and concerning the market for such property.

Id.

30. In determining the Appraised Value, the parties would each retain an appraiser. Id. Where the appraisers could not agree on the Appraised Value, the parties would retain a third appraiser. Id. The Appraised Value would then be determined by the average of the two appraisals that were closest in price. Id.

### iii. The Decade-Long Dispute Between Emerald and Kriti over ARP II

31. According to Kriti, after Kriti paid $1.25 million for its thirty-percent interest in ARP II, "[i]mmediately Emerald and its sole member, Stuart Longman [] directed and misappropriated those funds." ECF Doc. No. 22, at ¶ 7.

32. In March 2005, Kriti and ARP II filed for arbitration in New York alleging defaults under the Operating Agreement and forfeiture of Emerald's financial and voting rights. Longman Decl., at ¶ 9.

33. On October 31, 2005, the New York arbitration panel (the "Arbitration Panel") issued an "Award of Arbitrators." ECF Doc. No. 23, Ex. B, at p. 1.

34. Among other findings, the Arbitration Panel made the following determinations with respect to the Operating Agreement:

> 1. Emerald and Longman violated Section 5.2(g) by <u>wrongfully making payments of ARP II which were not on the approved marina budget or on the budget for future phases of the project or otherwise approved by Kriti.</u>
>
> 2. Emerald and Longman violated Section 5.2(p) by <u>making payments to or for the benefit of Longman or other entities Longman controlled, which were totally unrelated to ARP II.</u>
>
> 3. Emerald and Longman violated Sections 5.2, 5.7 and 13.01(b and c). Section 5.7 states that, "The funds of the Company shall not be commingled with the funds of any other party." From the first day Kriti sent investment funds to ARP II, Emerald and Longman <u>commingled these funds in various non-ARP II accounts, including an account, in part, in the name of Longman's wife, Gayla Longman</u>. . . .
>
> . . .
>
> 4. Emerald and Longman violated Section 3.9(a) by <u>failing to disclose that Sapphire Development, LLC ("Sapphire") had filed a petition in bankruptcy before execution of the Operating Agreement.</u> Sapphire, another entity controlled by Longman, was the party which entered into certain agreements regarding the neighboring Collins property and, in consideration of Kriti's investment, assigned these rights to ARP II. (See Joint Exhibit 3). Since the Sapphire bankruptcy proceeding could reasonably be expected to have a material adverse effect on the business of ARP II, the failure to disclose the proceeding was a clear material breach of Section 3.9(a).
>
> . . .
>
> 7. Emerald and Longman violated Sections 5.2(g), 5.2(p) and 5.7 by <u>diverting $150,000 of Marshall loan proceeds and paying themselves instead of paying Bellingham Marine</u>, even though the application to draw down the funds certified that the $150,000 would be paid to Bellingham Marine. Moreover, it is undisputed that when Bellingham Marine was finally paid, ARP II was charged an additional $64,000 because of the delay in payment occasioned by Emerald and Longman.

<u>Id.</u> (emphasis added).

6

35. The Arbitration Panel determined that due to the above violations of the Operating Agreement, Emerald had forfeited all voting interests in ARP II. <u>Id.</u>

36. On February 15, 2008, the Supreme Court of New York, County of New York (the "New York State Court") issued a memorandum opinion affirming the October 31, 2005 arbitration award as well as a June 22, 2006 award of damages.

37. The memorandum opinion made, among others, the following observations regarding Emerald's and Longman's conduct:

> Clearly, Longman, as the principal member and manager of Emerald, controlled and dominated Emerald and, by extension, ARP-ll. He admittedly <u>failed to observe the corporate formalities of these entities by taking money deposited by Kriti as capital for ARP-II, and putting it to personal use</u> in accounts he controlled of other entities. He also <u>diverted loan funds intended to pay, suppliers</u>, as well. Longman does not dispute this but claims to have returned all the improperly diverted funds and more. He does not dispute that he provided false documents to conceal this diversion. Under these facts, <u>Longman was the puppeteer pulling the strings of Emerald for his own advantage and to the detriment of Kriti and can be held accountable for his actions as the alter ego of Emerald</u>. Kriti is entitled to pierce the corporate veil to get to Longman.

ECF Doc. No. 23, Ex. D, at p. 22 (emphasis added).

38. On March 27, 2008, the New York State Court entered a money judgment against Longman and Emerald, jointly and severally, in favor of Kriti and ARP II in the amount of $1,1,84,581.72. ECF Doc. No. 23, Ex. E, at p. 4.

39. On October 17, 2008, the Ninth Judicial Circuit sitting in Charleston, South Carolina issued a charging order perfecting a lien on Emerald's membership interest in ARP II in the $1,1,84,581.72 plus post-judgment interest. ECF Doc. No. 23, Ex. F, at p. 3.

40. On July 14, 2014, the Court of Common Pleas of the County of Charleston, South Carolina (the "South Carolina State Court") entered a foreclosure order on Emerald's membership interest in ARP II. ECF Doc. No. 23, Ex. H, at p. 7.

7

41. On October 21, 2014, upon the motion of Emerald and Longman, the South Carolina State Court entered an order requiring the foreclosure of Emerald's membership interest in ARP II to be conducted under South Carolina procedures for the foreclosure of real property rather than under procedures for the foreclosure of personal property. ECF Doc. No. 23, Ex. I, at p. 14.

42. The foreclosure of Emerald's membership interest was scheduled for December 16, 2014, which is the day after the Petitions were filed. ECF Doc. No. 23, at ¶ 13.

**D.    The Disputed Valuations of ARP II**

43. On February 2, 2015, Kriti and ARP II filed a motion seeking the dismissal of Emerald's case, or in the alternative, relief from the automatic stay (the "Kriti/ARP II Motion"). ECF Doc. No. 22. Kriti and ARP II asserted a secured claim against Emerald's membership interest in the amount of $1.7 million, which includes the initial judgment amount plus interest. Id. at ¶ 60.

44. Kriti and ARP II assert that as of December 31, 2014, the liabilities of ARP II exceeded $14.6 million. Id. at ¶ 61.

45. On February 17, 2015, Emerald filed an objection to the Kriti/ARP II Motion. ECF Doc. No. 26. Pursuant to this objection, Emerald claims that ARP II is worth in excess of $30 million. Id. at ¶ 35.

46. On February 20, 2015, Kriti and ARP II filed an omnibus reply to Emerald's objection. ECF Doc. No. 32. Kriti and ARP II indicated that it has conducted various appraisals of the Yacht Club between 2007 and 2015. Id. at ¶ 7. The most recent appraisal estimates the value of the Yacht Club as $7.96 million. Id. at ¶ 6.

47. On February 24, 2015, following a hearing on the same date, the Court entered an

8

order denying the Kriti/ARP II Motion without prejudice.  ECD Doc. No. 36.

### III.  DISCUSSION

**A.     Section 1104(a) of the Bankruptcy Code**

Section 1104(a) of the Bankruptcy Code sets forth two separate standards for the court's determination of the necessity of appointing a Chapter 11 trustee.  Section 1104(a) provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)

**B.     The Appointment of a Chapter 11 Trustee Is in the Interests of Creditors Pursuant to Section 1104(a)(2)**

Section 1104(a)(2) of the Bankruptcy Code allows appointment of a trustee even when no "cause" exists.  See In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989); In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).  Under Section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities."  See In re Taub, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (quoting In re Adelphia Commc'n Corp., 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006)); In re Euro-American Lodging Corp., 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007).  As a court noted in Schuster v. Dragone (In re Dragone):

> In determining whether the appointment of a trustee is in the best interests of creditors, a bankruptcy court must necessarily resort to its broad equity

9

> powers . . . . In equity, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . . Moreover, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.

266 B.R. 268, 272–73 (D. Conn. 2001) (internal quotations omitted).

Accordingly, the standard for appointment of a Chapter 11 Trustee under section 1104(a)(2) is flexible. See 124 Cong. Rec. H11, 102 (daily ed. Sept. 28, 1978); S17,419 (daily ed. Oct. 6, 1978). The House Report summarizes the reasons for Congress' adoption of a flexible standard for the appointment of trustees. The House Report, in part, reads as follows:

> The twin goals of the standard for the appointment of a trustee should be protection of the public interest and the interests of creditors, as contemplated in current chapter X and facilitation of a reorganization that will benefit both the creditors and the debtors, as contemplated in current chapter XI. Balancing the goals is a difficult process, and requires consideration of many factors.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 (1977), U.S. Code Cong. & Admin. News 1978, p. 6192.

Among the factors considered by the courts in assessing motions brought under this subsection include: (1) the trustworthiness of the debtor, (2) the debtor's past and present performance and prospects for rehabilitation, (3) the confidence – or lack thereof – of the business community and of creditors in present management, and (4) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment. Euro-American Lodging, 365 B.R. at 427.

    **i.**    **The Main Issue in these Cases is to Determine the Fair Market Value of ARP II**

As discussed below, the dominant issue in these cases is the valuation of the ARP II and its underlying asset – the Yacht Club. Valuation is the paramount issue for two reasons.

First, the dissociation provision of the Operating Agreement, which would be triggered

after a member has been in bankruptcy for ninety days, requires such a valuation. Operating Agreement, Art. X § 10.1(b). If this occurs, as it likely will, the Operating Agreement requires that each member of ARP II retain an appraiser to determine the fair market value of the Yacht Club. Id. § 11.3(b). If the members do not agree on the appraised value, the parties are to retain a third appraiser that will determine the fair market value by averaging the difference between the two appraisals closet in price. Id. § 11.3(b). The valuation of the Yacht Club is already a highly-contested issue. On the one hand, the Debtors claim that the property is worth more than $30 million. Case No. 14-13407, ECF Doc. No. 26, at ¶ 35. On the other hand, Kriti and ARP II assert that the property is worth no more than $7.96 million. ECF Doc. No. 32, at ¶ 6. Second, the valuation of the Yacht Club will determine whether unsecured creditors will receive any distributions. This will occur only if the sale of the Yacht Club results in a price greater than its liabilities, which are currently estimated at $14.6 million. Case No. 14-13407, ECF Doc. No. 22, at ¶ 61.

If appointed, the Chapter 11 trustee could examine the recent appraisals of the Yacht Club, and if necessary, engage an appraiser to conduct another appraisal to determine its fair market value. A neutral fiduciary at the helm may avoid the lengthy and costly evidentiary hearings that would inevitably arise in the absence of a trustee. Accordingly, the appointment of a Chapter 11 trustee is in the interests of the estates and their creditors.

    **ii.    The Lack of Trust and Confidence in Debtors' Management Will Hinder Reorganization and Lead to Increased Costs**

An independent fiduciary is also needed to restore the trust and confidence of the creditors. Based on the past conduct of Emerald and Longman, it is likely that Kriti and ARP II will distrust any action by the Debtors – and not without justification. Based on the findings by both the arbitration panel and the New York State Court, Longman and Emerald have engaged in

11

wrongdoing. Specifically, the Arbitration Panel determined that Emerald and Longman violated the Operating Agreement by, among other conduct, "wrongfully making payments to or for the benefit of Longman or other entities Longman controlled, which were totally unrelated to ARP II," "commingl[ing] these funds in various non-ARP II accounts, including an account, in part, in the name of Longman's wife, Gayla Longman," "failing to disclose that Sapphire Development, LLC," and "diverting $150,000 of Marshall loan proceeds and paying themselves . . . ." Case No. 14-13407, ECF Doc. No. 23, Ex. B. In addition, the New York State Court issued a memorandum opinion affirming the Arbitration Panel and made the following observation of Longman's conduct:

> Clearly, Longman, as the principal member and manager of Emerald, controlled and dominated Emerald and, by extension, ARP-ll. He admittedly failed to observe the corporate formalities of these entities by taking money deposited by Kriti as capital for ARP-II, and putting it to personal use in accounts he controlled of other entities. He also diverted loan funds intended to pay, suppliers, as well. Longman does not dispute this but claims to have returned all the improperly diverted funds and more. He does not dispute that he provided false documents to conceal this diversion. Under these facts, Longman was the puppeteer pulling the strings of Emerald for his own advantage and to the detriment of Kriti and can be held accountable for his actions as the alter ego of Emerald. Kriti is entitled to pierce the corporate veil to get to Longman.

Case No. 14-13407, ECF Doc. No. 23, Ex. D, at p.22.

      This past wrongdoing will detrimentally affect the creditors' perceptions of the Debtors and their ability to guide these reorganizations in a manner that is fair and equitable to all creditors. In this atmosphere of distrust and long-standing acrimony, it is inevitable that disputes will arise between the Debtors and Longman, on one side, and Kriti and ARP II, on the other. These disputes will increase the cost of these cases. Accordingly, an independent fiduciary is necessary to restore confidence of the creditors in the reorganization of the estates for the ultimate benefit of all parties in interest.

## IV. CONCLUSION

WHEREFORE, the United States Trustee requests that the Court enters an order: i) directing the appointment of a Chapter 11 trustee; and ii) granting him such other and further legal and equitable relief to which he may be entitled.

Dated: New York, New York
March 4, 2015

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2

By: */s/ Michael T. Driscoll*
Michael T. Driscoll
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
Tel. (212) 510-0500