**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

In re:                                                                    **NOT FOR PUBLICATION**

ASHLEY RIVER CONSULTING, LLC,                        Chapter 11
                                                                          Case No. 14-13406 (MG)

                        Debtor.
----------------------------------------------------------------X

In re:
                                                                          Chapter 11
EMERALD INVESTMENTS, LLC,                              Case No. 14-13407 (MG)

                        Debtor.
----------------------------------------------------------------X

## MEMORANDUM OPINION AND ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE CHAPTER 11 CASES

*A P P E A R A N C E S:*

WHITE & WOLNERMAN, PLLC
*Attorneys for Debtors Ashley River Consulting, LLC*
*and Emerald Investments, LLC*
110 E. 59th Street, 25th Floor
New York, New York 10022
By:    David Y. Wolnerman, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, New York 10014
By:    Michael T. Driscoll, Esq.
        Trial Attorney

EMMET, MARVIN & MARTIN, LLP
*Attorneys for Creditors Kriti Ripley, LLC and*
*Ashley River Properties II, LLC*
120 Broadway, 32nd Floor
New York, New York 10271
By:    Edward P. Zujkowski, Esq.
        Thomas A. Pitta, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

The United States Trustee (the "UST") filed a motion (the "Motion," Case No. 14-13406 ECF Doc. # 20; Case No. 14-13407 ECF Doc. # 38) for the entry of an order directing the appointment of a chapter 11 trustee pursuant to section 1104(a)(2) of the Bankruptcy Code in the chapter 11 bankruptcy proceedings of Debtors Ashley River Consulting, LLC ("ARC") and Emerald Investments, LLC ("Emerald," and together with ARC, the "Debtors"). Creditors of Emerald, Kriti Ripley, LLC ("Kriti") and Ashley River Properties, II ("ARP II," and together with Kriti, the "Creditors"), filed a statement in support of the Motion ("Creditors Statement" or "CS," Case No. 14-13407 ECF Doc. # 41), arguing that the appointment of a chapter 11 trustee is warranted under both subsections (a)(1) and (a)(2) of section 1104 of the Bankruptcy Code.[1] The Debtors filed an opposition to the Motion (the "Opposition," Case No. 14-13406 ECF Doc. # 23; Case No. 14-13407 ECF Doc. # 43), supported by the declaration of the Debtors' mutual principal, Stuart Longman ("Longman"). (*See* "Longman Decl. II," Case No. 14-13406 ECF Doc. # 23-1; Case No. 14-13407 ECF Doc. # 43-1.)[2]

The Court held a hearing on the Motion on March 16, 2015 (the "Hearing"), at which time the UST sought to expand the relief requested in its Motion from its original request under only subsection (a)(2) of section 1104, to a request under both subsections (a)(1) and (a)(2). The Court granted this request and the Motion on the record, directing the appointment of a chapter 11 trustee in both of the Debtors' chapter 11 proceedings. On the same day, the Court entered a written order granting the Motion for the reasons stated on the record and indicating that a

---

[1]    The Creditors Statement is supported by the declaration of Davidson Williams (the "Williams Decl.," Case No. 14-13407 ECF Doc. # 42).

[2]    Longman previously filed identical declarations in each of the Debtors' chapter 11 cases pursuant to Local Bankruptcy Rule 1007-4. (*See* Case No. 14-13406 ECF Doc. # 6; Case No. 14-13407 ECF Doc. # 8.) The UST relies on many of the factual representations made by Longman in his first declaration to support its Motion. Citations to "Longman Decl. I" herein after refer to these declarations.

written opinion detailing the reasoning underlying the Court's decision would follow in due course.[3]  (*See* Case No. 14-13406 ECF Doc. # 24; Case No. 14-13407 ECF Doc. # 45.)  This is that Opinion.

## BACKGROUND

### A.    Ownership Structure of the Debtors

Debtors ARC and Emerald are limited liability companies ("LLC").  Emerald is wholly owned by the Gayla Longman Family IRR Trust (the "Trust").  (Motion ¶ 12 (citing Case No. 14-13407 ECF Doc. # 7).)  ARC is 80% owned by Emerald.  (*Id.* ¶ 7.)  The other 20% of ARC is owned by David A. Thomas ("Thomas"), the manager of each of the Debtors.  (*Id.* ¶¶ 2, 7.)  Longman is the principal of each of the Debtors and is the trustee of the Trust that owns Emerald.  (*See id.* ¶ 3.)

### B.    Emerald's Relationship with the Creditors

Emerald currently holds a 70% membership (though non-voting) interest in ARP II.  (*Id.* ¶ 17 (citing Longman Decl. ¶ 7).)  Kriti owns the other 30% of ARP II.  (*Id.*)  Significant to these chapter 11 proceedings, since 2003,[4] ARP II has owned real estate known as the Ripley Light Yacht Club and Condominiums (the "Yacht Club"), located in Charleston, South Carolina.  (*Id.* ¶¶ 18–19 (citing Longman Decl. ¶ 5).)

---

[3]    Since the order directing the appointment of a chapter 11 trustee was entered, the UST filed an application to appoint Ian J. Gazes ("Gazes") as the trustee in both of the Debtors' cases.  (*See* Case No. 14-13406 ECF Doc. ## 25, 26; Case No. 14-13407 ECF Doc. ## 46, 47.)  The Court entered an order approving of Gazes' appointment on March 18, 2015.  (*See* Case No. 14-13406 ECF Doc. # 27; Case No. 14-13407 ECF Doc. # 48.)  Gazes accepted his appointment on March 19, 2015 and is the current acting chapter 11 trustee in both chapter 11 proceedings.  (*See* Case No. 14-13406 ECF Doc. # 28; Case No 14-13407 ECF Doc. # 49.)

[4]    The UST points out that Emerald and Kriti dispute whether Emerald wholly owned ARP II at its inception or whether the entity was jointly created by Emerald and Kriti.  The UST argues that the fact that the parties cannot agree on this minor issue supports the UST's argument that they will likely not agree on large issues (i.e. the appraisal of the Yacht Club) that are central to the administration of the Debtors' chapter 11 proceedings.  (Motion ¶ 20 n.1.)

1.    *The Operating Agreement*

Governing their relationship in ARP II, Kriti and Emerald executed an agreement (the "Operating Agreement," or "OA" Emerald ECF Doc. # 23, Ex. A), pursuant to which certain events, including the filing of a voluntary petition for bankruptcy relief by one of the parties that is not dismissed within 90 days, trigger the dissociation of ARP II.  (Motion ¶¶ 21–23 (citing OA Art. X § 10.1(b)).)  In the event of dissociation, the dissociating member would be deemed to have made an offer of its membership interest to ARP II and if ARP II did not accept this offer by written notice within thirty days, the offer would be deemed rejected.  (*Id.* ¶¶ 25–26 (citing OA §11.3(a)).)  The non-dissociating member would then have the opportunity to purchase the dissociating member's interest under the same terms as was offered to ARP II.  (*Id.* ¶ 27 (citing OA § 11.3(a)).)  The purchase price of the membership interest upon dissociation would be determined by the "Appraised Value" of the membership interest, which requires the calculation of the "Fair Market Value," defined as:

> The cash equivalent price at which property would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under the compulsion to buy or sell and both having reasonable knowledge of relevant facts.  The hypothetical buyer and seller are assumed to be able, as well as willing, to trade and are assumed to be well-informed about the property and concerning the market for such property.

(*Id.* ¶ 29 (citing OA § 11.3(b)).)  The parties each retain their own appraiser and if the parties' appraisers cannot agree on the Appraised Value, the parties would retain a third appraiser and the Appraised Value would be determined by the average of the two appraisals that are closest in price.  (*Id.*)

4

2.    *The Dispute between Emerald and Kriti*

Emerald and Kriti have been in a dispute relating to the Operating Agreement and the

Yacht Club for over nine years.  According to Kriti, after Kriti paid $1.25 million for its 30%

interest in ARP II, Emerald and Longman diverted and misappropriated those funds.  (*Id.* ¶ 31

(citing the "Dismissal Motion," Case No. 14-13407 ECF Doc. # 22 ¶ 7).)  Kriti filed for

arbitration in March 2005, alleging defaults under the Operating Agreement and seeking the

forfeiture of Emerald's financial and voting rights in ARP II.  (*Id.* ¶ 32 (citing Dismissal Motion

¶ 9).)  On October 31, 2005, the arbitration panel issued an award which found, among other

things, that Emerald and Longman violated the Operating Agreement:

- "by wrongfully making payments of ARP II which were not on the approved marina budget or on the budget for future phases of the project or otherwise approved by Kriti";

- "by making payments to or for the benefit of Longman or other entities Longman controlled, which were totally unrelated to ARP II";

- "by failing to disclose that Sapphire Development, LLC [another entity owned by Longman that entered into agreements regarding neighboring property] had filed a petition in bankruptcy before execution of the Operating Agreement";

- "by diverting $150,000 of Marshall loan proceeds and paying themselves instead of paying [the marina.]"

(*Id.* ¶ 34 (citing Dismissal Motion Ex. B).)  In light of these breaches of contract, the arbitration

panel held that Emerald forfeited all voting interests in ARP II, but maintained its 70%

ownership interest otherwise.  (*Id.*)

5

On February 15, 2008, the Supreme Court of New York (the "New York State Court")

affirmed this arbitration award and a separate June 22, 2006 arbitration award of damages to

Kriti.  (*Id.* ¶ 36 (citing Dismissal Motion Ex. D at 22).)  In so holding, the New York State Court

noted the following:

> Clearly, Longman, as the principal member and manager of
> Emerald, controlled and dominated Emerald and, by extension,
> ARP-II.  He admittedly failed to observe the corporate formalities
> of these entities by taking money deposited by Kriti as capital for
> ARP-II, and putting it to personal use in accounts he controlled of
> other entities.   He also diverted loan funds intended to pay
> suppliers, as well. . . . Under these facts, Longman was the
> puppeteer pulling the strings of Emerald for his own advantage and
> to the detriment of Kriti and can be held accountable for his actions
> as the alter ego of Emerald.

(*Id.* ¶ 37 (citing Dismissal Motion Ex. D at 22).)  The New York State Court later issued a

money judgment against Longman and Emerald, jointly and severally, in favor of Kriti and ARP

II in the amount of $1,184,581.72 on March 27, 2008.  (*Id.* ¶ 38 (citing Dismissal Motion Ex. E

at 4).)  The judgment remains unsatisfied.

On October 17, 2008, the Ninth Judicial Circuit sitting in Charleston, South Carolina

issued a charging order perfecting a lien on Emerald's membership interest in ARP II for the

judgment plus post-judgment interest.  (*Id.* ¶ 40 (citing Dismissal Motion Ex. H at 7).)

Years later, on October 21, 2014, upon the motion of Emerald and Longman, the Court of

Common Pleas of the County of Charleston, South Carolina (the "South Carolina State Court")

entered an order requiring the foreclosure of Emerald's membership interest in ARP II to be

conducted under South Carolina procedures for the foreclosure of real property rather than under

procedures for the foreclosure of personal property.  (*Id.* ¶ 41 (citing Dismissal Motion Ex. I at

14).)  The foreclosure of Emerald's membership interest was scheduled for December 16, 2014.

(*Id.* ¶ 42 (citing Dismissal Motion ¶ 13).)

### C.    The Debtors' Bankruptcies

The Debtors each commenced voluntary cases under chapter 11 of the Bankruptcy Code one day prior to the scheduled foreclosure on December 15, 2014 (*Id.* ¶ 1 (citing Case No. 14-13406 ECF Doc. # 1; Case No. 14-13407 ECF Doc. # 1).)  Each petition was signed by Thomas, and on December 29, 2014, Longman, in his capacity as the trustee for the Trust, filed identical declarations in each of the Debtors' cases.  (*Id.* ¶ 3 (citing Longman Decl. I; Case No. 14-13406 ECF Doc. # 1; Case No. 14-13407 ECF Doc. # 1).)

The Debtors were acting as debtors-in-possession (until the Court entered the Order granting the motion for the appointment of a chapter 11 trustee), no official unsecured creditors' committees have been appointed, and no joint administration has been requested or ordered.  (*Id.* ¶¶ 4–6.)

According to Emerald's schedules, Emerald's assets consist of a checking account, its 70% interest in ARP II, and a redemption agreement with ARC.  (*Id.* ¶ 14 (citing Case No. 14-13407 ECF Doc. # 10).)  No value of the assets has been disclosed.  (*Id.*)  On February 20, 2015, Emerald filed amended schedules listing previously undisclosed ownership interests in (1) four parcels of land each valued at $2,500 in Palatka, Florida; and (2) a 2006 Chevrolet Silverado 2500, valued at $7,000.  (*Id.* ¶ 16 (citing Case No. 14-13407 ECF Doc. # 31).)

According to ARC's schedules, ARC's sole asset is the redemption agreement with Emerald.  (*Id.* ¶ 9 (citing Case No. 14-13406 ECF Doc. # 8).)  Though not entirely disclosed to the Court at this time, the redemption agreement contemplates ARC's purchase or redemption of Emerald's membership interest in ARP II, which will allegedly be financed by Thomas.  (*See id.*)  The value of this agreement has not been disclosed.  (*Id.* ¶ 10 (citing Case No. 14-13406 ECF Doc. # 8).)  ARC's Schedule F also lists general unsecured claims in the amount of $1,183.681,

7

owed to Emerald and a handful of other general unsecured creditors with contingent, unliquidated, and/or disputed claims.  (*Id.* ¶ 11 (citing Case No. 14-13406 ECF Doc. # 8).)

### D.    The Dismissal Motion and the Disputed Valuation of ARP II

In Emerald's bankruptcy case, the Creditors asserted a secured claim against Emerald's membership interest in the amount of $ 1.7 million, which includes their money judgment against Emerald and Longman affirmed by the New York State Court and post-judgment interest.  (*Id.* (citing Dismissal Motion ¶60).)  On February 5, 2015, the Creditors filed a motion to dismiss Emerald's chapter 11 case, or alternatively for relief from the automatic stay, arguing that Emerald filed its chapter 11 petition in bad faith.  (*Id.* ¶ 43 (citing Dismissal Motion).)

In the Dismissal Motion, the Creditors argue that as of December 31, 2014, ARP II's liabilities exceed $14.6 million.  (*See* Dismissal Motion ¶¶ 14–16.)  On February 17, 2015, Emerald filed an opposition to the Dismissal Motion arguing that ARP II is worth in excess of $30 million.  (*Id.* ¶ 45 (citing Case No. 14-13407 ECF Doc. # 26 ¶ 35).)  In their reply, the Creditors argue that they have conducted various appraisals of the Yacht Club between 2007 and 2015 and that the most recent one estimates a value of $7.96 million.  (*Id.* ¶ 46 (citing Case No. 14-13407 ECF Doc. # 32).)

The Dismissal Motion was denied without prejudice following the hearing on the motion on February 24, 2015.  (*Id.* ¶ 47.)  At the hearing on the Dismissal Motion, the Court directed the UST to investigate whether the appointment of a chapter 11 trustee in Emerald's chapter 11 case, and similarly in ARC's bankruptcy case, would be a more appropriate remedy.

### E.    Other Alleged Prior Conduct of Longman and the Entities He Controls

#### 1.    *The Dispute with Creditor Robert McKay*

Robert McKay ("McKay") is listed as an unsecured creditor on each of the Debtors'

bankruptcy schedules holding a purported contingent, unliquidated, and disputed claim in the

amount of zero dollars.  (*See* Case No. 14-13406 ECF Doc. # 8; Case No. 14-13407 ECF Doc.

# 31.)  In 1996, McKay obtained a judgment in the New York State Court against Longman,

awarding $1,261,546.86 in actual damages and interest, in addition to $2,702,500 in punitive

damages.  (CS ¶ 4 (citing Williams Decl. Ex.A).)  The punitive damages were awarded as a

result of the court's finding that Longman engaged in "affirmative fraud," "fraud by

concealment," and "gross, wanton, and willful" misconduct.  (*Id.*)

McKay commenced a second action on October 15, 2010 against Longman, entities

affiliated with Longman, including Emerald, and certain financial institutions in the Superior

Court of Connecticut (the "Connecticut State Court").  (*Id.* ¶ 5 (citing Williams Decl. Ex. B).)

This action sought to enforce the 1996 money judgment against Longman.  (*Id.*)  Hudson City

Savings Bank ("Hudson City") is a defendant in the action due to its involvement in the

mortgage on Longman's personal residence.  (*Id.*)  Hudson City filed a motion for summary

judgment in the Connecticut State Court that was denied.  (*Id.*)  In the opinion, the Connecticut

State Court indicated that Longman repeatedly transferred the title to his primary residence and

had "ulterior motives" for obtaining a mortgage on the property, the transaction for which was of

a "questionable nature."  (*Id.*)

#### 2.    *Sapphire Development LLC's Bankruptcy*

Sapphire Development LLC ("Sapphire") is a limited liability company wholly owned by

the Trust.  (*Id.* ¶ 7 (citing Williams Decl. Ex. D).)  On January 11, 2013, Sapphire filed a

voluntary chapter 11 petition in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court"); this filing was completed on the eve of trial of McKay's Connecticut State Court action.[5] (*Id.*) McKay moved to dismiss or alternatively for abstention to permit his underlying Connecticut State Court action to proceed. (*Id.* ¶ 8 (citing Williams Decl. Ex. F).) The Connecticut Bankruptcy Court granted the abstention portion of McKay's motion, finding that Longman formed Sapphire as "an artificial entity" and because it appeared that Sapphire and "Longman [were] attempting to lock McKay out of this court and the state court in an effort to avoid paying a judgment Longman owes to McKay for Longman's affirmative fraud." (*Id.* (citing Williams Decl. Ex. G at 6).)

On November 6, 2014, the United States District Court for the District of Connecticut (the "Connecticut District Court") vacated the Connecticut Bankruptcy Court's order, holding that abstention was not the appropriate remedy. (*Id.* ¶ 9 (citing Williams Decl. Ex. H at 16–17).) The Connecticut District Court intimated that either dismissal of Sapphire's bankruptcy case or relief for McKay from the automatic stay would be more appropriate in light of the Connecticut Bankruptcy Court's factual findings regarding Sapphire's motives. (*Id.*) The Connecticut District Court also suggested that sanctions may be appropriately imposed against Sapphire in the Connecticut Bankruptcy Court due to findings of bad faith. (*Id.* (citing Williams Decl. Ex. H at 17–18).)

McKay's motion was thereafter remanded to the Connecticut Bankruptcy Court, which has scheduled an evidentiary hearing on April 14, 2015 on the dismissal and lift stay portions of the motion. (*Id.* ¶ 11.)

---

[5]    At the Hearing on the Motion, the parties revealed that this was Sapphire's second bankruptcy filing. The first proceeding was filed in 2003, and was the bankruptcy that was not disclosed by Emerald in breach of the Operating Agreement discussed in the arbitration award in favor of Kriti. (*See* Connecticut Bankruptcy Court Case No. 03-51148.) According to Sapphire's schedules, Emerald and Longman were "co-debtors" of Sapphire in the 2003 bankruptcy case. (*See id.* ECF Doc. # 45 at 13.)

Based on Sapphire's bankruptcy case docket, Sapphire missed UST fees and failed to timely file monthly operating reports, prompting the UST to file a motion to dismiss or convert the chapter 11 case to chapter 7. (*See* Connecticut Bankruptcy Court Case No.13-50043 ECF Doc. # 242.) This motion was resolved as between the UST and Sapphire through a stipulation continuing the case under chapter 11 in exchange for Sapphire's timely payment of fees and filing of monthly operating reports. (*See id.* ECF Doc. # 285.)

> 3.    *60 Shelter Rock Associates, LLC's Bankruptcy*

60 Shelter Rock Associates, LLC ("Shelter Rock") consists of 15,000 "A" membership interests; Longman owns 5,000 shares and Lurie Investments, LLC, an entity with the same address as and likely controlled by Longman, owns 7,000 shares. (CS ¶ 13 (citing Williams Decl. Ex. L).) On February 11, 2014, Shelter Rock filed a voluntary petition for relief under chapter 11 in the Connecticut Bankruptcy Court. (*Id.* ¶ 12 (citing Williams Decl. Ex. K at 3).) The petition was executed by Thomas, who appeared with Longman on behalf of Shelter Rock at the meeting of creditors pursuant to section 341 of the Bankruptcy Code on February 12, 2015. (*Id.*)

Pending before the Connecticut Bankruptcy Court is a motion of secured creditor Savings Bank of Danbury ("SBD"), seeking to dismiss the bankruptcy case. (*Id.* ¶ 14 (citing Williams Decl. Ex. M ¶ 9).) The motion alleges that Longman, as principal of Shelter Rock, knowingly caused Shelter Rock to spend SBD's cash collateral without SBD's consent or a court order approving such usage. (*Id.*) The motion also alleges that Longman violated the automatic stay because he had to reimburse the estate over $5,000 since Shelter Rock paid Longman pre-petition expenses. (*Id.* (citing Williams Decl. Ex. M ¶ 10).) A hearing on SBD's motion was scheduled for March 24, 2015. (*Id.* ¶ 15.)

Based on Shelter Rock's bankruptcy case docket, Shelter Rock failed to timely file monthly operating reports, prompting the UST to file a motion to compel Shelter Rock to file the reports, to dismiss the chapter 11 case, or alternatively convert the chapter 11 case to chapter 7. (*See* Connecticut Bankruptcy Court Case No. 14-50217, ECF Doc. # 96.)  The Connecticut Bankruptcy Court held a hearing on the motion on March 24, 2015 and subsequently granted the UST's motion to compel Shelter Rock to file the monthly operating reports.  (*See id.* ECF Doc. # 125.)

### F.    The Motion

Through its Motion, the UST seeks to appoint a chapter 11 Trustee and strip the Debtors of their debtor-in-possession statuses.  The UST argues that the appointment of a chapter 11 Trustee in these two cases is in the interest of Creditors pursuant to section 1104(a)(2) of the Code.  (*Id.* at 9–12.)  According to the UST, the main issue of each of these cases is the Appraised Value or Fair Market Value of ARP II and its underlying asset, the Yacht Club.  (*Id.* ¶ 10.)  First, the Operating Agreement requires the appraisal if Emerald's bankruptcy case is not dismissed within 90 days of the filing of the petition.  (*Id.* at 10–11.)  Second, the issue is already hotly disputed between the Creditors and Emerald.  (*Id.* at 11.)  As such, the UST asserts that the Creditors are unlikely to trust the appraiser used by the Debtors as debtors-in-possession.  (*Id.*)  The UST argues that the provisions of the Operating Agreement require at least two, and possibly three, appraisers to value the property.  (*Id.*)  Since the matter is already disputed, it would save administrative expenses to insert a neutral and independent trustee to oversee the appraisal process.  (*Id.*)  Third, the UST asserts that the valuation of the Yacht Club and the membership interest will determine whether unsecured creditors will receive distributions in the chapter 11 proceedings.  (*Id.*)  This will only occur, the UST asserts, if the Yacht Club sells for a

price greater than the $14.6 million of ARP II's alleged liabilities.  (*Id.*)  The UST contends that

if appointed, a chapter 11 trustee could examine the recent appraisals and, if necessary, engage

an appraiser to conduct another appraisal to determine the fair market value of the property.  (*Id.*)

A neutral party is necessary, the UST argues, because it would aid in avoiding lengthy and costly

evidentiary hearings that would likely arise in the absence of a trustee.  (*Id.*)

The UST further argues that there is a demonstrated lack of trust and confidence in the

Debtors' management that will likely hinder reorganization and lead to increased costs.  (*Id.* at

11–12.)  The UST cites to the arbitration award and the opinions of the New York State Court

and South Carolina State Court, arguing that Longman and Emerald have been found to have

engaged in wrongful conduct in the past.  (*Id.*)  The UST further argues that it is clear from the

continuing dispute, that the Creditors—the largest secured creditors in Emerald's case—distrust

any action taken by Longman and Emerald.  (*Id.*)  The UST concludes by stating that there is an

"atmosphere of distrust and long-standing acrimony," such that disputes will arise and in turn

cause an increase of costs that can be avoided if an independent fiduciary is appointed.  (*Id.*)

### G.    The Opposition

The Debtors first argue that the standard to appoint a chapter 11 trustee is not flexible and

that there is a presumption in place that a debtor will remain in possession.  (Opp. ¶¶ 10–12.)

Second, the Debtors argue that the dispute between Emerald and Kriti does not justify

appointment of a chapter 11 trustee because the issue of valuing the Yacht Club is tied to

valuation calculations and credibility of experts—issues that will arise regardless of whether a

trustee is appointed.  (*Id.* ¶ 13.)  According to the Debtors, the only forms of conflicts and

animosity that warrant appointment of a trustee are those that make reorganization impossible.

(*Id.* ¶ 15 (citing cases).)  The Debtors argue that the UST fails to assert clear and convincing

evidence that the dispute gives rise to the need for a trustee here, but rather only recounts the pre-

petition dispute and notes the valuation dispute.  (*Id.* ¶ 16.)  The Debtors also argue that if they

obtain an appraisal greater than the $7 million, then it would be in the best interests of creditors,

and in furtherance of the Debtors' fiduciary duties, to dispute Kriti's appraisal; the Debtors note

that the UST fails to address how a trustee, obtaining an appraisal of greater value than Kriti,

would avoid such a dispute.  (*Id.* ¶ 17.)

Third, the Debtors assert that the appointment of a trustee is not in the best interests of

creditors.  The Debtors argue that the UST does not assert in its Motion that the chapter 11

trustee will necessarily retain a qualified appraiser, as the Debtors would.  (*Id.* ¶ 21.)  The

Debtors further argue that because the Debtors do not have liquid assets and the chapter 11

trustee will cost more to appoint than the Debtors remaining in possession, it is unlikely that a

proper valuation of the membership interest will be obtained by a trustee.  (*Id.*)  The Debtors

then dispute the reliability and basis of the most recent appraisal submitted by Kriti.  (*Id.* ¶¶ 22–

26.)

Fourth, the Debtors argue that the appointment of a trustee for cause or based upon the

Debtors' untrustworthiness is unwarranted.  (*Id.* ¶¶ 28–43.)  The Debtors argue that the Debtors'

reorganizations hinge on the value of the membership interest, but that the appointment of a

chapter 11 trustee would have no bearing on this.  (*Id.* ¶ 29.)  The Debtors further argue that

there is no evidence that creditors other than Kriti and ARP II distrust the Debtors and its current

management.  (*Id.* ¶ 30.)  Moreover, the Debtors' management is incentivized to obtain the

highest value possible for the membership interest in order to pay all creditors in full, freeing

Longman of personal liability from these claims, and making a distribution to the Debtors'

equity members.  (*Id.*)  The Debtors also argue that Longman's and Emerald's prior wrongful

conduct that occurred approximately ten years ago does not warrant a finding of "cause" for the appointment of a chapter 11 trustee now. (*Id.* ¶ 36.) The Debtors submit that there is no indication of any mismanagement or misconduct on the part of Emerald or Longman committed in the past ten years. (*Id.* ¶ 36.) The Debtors then dispute certain findings of the arbitration panel, arguing that the award does not tell the full story. (*Id.* ¶¶ 37–39.) According to the Debtors, what constituted breaches of the agreement was not necessarily the usual "commingling" or "diversion" of funds because the debtors kept a clear record of what funds were from which entity and in which accounts. (*Id.*) The Debtors further submit that the arbitration panel specifically did not make any findings of fraud against Longman or Emerald warranting a forfeiture of Emerald's ARP II membership interest. (*Id.* ¶ 40.) The Debtors argue that the UST merely relies on insufficient speculation that the Debtors may do something bad in the future. (*Id.* ¶ 41.)

**H.    The Creditors Statement**

The Creditors filed a statement in support of the Motion, arguing that in addition to it being in the best interests of creditors, cause exists to appoint a chapter 11 trustee under section 1104(a)(1) of the Bankruptcy Code. (CS ¶ 1.) The Creditors reiterate the Motion's emphasis of the allegedly abusive litigation tactics employed by Longman and Emerald in their nine year dispute. (*Id.* ¶¶ 2–3.) The Creditor Statement then lists the other instances of fraudulent or deceptive conduct employed by Longman and other entities he controls against parties other than the Creditors and in other courts that are outlined above. (*Id.* ¶¶ 4–15.) Contrary to the Debtors' assertions, some of this alleged wrongful conduct was carried out within the last ten years.

In light of the instances of courts finding fraud or misconduct on the part of Emerald, Longman, and other entities Longman controls, as well as their continued abuse of the judicial

system to evade money judgments against them, the Creditors Statement argues that cause exists

to appoint a chapter 11 trustee.  (*Id.* ¶¶ 21–20.)  The Creditors also point out that Emerald has not

been entirely forthcoming in its chapter 11 case before this Court in already failing to disclose

certain assets on its schedules, until it was conveniently for its benefit in opposing the Dismissal

Motion.  (*Id.* ¶ 23.)

### I.    The Hearing

At the Hearing, the UST requested to expand the relief requested in its Motion, arguing

that in light of the Creditors Statement and other developments in the case, the appointment of a

chapter 11 trustee was warranted not just under the Motion's originally asserted basis of section

1104(a)(2), but also under section 1104(a)(1).

In further support of the requested expansion of relief, the UST represented at the

Hearing that the Debtors did not disclose their affiliations with Sapphire and Shelter Rock on

their petitions consistent with the requirements of section 101 of the Bankruptcy Code.  The UST

was not informed about the Debtors' or Longman's interests in Sapphire and Shelter Rock until

the 341 meeting of creditors for the Debtors' bankruptcy cases.  The UST further represented at

the Hearing that the Debtors have not at this time disclosed whether there are any potential

claims between the Debtors and those other entities; a chapter 11 trustee, the UST argued, would

be best suited to investigate such claims.  The UST indicated that it inquired further about the

relationship the Debtors have with those other entities, and in light of the heightened attention to

it and in spite of the Debtors disagreement that these entities constitute "affiliates" under section

101, the Debtors' counsel voluntarily filed supplemental statements in support of their retention,

disclosing information about the Debtors' relationships with Sapphire and Shelter Rock.  (*See*

Case No 14-13406 ECF Doc. # 22; Case No 14-13407 ECF Doc. # 40.)

After hearing the arguments of the UST, the Creditors, and the Debtors, the Court granted

the Motion on the record explaining that the Court would enter an order for the appointment of a

chapter 11 trustee, with a written opinion explaining its reasoning in granting the Motion to

follow in due course.  An order granting the Motion was entered shortly after the Hearing

concluded.  (*See* Case No. 14-13406 ECF Doc. # 24; Case No. 14-13407 ECF Doc. # 45.)

## DISCUSSION

Chapter 11 of the Bankruptcy Code is designed to allow a debtor-in-possession to retain

management and control of the debtor's business operations.  *See In re Eurospark Indus.*, 424

B.R 621, 627 (Bankr. E.D.N.Y. 2010).  As such, a debtor-in-possession owes fiduciary duties to

the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its]

possession for the benefit of creditors" and "refrain[] from acting in a manner which could

damage the estate, or hinder a successful reorganization of the business."  *In re Ionosphere*

*Clubs, Inc*., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (internal quotations and citation omitted).

Although there is a strong presumption that a debtor should remain in possession absent a

showing of need for the appointment of a trustee, this presumption is not absolute.  *See id.* at

167; *see also In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (noting

"the appointment of a § 1104 trustee is an extraordinary remedy"); *see also In re Sharon Steel*

*Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be

the exception, rather than the rule." (collecting cases)).  For example, if a debtor-in-possession

defaults in its responsibilities, the debtor may be dispossessed of control of its business and a

chapter 11 trustee appointed.  *See Schuster v. Dragone*, 266 B.R. 268, 271 (D. Conn. 2001).

Section 1104(a) of the Bankruptcy Code, governing the appointment of a chapter 11

trustee, provides:

>(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
>>(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>>
>>(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>>
>>(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a).

The party seeking appointment of a chapter 11 trustee bears the burden of showing, by clear and convincing evidence, "cause" under section 1104(a)(1) or the need for a trustee under section 1104(a)(2). *In re Euro-Am. Lodging Corp.*, 365 B.R. at 426; *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006) (citing *In re Marvel Entertm't Grp., Inc.,* 140 F.3d 463, 471 (3d Cir. 1998)). Upon such a showing by a party in interest or the UST and after notice and hearing, a court is *required* to appoint a chapter 11 trustee prior to confirmation. *See* 11 U.S.C. § 1104. Although section 1104 mandates the appointment of a trustee if the requirements of the statute are met, a court has wide discretion in considering the relevant facts. *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Adelphia*, 336 B.R. at 656 ("The decision to

appoint a chapter 11 trustee is a factual determination entrusted to the discretion of the bankruptcy judge.").

### A.    Cause Exists to Appoint a Chapter 11 Trustee

Beginning with section 1104(a)(1), the appointment of a chapter 11 trustee is authorized upon the showing of cause—inclusive of fraud, dishonesty, incompetence or gross mismanagement of the debtor's affairs by current management.  11 U.S.C. § 1104(a)(1).   The list of wrongs constituting "cause" that warrants the appointment of a trustee is not exhaustive; some other "[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn. 1999).  Where a debtor "fails to disclose material and relevant information to the Court and creditors, a chapter 11 trustee is required." *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009).  Once the court makes a finding that cause exists pursuant to this subsection, "there is no discretion; an independent trustee *must* be appointed." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (emphasis added).

Although the court's finding is limited to a factual determination of whether "cause" exists, a court is given wide latitude in determining whether the challenged conduct rises to the level of "cause." *Comm. of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 241–42 (4th Cir. 1987) (noting that the construction of section 1104 "requires that the courts be given discretionary authority to determine whether the conduct rises to the level of 'cause'").  The court's focus in its analysis pursuant to subsection (a)(1) of section 1104 is on the debtor's

19

*current management*, not the misdeeds of past management. *See In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[O]n a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct." (citing 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][c][i] (15th ed.)); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][b][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014)). In other words, the fact that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or gross mismanagement does not necessarily provide grounds for the appointment of a trustee under section 1104(a)(1), provided that the court is satisfied that the current management is free from the taint of prior management. *In re Microwave Products of Am.*, 102 B.R. 666, 671 (Bankr. W.D. Tenn. 1989). A court may consider both the pre- and post-petition misconduct of the current management when making the determination that "cause" exists for the appointment of a trustee. *Midatlantic Nat'l Bank v. Anchorage Boat Sales, Inc. (In re Anchorage Boat Sales, Inc.)*, 4 B.R. 635, 644–45 (Bankr. E.D.N.Y. 1980).

The Court concludes that "cause" exists to appoint a chapter 11 trustee under section 1104(a)(1) based on the Debtors' current management's pre- and post-petition conduct. Prior to filing the Debtors' voluntary petitions, the Debtors' principal, Longman, was not only found to be guilty of affirmative fraud and gross, wanton, and willful misconduct such that an over $2 million punitive damages judgment was entered against him (*see* Williams Decl. Ex. A), but he was also found to be the "alter ego of Emerald" that should be held accountable for diverting and commingling funds in his reign as the controller of ARP II (*see* Dismissal Motion Ex. D at 22; *see also id.* Exs. B, E). Although the Debtors are correct in asserting that the court judgments making these factual findings were issued as early as 1996 and as late as 2008 and relate to conduct Longman and/or Emerald carried out several years ago, it is clear, based on the evidence

20

presented to the Court by the Creditors, that Longman's misconduct and wrongdoing has carried forward at least through the Sapphire bankruptcy. The Connecticut State Court and Connecticut Bankruptcy Court have made factual findings of bad faith and "ulterior motives" on the part of Longman and Sapphire, one of many entities Longman controls. (*See* Williams Decl. Exs. B, G; *see also id.* Ex. H at 16–18.) In light of these findings, the Connecticut District Court, in turn, has recommended that the Connecticut Bankruptcy Court revisit issues of dismissal or relief from the automatic stay—issues which remain pending—and potentially issue sanctions against Sapphire. (*See id.* Ex. H at 16–18; CS ¶ 11.) Moreover, Sapphire, which is a debtor-in-possession in the Connecticut Bankruptcy Court, failed to timely file monthly operating reports or pay UST fees until compelled to do so by the UST. (*See* Connecticut Bankruptcy Court Case No.13-50043 ECF Doc. ## 242, 285.) Shelter Rock has also been found to have failed to timely file its monthly operating reports. (*See* Connecticut Bankruptcy Court Case No. 14-50217, ECF Doc. # 125.) Moreover, though not controlling, it is certainly persuasive that Longman's conduct relating to the use of cash collateral has been called into question in the Shelter Rock bankruptcy. (*See* Williams Decl. Ex. M ¶¶ 9–10.)

Similarly, the Debtors' and their current management's post-petition conduct before this Court has fallen short of forthcoming. First, Emerald failed to disclose real property it owned in Florida and a car in its schedules and only amended its schedules after having relied on the existence of such assets in its opposition to the Dismissal Motion—begging the question of whether those assets would have ever been disclosed if the Creditors had not filed the motion. *Compare* (Case No. 14-13407 ECF Doc. # 10), *with* (Case No. 14-13407 ECF Doc. # 31). Second, the Debtors did not disclose their relationships to other entities controlled by Longman, such as Sapphire and Shelter Rock, until they revealed the relationships at the 341 meeting and

the UST expressed concern.  Though the Court does not at this time decide whether Sapphire and

Shelter Rock constitute "affiliate" entities pursuant to section 101 of the Bankruptcy Code, the

Debtors' failure to disclose these relationships, when Emerald and Longman were listed as co-

debtors in Sapphire's 2003 bankruptcy in the Connecticut Bankruptcy Court (*see* Connecticut

Bankruptcy Court Case No. 03-51148 ECF Doc. # 45 at 13), does not weigh in the Debtors'

favor.  Further to this point, the UST correctly points out that there may be claims as between the

Debtors and these other affiliated entities that the Debtors, if they remained debtors-in-

possession under the control of Longman, may not properly investigate or pursue.  Indeed, the

Debtors concede in their Opposition that Longman and Emerald were guilty of commingling

funds of Emerald in "sweep accounts" that contained funds of other entities Longman controls.

(Opp. ¶¶ 37–39.)  Though the Debtors argue that Longman and Emerald kept proper records of

which funds belong to which entity (*see id.*), those records are not before the Court at this time

and may very well be called into question should the chapter 11 trustee undertake an

investigation of them.

Overall, the Court concludes that "cause" exists and the appointment of a chapter 11

trustee is warranted under section 1104(a)(1).

**B.**     **The Appointment of a Chapter 11 Trustee is in the Interest of Creditors**

Even if the Court does not find that "cause" exists to appoint a chapter 11 trustee under

section 1104(a)(1), the Court may still appoint a trustee if it is in the "interest of the creditors . . .

and other interests of the estate."  11 U.S.C. § 1104(a)(2).  Section 1104(a)(2) "envisions a

flexible standard" and "gives the district court discretion to appoint a trustee when doing so

would serve the parties' and estate's interests."  *In re Marvel Entertm't*, 140 F.3d at 474 (quoting

*In re Sharon Steel Corp.*, 871 F.2d at 1226) (internal quotations omitted); *In re Ionosphere*, 113

B.R. at 168 (noting that "courts look to the practical realities and necessities" in considering whether to appoint a chapter 11 trustee under section 1104(a)(2)).  "The twin goals of the standard for appointment of a trustee should be protection of the *public interest* and the interests of creditors . . . and facilitation of a reorganization that will benefit both the creditors and the debtors. . . ."  *Id.* (quoting House Report, 124 Cong.Rec. H11, 11 (daily ed. Sept. 28, 1978)). Factors to be considered by courts in assessing whether to appoint a trustee pursuant to section 1104(a)(2) include:  (1) the trustworthiness of the debtor, (2) the debtor's past and present performance and prospects for rehabilitation, (3) the confidence—or lack thereof—of the business community and of creditors in present management, and (4) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment. *See In re 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y. 2007).  "In essence, § 1104(a)(2) reflects the practical reality that a trustee is needed." *Id*.

Here, based on Longman's prior fraud and misconduct that has continued through to the present in the Sapphire bankruptcy, it is clear to this Court that the Debtors, under Longman's control, are not trustworthy and do not deserve the confidence of their creditors.  Although the Debtors attempted to argue that there is only evidence that the Creditors do not trust the Debtors and Longman, the litigation with Creditor McKay and the alleged and questioned conduct of the other entities controlled by Longman as debtors-in-possession in other bankruptcies evince a broader basis for distrust.  Moreover, the Court would be remiss if it did not note the Debtors' admitted purpose underlying the filing of the Debtors' bankruptcy petitions of triggering the dissociation of ARP II—an event that potentially allows Emerald and Longman to take back control of the sale of its membership interest in ARP II from Kriti.  Even though filing on the eve

23

of a foreclosure sale is not *per se* evidence of bad faith, the timing of the bankruptcy filings coupled with this dissociation effect certainly warrants a closer look.

The Court also finds that the Debtors have failed to demonstrate any prospect for rehabilitation or reorganization. The Debtors have vaguely put forth a purported redemption agreement amongst themselves that will allegedly be financed by the Debtors' manager Thomas. The Debtors have also represented in Court, and apparently to the UST and creditors, that they would promptly file applications to retain an appraiser to trigger their reorganization processes. To date, the Debtors have not filed any such application. In fact, the Debtors have not done much of anything in their bankruptcies since they filed their petitions other than file their schedules (which had to be amended in Emerald's case because it did not properly disclose all of its assets), applications to approve their retention of their attorneys, and respond to the motions of other parties in interest, including the UST, who seek relief to move these cases along. If the Debtors really wished to reorganize, and if reorganization was as simple as they suggest, based entirely on the appraisal, the Debtors would have, or in the least should have, done something to launch that process by now. Since they have failed to do so thus far, the Court has little confidence that the Debtors would do so promptly in the future if these cases were left in their hands.

The Debtors' argument that the cost of appointing a trustee would be burdensome to the estates because the Debtors do not have liquid assets is unpersuasive. *See V. Savino Oil & Heating*, 99 B.R. at 527–28 ("Finally, the Debtor contends that benefits conferred by a trustee are not commensurate to the attendant expense and that the appointment of a trustee may jeopardize the rehabilitation effort. These arguments are also without merit. They represent 'just another way of stating the natural preference of debtor's management' to remain in control

without the interference of independent scrutiny by a disinterested trustee.  *Sec. Exch. Comm'n v. Am. Trailer Rentals Co.*, 379 U.S. 594, 617 (1965).  Furthermore, a cost/benefit analysis under 11 U.S.C. 1104(a)(1) is inappropriate.").  To the extent the Debtors assert that creditors should find comfort in the fact that Longman cannot commingle or divert funds because there are no funds to so divert, their argument is a non-starter.  That creditors do not have to worry solely because the cookies are not in the cookie jar does not seem to evince any trustworthiness or warrant confidence in Longman or the Debtors.  There are several other fiduciary obligations debtors-in-possession must carry out with or without liquid assets and Longman and Emerald have previously been found to have failed to abide by corporate formalities even when obligations that rise to a fiduciary level were not in question.

The Court therefore concludes that there is a need for the appointment of a chapter 11 trustee in these proceedings under section 1104(a)(2); without such an appointment, the interests of creditors and the Debtors' estates would be neglected.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the UST's Motion to direct the appointment of a chapter 11 trustee in these Debtors' bankruptcy proceedings.

**IT IS SO ORDERED.**

Dated: March 31, 2015
        New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge