**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Emerald Investments, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 14-13407 (MG) |
| In re:<br><br>Ashley River Consulting, LLC<br><br>Debtor. | Chapter 11<br><br>Case No. 14-13406 (MG) |

**OBJECTION OF THE GAYLA LONGMAN FAMILY IRREVOCABLE TRUST TO APPROVAL OF DISCLOSURE STATEMENT, APPROVAL OF SALE AND CONFIRMATION OF CHAPTER 11 PLAN**

The Gayla Longman Family Irrevocable Trust (the "Longman Trust"), by its undersigned attorneys, submits this objection (the "Objection") to (i) approval of the Disclosure Statement (the "Disclosure Statement") to Accompany Joint Plan of Liquidation filed by Ian J. Gazes (the "Trustee"), as Trustee for Emerald Investments, LLC ("Emerald") and Ashley River Consulting, LLC ("Ashley", and together with Emerald, the "Debtors"), Kriti Ripley, LLC ("Kriti") and Ashley River Properties II, LLC ("ARPII", and together with Kriti "ARPII/Kriti"). ARPII/Kriti and the Trustee shall be referred to herein as the "Plan Proponents"); (ii) confirmation of the Joint Plan of Liquidation Filed by the Trustee, Kriti Ripley and Ashley River Properties II, LLC; and (iii) approval of the (foreclosure) sale of Emerald's 70% interest to ARPII/Kriti. In support of the Objection, the Longman Trust respectfully submits as follows:

1

**Preliminary Statement**

1.  Rather than attempt to maximize the value of these estates for the benefit of all parties in interest, ARPII/Kriti, with the assistance of the Trustee, effectuated a plan process that ensured one outcome – that ARPII/Kriti acquires ownership of a 100% interest in ARPII. This process began with what ARPII/Kriti and the Trustee characterized as a "marketing, sale and auction" process. In reality, this process was a sham that had absolutely no probability of attracting a qualified bid. This has been the position of the Longman Trust from the get-go and has, unfortunately, been proven true by the results (or lack thereof) of such process. ARPII/Kriti and the Trustee have failed to receive even one qualified bid for the property and, pursuant to the proposed plan, Kriti will receive the Debtor's 70% interest in ARPII. Every single other party in interest will receive absolutely nothing under the Plan.

2.  The Debtor's 70% interest in ARPII is a valuable asset that could have been (and still can be) monetized for the benefit of all parties in interest in these cases. Indeed, the Longman Trust submits that the estate has the ability to recapture any voting rights it lost pursuant to the "dissociation" provisions of ARPII's Operating Agreement, thereby enhancing the value and marketability of this asset. The Plan Proponents, however, have refused to pursue this path. In fact, the proposed Disclosure Statement does not even address the "dissociation" provisions of ARPII's Operating Agreement, let alone why the Debtor's rights under such provisions were not pursued. The Longman Trust submits that this failure, as well as others discussed herein, is grounds to deny approval of the proposed Disclosure Statement.

3.  One result of the refusal to pursue the Debtor's dissociation rights and the associated appraisal process, together with the Trustee's refusal to obtain an independent appraisal on behalf of the estate, is that there is no current benchmark value for ARPII (or the Debtor's 70% interest therein) available. Not surprisingly, therefore, the Disclosure Statement

also contains no discussion regarding the potential value of ARPII. Historical appraisals, however, demonstrate that it is quite valuable and would, if the dissociation process were pursued, provide a source for creditor recoveries. Even if ARPII/Kriti's most recent appraisal accurately reflected the value of ARPII (which, as discussed herein, it does not), creditors would fare far better under a dissociation process than they would under the Plan. The sale process simply deprived parties in interest of a distribution based upon these values and, therefore, approval of the sale should be denied and the Plan should not be confirmed.

4. Although the Longman Trust is not yet privy to the final tabulation of votes on the Plan, given that only Class 1 Kriti Claims will receive a distribution under the plan and that the Longman Trust voted against the Plan, the Longman Trust assumes that the only accepting class that will accept the Plan is Class 1. In this regard, Plan confirmation should also be denied because there is no class of impaired creditors that have accepted the Plan. The Plan's labels notwithstanding, Class 1 is not impaired.

## I.

## APPROVAL OF THE DISCLOSURE STATEMENT SHOULD BE DENIED

### A.  The Statutory Predicate

5. Pursuant to section 1125 of the Bankruptcy Code, a disclosure statement must contain "adequate information" to allow a "hypothetical investor" to make an "informed judgment" about whether to vote for or against the proposed plan. *In re 18 RVC, LLC*, 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012) citing 11 U.S.C. § 1125(a). The Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax

3

>consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1). "Beyond the statutory guidelines described in Section 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy court." *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008). Additionally, the proposed plan must be capable of confirmation; accordingly, a bankruptcy court should not approve a disclosure statement if the proposed plan is unconfirmable. *See, e.g., In re 18 RVC, LLC,* 485 B.R. 492, 495 (Bankr. E.D.N.Y. 2012); *In re GSC, Inc.,* 453 B.R. 132, 157 n. 27 (Bankr. S.D.N.Y. 2011); *In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) ("An unconfirmable plan is grounds for rejection of the disclosure statement; a disclosure statement that describes a plan patently unconfirmable on its face should not be approved.").

Here, the proposed Disclosure Statement fails to provide "adequate information" within the meaning of Section 1125 and, therefore, should not be approved. In addition, the proposed Plan is not confirmable thereby warranting rejection of the Disclosure Statement.

**B.     The Disclosure Statement Provides no Discussion Regarding Emerald's Rights in the Event of Dissociation**

6.     Article III of the Disclosure Statement purports to describe the significant events in these Chapter 11 cases. Specifically, Article III(C) mentions in passing that Longman issued a notice of dissociation (the "Dissociation Notice") which the Trustee immediately withdrew upon his appointment. The Disclosure Statement, however, provides no description of the dissociation process Emerald attempted to set in motion prior to the Trustee's appointment, no discussion

4

regarding the benefits that Emerald believed could be obtained for the benefit of creditors through this process, nor why the Trustee withdrew the Dissociation Notice and never attempted to pursue this path to creditor recoveries.

7. By way of background, Article X of ARPII's Operating Agreement provides that a bankruptcy filing by Emerald that is not dismissed within 90 days of its commencement is an "Event of Dissociation". Operating Agreement, Article 10.1(b). A copy of the Operating Agreement is annexed hereto as Exhibit A.

8. In turn, Emerald's right to be compensated for its "Membership Share" in the event of dissociation is governed by Article XI of the Operating Agreement. Operating Agreement, Article 10.2. In this regard, Emerald's "Membership Share" is comprised of a bundle of rights, including (but not limited to) its "Financial Rights" and "Voting Rights". Operating Agreement, Article 1.1(r). "Financial Rights" are defined as a member's right to share in the profits and losses of ARPII. Operating Agreement, Article 1.1(o). "Voting Rights" are defined as a member's right to vote on any matter in accordance with the Operating Agreement. Operating Agreement, Article 1.1(z). A member's Financial Rights and Voting Rights are a function of its "Financial Membership Shares" and "Voting Membership Shares", respectively, in ARPII as set forth on Exhibit A to the Operating Agreement.

9. In the course of pre-petition arbitration, it was found that Emerald forfeited its Voting Rights in ARPII. *See* October 31, 2005 Award of Arbitrators, B(1), annexed hereto as Exhibit B. On the other hand, Emerald's "Voting Membership Shares" were never deemed forfeited – Emerald was simply prohibited from exercising its right to vote.

10. The distinction between Emerald's Voting Rights and its Voting Membership Shares from which this right derived is critical to analyzing the dissociation provisions of the

5

Operating Agreement. Pursuant to Article 11.3(a) of the Operating Agreement, Emerald's dissociation from ARPII is deemed to be an offer to ARPII to purchase all of its Membership Shares at a price determined by Section 11.3 of the Operating Agreement. If ARPII declines to so purchase Emerald's Membership Shares, such shares are deemed to be offered to the non-dissociating member (i.e., Kriti). Finally, if Kriti declines to so purchase Emerald's Membership Shares, such shares are transferred to Emerald's legal successor – here, the estate – and the estate is admitted as a "Member" of ARPII. Operating Agreement, Article 11.3(a).

11. In the event of a transfer of Emerald' Membership Share to its bankruptcy estate, the estate would be in possession of its Financial Rights and Voting Rights. In this regard, the estate's "Voting Rights" would "be a percentage, expressed as a fraction, the numerator of which is Emerald's Voting Membership Shares and the denominator of which is the total Voting Membership Shares owned by all Members". Operating Agreement, Article 1.1(z). In turn, Emerald's Voting Membership Shares are defined as its "Voting Membership Shares listed on Exhibit A attached [to the Operating Agreement]", Operating Agreement, Article 1.1(y), i.e. 70/100 or 70%. *See* Operating Agreement, Exhibit A. In other words, the Operating Agreement provides a mechanism pursuant to which the Trustee could re-instate the Voting Rights lost by Longman, thereby allowing the estate to realize the true value of its (controlling) 70% ownership interest in ARPII for the benefit of all creditors and other parties in interest.

12. The Disclosure Statement, however, is completely silent in this regard, thereby preventing parties in interest from making an informed decision whether or not to vote in favor of the Plan.

13. As a corollary to the above, the Disclosure Statement offers parties in interest absolutely no information regarding the potential creditor recoveries that could be realized

6

through a dissociation process. For example, assuming ARPII/Kriti's most recent appraisal accurately reflected the value of ARPII (which, as discussed herein, it does not), creditors would fare far better under a dissociation process than they would under the Plan. Under this appraisal, ARPII is worth approximately $8 Million, and the Debtor's 70% interest therein is worth approximately $5.6 Million. Pursuant to the dissociation provisions of the Operating Agreement, ARPII/Kriti would be required to pay $5.6 Million for the Debtor's interest in ARPII (an amount sufficient to pay all creditors in full) or, alternatively, the Trustee could sell this 70% controlling interest pursuant to a 363 sale (which the Longman Trust submits would provide for payment in full to all creditors and also a distribution to equity holders).

C.  **The Disclosure Statement Provides no Discussion Regarding the Value of ARPII**

14.   In light of the above, it is not surprising that the proposed Disclosure Statement also contains no discussion regarding the value of ARPII or the Debtor's 70% interest therein. As noted in prior submissions to this Court, previous appraisals of ARPII's property resulted in valuations ranging from $17.25 Million to $24.53 Million, and potentially higher. *See Longman Declaration in Opposition to Motion to Dismiss* [Docket No. 26-1], hereinafter the "Longman Declaration", Exhs. D-F. However, the property has not since been re-appraised to reflect the recovery of the real estate market. (*See* Longman Declaration, Exh. A, p. 2). In fact, as of the June 23, 2014 hearing in state court, Kriti was not prepared to give its estimate of the property's value. (*See* Longman Declaration, Exh. A, p. 2).

15.   In addition, prior appraisals were based upon ARPII's ownership of 87 wet slips. Since then, on March 30, 2012, ARPII received a permit from the Army Corps of Engineers to add an additional 186 wet slips, which would expand the marina by more than double its current size. (*See* Longman Declaration, Exh. A, p. 2). The prior appraisals do not reflect the additional

7

value resulting from the permit granted to expand the marina. (*See* Longman Declaration, Exh. A, p. 2).

16. In light of prior valuations, the recovery of the real estate market and the addition of 186 additional wet slips, it is submitted that the property is worth well in excess of the prior $24.53 Million valuation. Moreover, the base $24.53 Million valuation was credited by the State Court in the findings that ARPII/Kriti relied upon in their prior Motion to Dismiss this case pursuant to Section 1112 of the Bankruptcy Code.

17. Ignoring this, ARPII/Kriti claim that, based upon a more recent appraisal, ARPII is worth approximately $8 Million. The flaws and unreliability of ARPII/Kriti's most recent appraisal cannot be overstated. That appraisal provided appraisals for both the marina and condominium site. With respect to the marina, the appraisal employs an income capitalization approach. However, the use of an income capitalization valuation approach is improper and was orchestrated for purposes of reaching the lowest possible value for the property at issue. This approach assumes the continued rental of the wet-slips, as opposed to an outright sale which would greatly increase the value of the marina. Renting the wet-slips is far from the best method to maximize value for the marina and should not have been used – surely it should not have been the only valuation method used.

18. Even more glaring, the "comparables" listed on page 58 of the appraisal include six (6) properties, five of which are located nowhere near the subject property – three are in Florida, one in Massachusetts, and one in Virginia. The closest "comparable" is the one in South Carolina, and that property does not even contain any wet-slips. Accordingly, it is puzzling how these properties can be used as the reference-points in connection with a valuation that should not have been used in the first instance.

19. ARPII/Kriti's proposed appraisal of the condominium site is equally offensive. Although the appraisal employs the comparable sales method for this part of the property and the "comparables" are in South Carolina, a cursory review of these "comparable" properties demonstrates that they are anything but comparable:

- 930 Morrison Drive – Located between highway and railroad track;

- Spring, Norman & Ashton Street – Located beside the major north/south highway and adjacent to slum neighborhoods;

- 35 & 19 Folly Road – Located immediately adjacent to a highway overpass;

- Albemarle Road – Concrete plant located above a highway;

- Maybank Highway – Bad neighborhood;

Most notably, none of the above-referenced properties are waterfront properties or even near the waterfront.

20. The reference to the Ripley Point Drive property as a "comparable" deserves special attention. This is the property located adjacent to the subject property, and was purchased by the Manager of ARPII/Kriti, Mr. Williams, directly from the bank at a discount. In addition, this parcel of property was valued as a stand-alone property, as opposed to property that may be joined to the subject property. Valued in conjunction with the subject property, the Longman Trust submits this parcel of property is worth far in excess of the amount paid by Mr. Williams. The reason for this is the density of the property could be increased three-fold when combined with the property at issue. Indeed, the fact that Kriti's affiliates obtained this property evidences self-dealing that directly impacts this case. Neither the prior appraisals of ARPII nor the fact that David Williams, Manager of both Kriti and ARPII, owns the "adjacent property" however, is contained in the Disclosure Statement.

9

## II.

## PLAN CONFIRMATION SHOULD BE DENIED AS THERE
## IS NO IMPAIRED CLASS ACCEPTING THE PLAN

21. Section 1129(a)(10) of the Bankruptcy Code allows for conformation of a Chapter 11 plan notwithstanding that each class of claims under the plan does not vote in favor thereof where "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). A claim is "impaired" under a plan unless, among other things, the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest". 11 U.S.C. § 1124.

22. Presumably, the only class of creditors that will accept the proposed Plan is Class 1 "Kriti Claims", which class is labeled as "impaired" under the Plan. Plan, Section 3.2. Although Kriti has not filed a proof of claim in these cases, "Kriti Claims" are defined as "the Claims of Kriti and Ashley River II against Emerald arising out of the 2005 Arbitration Award, the 2008 New York Judgment, the Charging Order, and any and all claims arising prior to the Petition Date that could be asserted against the Debtors by Kriti or Ashley River II." Plan, Section 1.1(Kriti Claims). Neither the Plan nor the Disclosure Statement provide clarity as to the secured vs. unsecured status of the Kriti Claims, although it appears that at least a portion of such claim is secured pursuant to the lien asserted in connection with ARPII/Kriti's charging order against the estate. *See, e.g.,* Plan, Section 3.2(b)(1) (referencing "Kriti Secured Claim").

23. In this regard, subsection (a) of section 506 of the Bankruptcy Code provides that a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured. 11 U.S.C. 506(a); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989). Obviously,

10

some baseline valuation of the subject property is required in order to determine the extent to which property secures a creditor's claim.

24. Although the Longman Trust and ARPII/Kriti disagree regarding the proper valuation of ARPII and Emerald's 70% interest therein, the record of this case clearly demonstrates that Emerald's 70% interest in ARPII is worth something (considerably) more than $0.00. Accordingly, the Kriti Claims are secured up to the value of Emerald's 70% interest in ARPII and its remaining claims are unsecured deficiency claims that should be classified as Class 2 General Unsecured Claims. *See* Plan, Section 1.1 (General Unsecured Claim) (excluding "Kriti Claims" from definition).

25. The portion of the "Kriti Claims" that is secured is unimpaired under the plan. As set forth in the Disclosure Statement:

> On July 15, 2014, the Circuit Court entered an *Order of Foreclosure and Sale* (the "Foreclosure Order") ordering the sale of the Emerald Membership Interest (the "Sale"). On October 21, 2014, the Circuit Court granted Emerald's motion to amend the Foreclosure Order and ordered that the Sale 'be conducted in accordance with and subject to the procedures followed for the foreclosure of a real estate mortgage' in South Carolina. The Sale of the Emerald Membership Interest was scheduled for December 16, 2014 at 11:00 a.m. The Debtor commenced this case on December 15, 2014 (the "Petition Date") in order to prevent the completion of the Sale.

Disclosure Statement, Article II(B). Where, as here, a creditor's claim entitles it to the remedy of foreclosure in lieu of a legal claim for repayment of a debt, then any plan that gives such creditor title to collateral securing its claim leaves that claim unimpaired. *See In re 183 Lorraine Street Assoc.*, 198 B.R. 16, 31 (E.D.N.Y. 1996). As ARPII/Kriti have already commenced a foreclosure sale, which was stayed only as a result of this bankruptcy filing, the Plan's offer to give ARPII/Kriti Emerald's 70% interest in ARPII leaves ARPII/Kriti's rights unaltered, thereby rendering Class 1 claims unimpaired.

26. Presumably in an effort to gerrymander an impaired accepting class, the Plan provides that all of ARPII/Kriti's claims against the Debtors are to be treated as Class 1 secured claims and are specifically excluded from Class 2 general unsecured claims. As discussed above, however, Section 506 of the Bankruptcy Code provides for the bifurcation of claims into secured and unsecured deficiency claims, thereby placing an unspecified portion of ARPII/Kriti's claims into Class 2 general unsecured claims. *See In re 183 Lorraine Street Assoc.,* 198 B.R. 26 ("'There can be a 'secured claim" in excess of collateral . . . in a plan, but there cannot be an 'allowed secured claim" in excess of the value of the collateral.'") (quoting *In re BBT*, 11 B.R. 224, 231 (Bankr. D. Nev. 1981).

27. A fundamental principle of classification is that similar claims must be classed together. Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class *only if such claim or interest is substantially similar to the other claims or interests of such class.*" 11 U.S.C. 1122(a) (emphasis added).

28. In general, secured claims cannot be classified with unsecured claims. *See, e.g., In re Bjolmes Realty Trust,* 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991). In the case of an undersecured creditor, the deficiency claim is an unsecured claim which cannot be placed in the same class as the secured portion of the undersecured creditor's claim. *See In re D & W Realty Corp.,* 165 B.R. 127, 129 (S.D.N.Y.1994) ("Manifestly, a secured claim and an unsecured claim, even those of the same creditor, are about as dissimilar as two claims can be.").

29. Moreover, the deficiency portion of an undersecured creditor's claim must be classified with other unsecured claims, absent a compelling business reason to the contrary. *See In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir.1994); *D & W Realty,* 165 B.R. at 130 ("separate classification of unsecured deficiency claims and other unsecured claims

12

... may be permitted only for legitimate business or Code-based reasons"); *see also In re 500 Fifth Avenue Assoc.,* 148 B.R. 1010, 1021 (Bankr.S.D.N.Y.), *aff'd,* 1993 WL 316183 (S.D.N.Y.1993) ("[I]f claims could be arbitrarily placed in separate classes, it would almost always be possible for the [proponent of a plan] to manipulate 'acceptance' by artful classification."). Here, there has been no economic or business reason advanced by the Plan Proponents to justify the classification of the ARPII/Kriti's secured claims together with their deficiency unsecured claims, nor is any such justification apparent. Rather, it appears that the Plan's classification scheme was formulated for no other reason that to satisfy the requirement of Section 1129(a)(10) that at least one class of impaired claims has accepted the plan.

### III.

### APPROVAL OF THE (FORECLOSURE) SALE SHOULD BE DENIED

30. Based upon the above and the Longman Trust's prior court submissions, the Longman Trust submits that the sale process undertaken by the Plan Proponents simply deprived parties in interest of a distribution based upon the actual value of the Debtor's interest in ARPII and, therefore, approval of the sale should be denied and the Plan should not be confirmed. The amount of ARPII/Kriti's claims is so grossly inadequate in comparison to the value of the Debtor's interest in ARPII as to shock the conscience of the Court and raise a presumption of fraud, unfairness and/or mistake and preclude approval of this sale. *In re Muscongus Bay Co.,* 597 F.2d 11, 12–13 (1st Cir. 1979) ("The policy favoring confirmation of a bankruptcy sale to the highest bidder at a fairly conducted public auction gives way to the goal of benefitting the bankrupt estate when the sale price would be 'grossly inadequate.'") (citation omitted); *see also In re WPRV-TV, Inc.,* 983 F.2d 336, 340-41 & n. 12 (1st Cir.1993); *In re Chung King, Inc.,* 753 F.2d 547, 549-50 (7th Cir. 1985).

## **CONCLUSION**

**WHEREFORE**, the Longman Trust respectfully requests entry of an order denying (i) approval of the Disclosure Statement, (ii) confirmation of the Plan; and (iii) approval of the sale of the Debtor's interest in ARPII to ARPII/Kriti, and granting the Longman Trust such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 7, 2015

**WHITE & WOLNERMAN, PLLC**

By: /s/ David Y. Wolnerman
David Y. Wolnerman, Esq.
Randolph E. White, Esq.
950 Third Avenue, 11th Floor
New York, New York 10022
Phone: (212) 308-0603
Fax: (212) 308-7090

*Counsel to the Gayla Longman
Family Irrevocable Trust*