## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Emerald Investments, LLC | Case No. 14-13407 (MG) |
| Debtor. | |
| In re: | Chapter 11 |
| Ashley River Consulting, LLC | Case No. 14-13406 (MG) |
| Debtor. | |

**MEMORANDUM OF LAW OF KRITI RIPLEY, LLC, ASHLEY RIVER II PROPERTIES, LLC AND IAN J. GAZES, AS TRUSTEE, IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED PLAN OF LIQUIDATION**

**EMMET, MARVIN & MARTIN, LLP**
Thomas A. Pitta, Esq.
120 Broadway, 32nd Floor
New York, New York 10271
(212) 238-3000 (Telephone)
(212) 238-3100 (Facsimile)

*Attorneys for Kriti Ripley, LLC and*
*Ashley River II Properties, LLC*

**GAZES LLC**
Ian J. Gazes, Esq.
151 Hudson Street
New York, NY 10013
(212) 765-9000 (Telephone)
(212) 765-9675 (Facsimile)

*Counsel for Ian J. Gazes, as Trustee for*
*Emerald Investments, LLC and Ashley River*
*Consulting, LLC*

Dated: October 9, 2015

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

A.    The Debtors and the Chapter 11 Cases .............................................2

B.    The Creditors' Attempts to Collect The Judgment Led to the Chapter 11
      Cases .............................................................................................4

C.    Emerald Has No Equity in the Emerald Membership Interest ...........5

D.    Brief Summary of Plan and Voting Results.......................................7

E.    Voting Status...................................................................................8

THE PLAN MEETS THE BANKRUPTCY CODE'S  REQUIREMENTS FOR
      CONFIRMATION ..........................................................................8

B.    The Plan Complies with the Applicable Provisions of the Bankruptcy
      Code (Section 1129(a)(1)). .............................................................9

C.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122 by
      Placing Only Substantially Similar Claims or Interests into Each Class...........9

D.    The Plan Satisfies the Requirements of 11 U.S.C. § 1123(a). .........10

E.    The Proponents Have Fully Complied with the Applicable  Provisions of
      the Bankruptcy Code as Required by Section 1129(a)(2). ...............12

F.    The Plan Has Been "Proposed In Good Faith and Not by Any Means
      Forbidden by Law." ........................................................................13

G.    The Plan Provides that Payments Made or to be Made for Services or
      Costs and Expenses are Subject to Court Approval (Section 1129(a)(4)).........15

H.    The Proponents Have Disclosed All Necessary Information Regarding
      Directors, Officers and Insiders (Section 1129(a)(5)). .....................16

I.    The Plan Does Not Contain Rate Changes Subject to the Jurisdiction  of
      any Governmental Regulatory Commission (Section 1129(a)(6)). ...................16

J.    The Plan is in the Best Interests of Creditors and Interest Holders (Section
      1129(a)(7)). ...................................................................................17

K.    The Plan Provides for Payment in Full of All  Allowed Priority Claims
      (Section 1129(a)(9))........................................................................18

L.      At Least One Class of Impaired Claims Has Accepted the Plan (Section 1129(a)(10)). ................................................................................................19

M.      The Plan Is Not Likely to Be Followed by Liquidation or the Need for Further Financial Reorganization (Section 1129(a)(11)). ....................................20

N.      All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)). ...........................21

O.      The Plan Must Adequately and Properly Treat Retiree Benefits (Section 1129(a)(13)). ................................................................................................21

P.      The Plan Satisfies the "Cram Down" Requirements   Under Section 1129(b) of the Bankruptcy Code. ..........................................................................21

Q.      The Plan Does Not Discriminate Unfairly ................................................................22

R.      The Plan is Fair and Equitable ..............................................................................22

The Plan's Release, Injunction, And Exculpation Provisions, Are Appropriate. .........................22

A.      The Debtor Release Is Appropriate .........................................................................23

B.      The Exculpation Provision Is Appropriate. ..............................................................26

C.      The Injunction Provision Is Appropriate. ................................................................28

The Longman Objection Is Unsupported by Facts and Should be Overruled ..............................29

A.      Dissociation Would Serve No Purpose ....................................................................29

B.      The Value of the Marina Property Has Been Clearly Established. ..................................30

CONCLUSION      ....................................................................................................32

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGES**

203 N. LaSalle St. P'ship., 526 U.S. 434, 442 & n. 13 (1999) ............................................... 16, 17

*Aetna Casualty & Surety Co. v. Chateaugay Corp., (In re Chateaugay Corp.)*, 89 F.3d
942, 949 .................................................................................................................................... 9

*Hanson v. First Bank of South Dakota,* 828 F.2d 1310 (8th Cir. 1987) ....................................... 13

*In re 183 Lorraine St. Assocs.*, 198 B.R. 16 (Bankr. E.D.N.Y. 1996) ........................................ 19

*In re Adelphia Commc'ns Corp.,*
No. 02-41729 (Bankr. S.D.N.Y. Jan. 5, 2007) ..................................................................... 26

In re Allegiance Telecom, Inc., No. 03-13057 (Bankr. S.D.N.Y. June 10, 2004) ....................... 25

*In re AOV Industries, Inc.,* 792 F.2d 1140 (D.C. Cir. 1986) ...................................................... 9

*In re Baldwin United Corp.,*
43 B.R. 888 (Bankr. S.D. Ohio 1984) ................................................................................... 25

*In re Century Glove, Inc.,* 1993 WL 239489 (Bankr. D. Del. 1993) ........................................... 17

*In re DBSD N. American, Inc.,*
419 B.R. 179 (Bankr. S.D.N.Y. 2009) .................................................................................. 24

*In re DJK Residential LLC,*
No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) ..................................................................... 27

*In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................... 9

*In re Drexel Burnham Lambert Grp., Inc.,*
960 F.2d 285 (2d Cir. 1992) .................................................................................................. 28

*In re Future Energy Corp.,* 83 B.R. 470 (Bankr. S.D. Ohio 1988) .............................................. 15

*In re Granite Broadcasting Corp.,* 369 B.R. 120 (Bankr. S.D.N.Y. 2007) .................................. 13

*In re Johns-Manville Corp.,* 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................. 14, 23, 26

*In re Jorgensen,* 66 B.R. 104 (9th Cir. BAP 1986) .................................................................... 13

*In re Leslie Fay Cos.,* 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................... 13

*In re Madison Hotel Associates,* 749 F.2d 410 (7th Cir. 1984) ................................................... 13

*In re Oneida Ltd.*, No. 06-10489 (Bankr. S.D.N.Y. Aug. 30, 2006) ........................................... 27

*In re Resorts, International, Inc.,* 145 B.R. 412 (Bankr. D.N.J. 1990) .................................... 14, 15

*In re River Vill. Associates,* 161 B.R. 127 (Bankr. E.D. Pa 1993) ............................................. 15

*In re Spiegel, Inc.,*
2005 WL 1278094 at *11 (Bankr. S.D.N.Y. 2005) ............................................................... 24

*In re Sylmar Plaza, L.P.,* 314 F.3d 1070 (9th Cir. 2002) ........................................................... 13

*In re Teltronics Services, Inc.,*
762 F.2d 185 (2d Cir. 1985) .................................................................................................. 25

*In re Texaco, Inc.,* 84 B.R. 893 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38
(S.D.N.Y.1988) .................................................................................................................... 14

*In re W.T. Grant Co.,*
699 F.2d 599 (2d Cir. 1983) .................................................................................................. 25

In re Wellman, Inc., No. 08-10595 (Bankr. S.D.N.Y. Jan. 14, 2009) .......................................... 27

*In re Worldcom, Inc.,*
2003 WL 23861928 (Bankr. S.D.N.Y. 2003) ........................................................................ 26

*Koelbl v. Glessing, (In re Koelbl)*, 751 F.2d 137, 139 ................................................................ 13

*Manti Sugar Co. v. Mock,* 75 F.2d 284 (2d Cir. 1935) ................................................................ 13

*United States v. Reorganized C&I Fabricators, Inc.,* 518 U.S. 213 (1996) ................................. 17

*Upstream Energy Services v. Enron Corp.* (In re Enron Corp.), 326 B.R. 497, 501 .................. 26

## STATUTES

11 U.S.C. §§328, 329 .................................................................................................................. 13

11 U.S.C. §1122 ................................................................................................................... 6, 7, 8

11 U.S.C. §1122(a) ........................................................................................................................ 6

11 U.S.C. §1123(a) ................................................................................................................... 7, 8

11 U.S.C. §1123(a)(1) .................................................................................................................... 8

11 U.S.C. §1123(a)(2) .................................................................................................................... 8

11 U.S.C. §1123(a)(3) .................................................................................................................... 8

11 U.S.C. §1123(a)(4) ................................................................................................................ 8, 9

11 U.S.C. §1123(a)(5) .................................................................................................................... 9

11 U.S.C. §1123(a)(6) .................................................................................................................... 9

11 U.S.C. §1123(a)(7) .................................................................................................................... 9

11 U.S.C. §1123(b) .................................................................................................................. 20, 32

11 U.S.C. §1123(b)(3)(A) ............................................................................................................ 22

11 U.S.C. §1125 ........................................................................................................................... 10

11 U.S.C. §§1125(b) .................................................................................................................... 10

11 U.S.C. §1126 ..................................................................................................................... 7, 10

11 U.S.C. §1129(a)(1) ............................................................................................................. 6, 32

11 U.S.C. §1129(a)(2) .................................................................................................................. 10

11 U.S.C. §1129(a)(3) .................................................................................................................. 11

11 U.S.C. §1129(a)(4) .................................................................................................................. 13

11 U.S.C. §1129(a)(5)(A) ............................................................................................................ 14

11 U.S.C. §1129(a)(6) .................................................................................................................. 14

11 U.S.C. §1129(a)(7) .................................................................................................................. 15

11 U.S.C. §1129(a)(9) ............................................................................................................ 16, 17

11 U.S.C. §1129(a)(10) ................................................................................................................ 17

11 U.S.C. §1129(a)(12) ................................................................................................................ 18

11 U.S.C. §1129(a)(13) ........................................................................................................... 18, 19

11 U.S.C. §1129(b) ...................................................................................................................... 19

11 U.S.C. §1129(b)(2) .................................................................................................................. 20

11 U.S.C. §1129(b)(2)(B)(ii) ................................................................................................... 19, 20

11 U.S.C. 1129(a)(7)(A)(ii) ......................................................................................................... 15

28 U.S.C. §1930 ........................................................................................................................... 18

## RULES AND REGULATIONS

Fed. R. Bankr. P. 9019 ................................................................................................................. 22

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595 (1977) .................................................................................................... 6, 10

S. Rep. No. 95-989 (1978) ............................................................................................................. 6

## INTRODUCTION

Kriti Ripley, LLC ("**Kriti**"), Ashley River Properties II, LLC ("**Ashley River II**" and, together with Kriti, the "**Creditors**"), and Ian J. Gazes, as Trustee of the Debtors (the "**Trustee**" and, together with the Creditors, the "**Proponents**"), submit this Memorandum of Law in Support of Confirmation of the *First Amended Joint Plan of Liquidation Filed By The Trustee, Kriti Ripley, LLC and Ashley River Properties II, LLC* (the "**Plan**").[1]  This memorandum should be considered in connection with (a) the *Chapter 11 Trustee's Report of Bidding and Sale for Marina Property* (the "**Trustee Auction Report**") [Docket No. 91], (b) the *Declaration of Ian J. Gazes in Support of Confirmation of the Plan* (the "**Trustee Declaration**") [Docket No. 96], (c) the *Declaration of Davidson Williams in Support of Motion for an Order (A) Dismissing the Debtors' Cases or, in the Alternative, (B) Granting Relief from the Automatic Stay* (the "**Williams Dismissal Declaration**") [Docket No. 23],[2] and (d) the *Declaration of Davidson Williams in Support of Motion for Order Approving Marketing, Bidding and Sale Procedures in Connection with Joint Plan of Liquidation* (the "**Williams Debt Declaration**") [Docket No. 61], the evidence and testimony proffered at the confirmation hearing and the record in these Cases.  Part I of this Memorandum briefly discusses relevant background concerning the Debtor, its chapter 11 case, the Plan and the results of voting on the Plan.  Part II sets forth the standards for confirmation of a plan of liquidation in this District and demonstrates why the Plan should be confirmed by the Bankruptcy Court.

The Plan has been accepted by the members of Class 1 (Kriti Claims).  The members of Classes 2 (General Unsecured Claims) and 3 (Interests), each of which will receive

---

[1]    Capitalized terms not otherwise defined herein shall retain the meanings ascribed thereto in the Plan.

[2]    All docket references herein shall refer to the docket in the Emerald Investments, LLC case, Case No. 14-13407.

no distribution under the Plan, have voted to reject the Plan. The Gayla Longman Family Irrevocable Trust ("**Longman**") filed the only objection to confirmation of the Plan (the "**Longman Objection**"). On October 9, 2015, the Proponents filed the amended Plan, pursuant to which the Proponents removed the proposed "third-party releases" from the Plan.

## BACKGROUND

A.    The Debtors and the Chapter 11 Cases

1.    On December 15, 2014 (the "**Petition Date**"), Emerald Investments, LLC ("**Emerald**") and Ashley River Consulting, LLC ("**ARC**" and, together with Emerald, the "**Debtors**") filed voluntary petitions for relief commencing cases (the "**Cases**") under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). On March 16, 2015, the Bankruptcy Court directed the appointment of a chapter 11 trustee [Docket no. 45], and on March 18, 2015, the Bankruptcy Court approved the appointment by the Office of the United States Trustee (the "**US Trustee**") of Ian J. Gazes (the "**Trustee**") as chapter 11 trustee [Docket no. 48]. On March 31, 2015, the Bankruptcy Court entered the *Memorandum Opinion and Order Directing the Appointment of a Chapter 11 Trustee in These Chapter 11 Cases* (the "**Trustee Opinion**"). No Committee has been appointed in this Case.

2.    Kriti and Emerald formed Ashley River II in 2003 for the purpose of developing a marina and condominiums (the "**Marina Property**") on a parcel of property in Charleston, South Carolina. Kriti and Emerald have at all times been the only members of Ashley River II. (*See Trustee Opinion*, p. 3; *Declaration of Davidson Williams in Support of Dismissal Motion* ("**Williams Dismissal Decl.**") at ¶ 2.)

3.      Upon the formation of Ashley River II, Kriti and Emerald entered into the Operating Agreement of Ashley River Properties II, LLC (the "**Operating Agreement**") (*See, Trustee Opinion*, p. 4).    Pursuant to the Operating Agreement, Emerald made in-kind contributions, including the Marina Property, in exchange for its 70% membership (the "**Emerald Membership Interest**"), and Kriti contributed $1.25 million in cash in exchange for the remaining 30% membership interest. *Immediately*, Emerald and its sole member, Stuart Longman ("**Longman**"), diverted and misappropriated those funds.  (*See Trustee Opinion*, p. 5; Williams Dismissal Decl. at ¶ 3.)

4.      In 2005, an arbitration panel in New York found that Longman and Emerald diverted Ashley River II's funds "by wrongfully making payments [from Ashley River II] which were not on the approved Marina budget or on the budget for future phases of the project." (*See Trustee Opinion*, p. 5; Williams Dismissal Decl., Ex B.)  The Panel further held that Emerald and Longman violated the Agreement "by making payments to or for the benefit of Longman or other entities Longman controlled, which were totally unrelated to Ashley River II." (*See Trustee Opinion*, p. 5; Williams Decl. at ¶ 4.)  The Panel held "Emerald and Longman commingled [Ashley River II's] funds in various non-[Ashley River II] accounts, including an account, in part in the name of Longman's wife, Gayla Longman."  (*See Trustee Opinion*, p. 22; Williams Decl. at ¶ 4.)  In addition to the diversion of Kriti's equity contribution, the Panel held that Emerald and Longman violated the Operating Agreement "by diverting $150,000.00 of . . . loan proceeds and paying themselves instead of paying" other legitimate Ashley River II expenses for which those funds were earmarked.  (*See Trustee Opinion*, p. 5; Williams Decl. at ¶ 4.)

-3-

5.     As a result of Emerald's and Longman's wrongful conduct, the Panel held that Emerald forfeited all voting rights in Ashley River II.  (*See Trustee Opinion*, p. 5; Williams Decl. at ¶ 5.)   In a separate arbitration decision, Kriti and Ashley River II were awarded additional amounts following an accounting of the Ashley River II funds improperly used by Emerald and Longman.  The awards were confirmed by the New York Supreme Court on March 27, 2008.  (*See Trustee Opinion*, p. 6; Williams Dismissal Decl., Ex. D.)  As a result of these awards, Kriti and Ashley River II have a judgment against Emerald and Longman in the amount of $1,184,581.72, which, with post-judgment interest, now exceeds $1.7 million (the "**Judgment**").  (*See Trustee Opinion*, p. 6; Williams Dismissal Decl., Ex. E.)

B.     The Creditors' Attempts to Collect The Judgment Led to the Chapter 11 Cases

6.     In an effort to collect the Judgment, Kriti and Ashley River II perfected a lien upon the Emerald Membership Interest by way of a charging order issued by the Charleston County Court of Common Pleas (the "**Circuit Court**") on October 17, 2008 (the "**Charging Order**").  (*See Trustee Opinion*, p. 6; Williams Dismissal Decl., Ex. F.)

7.     On July 15, 2014, the Circuit Court entered an *Order of Foreclosure and Sale* (the "**Foreclosure Order**") ordering the sale of the Emerald Membership Interest (the "**Foreclosure Sale**").  (Williams Dismissal Decl., Ex. H.)  On October 21, 2014, the Circuit Court granted Emerald's motion to amend the Foreclosure Order and ordered that the Sale "be conducted in accordance with and subject to the procedures followed for the foreclosure of a real estate mortgage" in South Carolina and referred the action to the Master-in-Equity for Charleston County (the "**Master**").  (Williams Dismissal Decl., Ex. I.)

8.      The Master scheduled the Sale of the Emerald Membership Interest for December 16, 2014 at 11:00 a.m.  (Williams Dismissal Decl. at ¶ 8.)  The Debtor commenced the Chapter 11 Cases on in order to prevent the completion of the Sale.

C.      Emerald Has No Equity in the Emerald Membership Interest

9.      The Emerald Membership Interest is a 70% non-voting equity interest in Ashley River II.  On December 31, 2014, Ashley River had long-term liabilities exceeding $14.4 million. (Williams Debt Decl. at ¶ 3)   Ashley River II's only meaningful assets consist of the Marina Property and the improvements thereon and the Judgment.

10.     During 2014, various proposals were made by third parties to acquire the Marina Property.  These proposals ranged in value from $6.3 million to $9.3 million (Williams Decl., at ¶ 10.) and were subject to various contingencies (such as permits and approvals) and exceptions.  (Williams Dismissal Decl. at ¶ 10.)  Furthermore, a recent appraisal estimated the value of the Marina Property as $7.96 million.  (Williams Dismissal Decl., Ex. L.)

11.     On July 10, 2015, the Bankruptcy Court entered the *Order Authorizing the Trustee to Retain Colliers International Charleston, LLC as Commercial Real Estate Broker* (the "**Colliers Order**"). [Docket No. 78].  On July 14, 2015, the Bankruptcy Court entered the *Order Approving Marketing, Bidding and Auction Procedures* (the "**Bid Procedures Order**"). [Docket No. 79].  The Bid Procedures Order established procedures for the marketing and potential sale of the Marina Property (the "**Bid Procedures**").  Pursuant to the Colliers Order and the Bid Procedures Order, the Trustee retained Colliers International Charleston, LLC ("**Colliers**") to market the Marina Property for a sale pursuant to the Plan, subject to bids meeting or exceeding a reserve price of $18 million.

-5-

12.     Following its retention, Colliers implemented the marketing procedures established in the Bid Procedures Order and undertook an extensive effort to solicit interest in the acquisition of the Marina Property. (Trustee Decl. at ¶ 4)  As a result of those efforts, the Marina Property was exposed to thousands of potential purchasers through, among other things: (a) Colliers' proprietary lists of developers of hotel, condominium, multifamily, senior housing, retail and office properties, (b) local MLS listings, nationwide listing portals and Colliers.com, (c) e-mails via "Property Blast" to over 120,000 investors and brokers across the United States, (d) a dedicated webpage for the Marina Property, (e) three (3) print advertisements in the Charleston Post & Courier and (f) the DisPop advertising service with ad placements on the websites of the Wall Street Journal, Forbes, The Business Journals, the Charleston Post and Courier, the State (Columbia, SC) and Greenville Online (Greenville, SC).  (Trustee Decl. at ¶ 5).

13.     As a result of the marketing efforts of Colliers, 27 potential purchasers and 8 brokers executed confidentiality agreements entitling them to due diligence information. Information regarding the property was made available to these parties by Colliers via a digital data room that contained an extensive offering memorandum and other documents regarding the Marina Property, including (a) an updated environmental Phase One report commissioned by Ashley River II, (b) concept drawings showing the improvements that could be made to the Marina Property to enhance and maximize its value and (c) other documents critical to understanding the value of the Marina Property.  (Trustee Decl. at ¶ 6).

14.     Notwithstanding the efforts of Colliers, only two (2) bids were received for the Marina Property prior to the September 23, 2015 bid deadline.  The highest of the bids was for only $8.5 million and did not comply with the Bid Procedures in multiple ways,

including (a) the requirement of diligence and permitting periods totaling 270 days, (b) the failure to post a non-refundable deposit, and (c) a requirement that the purchaser receive such permits as it deemed, in its discretion, necessary to maximize the value of the Marina Property. (Trustee Auction Report at ¶ 5).  The only other bid was for only $5.7 million for a portion of the Marina Property and was also non-binding and subject to nearly year-long diligence and permitting periods. (*Id.*; *see also* Trustee Decl. at ¶ 7)

15.     The bids received through the Colliers marketing effort are consistent with (a) the bids received during the marketing of the Marina Property during 2014 and (b) the appraisal produced in February 2015, and demonstrate that the value of the Marina Property is well below the amount of debt burdening Ashley River II.

D.     Brief Summary of Plan and Voting Results

16.     The Plan provides for a dual track approach depending on whether a Sale of the Marina Property was achieved.  Pursuant to the Plan, in the event of a Sale, the proceeds of the Sale were to be used to satisfy the Administrative Claims (including any Broker Commission) and the liabilities of Ashley River II and then to be distributed to the members of Ashley River II (including Emerald) in accordance with the Operating Agreement.  However, as there were no bids above the Strike Price, no Sale will occur.  As such, the Plan treats creditors and interest holders as follows:

- **Class 1 (Kriti Claims).**  Class 1 Claims consist of the Claims of Kriti and Ashley River II against Emerald arising out of the 2005 Arbitration Award, the 2008 New York Judgment, the Charging Order, and any and all other claims arising prior to the Petition Date that could be asserted against the Debtors by Kriti or Ashley River II.  Kriti shall receive the Emerald Membership Interests in full and final

satisfaction of the Allowed Kriti Claims and no other payment or reserve shall be made on account of such Allowed Kriti Claims. **Class 1 has voted to accept the Plan**.

- **Class 2 (General Unsecured Claims).** Class 2 consists of any Claim that is not an Administrative Claim, Kriti Claim, Professional Claim or Priority Claim (Class 2). Holders of Allowed Class 2 Claims will receive no distribution under the Plan. **Class 2 has voted to reject the Plan**.

- **Class 3 (Interests).** Class 3 consists of Holders of the Debtor's equity interests (Class 3). Class 3 Interest holders shall receive no distribution under the Plan and all Interests shall be cancelled and extinguished. **Class 4 has voted to reject the Plan.**

E.    <u>Voting Status.</u>

17.    The deadline for submitting ballots to accept or reject the Plan was October 7, 2015. Submitted herewith is the Trustee Declaration. As set forth in the Trustee Declaration summarized below, 100% of the Kriti Claims voted in favor of accepting the Plan and 100% of the Claims in Class 2 and the Interests in Class 3 have voted to reject the Plan.

**THE PLAN MEETS THE BANKRUPTCY CODE'S
REQUIREMENTS FOR CONFIRMATION**

18.    The Proponents submit that the Plan complies with all relevant sections of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law relating to the confirmation of the Plan. In particular, the Plan complies with all of the requirements of sections 1122, 1123 and 1129 of the Bankruptcy Code. This Memorandum addresses such requirements individually.

-8-

B.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

19.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 governing classification of claims and contents of the plan, respectively.  *See* H.R. Rep. No. 95-595 at 412 (1977); S. Rep. No. 95-989 at 126 (1978).  *See also In re AOV Industries, Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986).

C.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122 by Placing Only Substantially Similar Claims or Interests into Each Class.

20.    Section 1122 of the Bankruptcy Code governs the classification of claims and interests and provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class."  11 U.S.C. § 1122(a).  This requirement of substantial similarity does not mean, however, that claims or interests within a particular class must be identical.  Instead, a plan proponent has flexibility in classifying claims and interests so long as the proponent has some reasonable basis for the classification or the creditor agrees to the classification of its claim.  *See Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

21.    The Proponents submit that the classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Article III of the Plan provides for the separate classification of Claims and Interests in three (3) different classes based upon differences in the legal nature and/or priority and/or convenience of such Claims or Interests.

-9-

Each of the Claims or Interests in each particular class is substantially similar to the other Claims or Interests in such class.

22.     Class 1 consists of all Kriti Claims.  Class 1 is impaired and has voted to accept the Plan pursuant to section 1126 of the Bankruptcy Code.  Class 2 consists of all General Unsecured Claims and has voted to reject the Plan pursuant to section 1126 of the Bankruptcy Code.  Class 3 consists of all equity Interests in the Debtor and has voted to reject the Plan pursuant to section 1126 of the Bankruptcy Code.

23.     Because the Plan classifies all Claims and Interests based upon differences in the legal nature and/or priority and/or convenience of such Claims or Interests, the Proponents submit that the Plan's classification scheme is appropriate under section 1122 of the Bankruptcy Code.

D.     The Plan Satisfies the Requirements of 11 U.S.C. § 1123(a).

24.      Section 1123(a) of the Bankruptcy Code sets forth seven (7) mandatory requirements with which every chapter 11 plan must comply.  *See* 11 U.S.C. § 1123(a).  As demonstrated herein, the Plan fully complies with each such requirement.

25.     Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims and interests.  As previously noted with respect to the Plan's compliance with section 1122, Article II of the Plan designates and classifies two (2) classes of Claims and one class of Interests.  The Bankruptcy Code does not require that administrative expense claims and priority claims be classified.  Such claims must only be designated. The Plan provides for the full treatment of Administration and Priority Claims in Article II. Thus, the Plan complies with section 1123(a)(1) of the Bankruptcy Code.

26.     Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify any class of claims or interests that is not impaired under the plan.  Article II of the Plan specifies that Administration and Priority claims are not impaired except to the extent expressly permitted under the Bankruptcy Code.  There are no other unimpaired classes of Claims or Interests under the Plan. Thus, the Plan complies with Section 1123(a)(2).

27.     Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify the treatment of any class of claims or interests that is impaired under the plan. Article III of the Plan specifies that Class 1 and Class 2 Claims and Class 3 Interests are impaired and specifies the treatment of each such, therefore, it complied with section 1123(a)(3) of the Bankruptcy Code.

28.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest. The treatment of each Claim or Interest under the Plan in each particular class is the same as the treatment of each other Claim or Interest in such class, as required by section 1123(a)(4) of the Bankruptcy Code.

29.     Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide adequate means for its implementation.  Article V. of the Plan sets forth the means for implementing the Plan, as required by section 1123(a)(5) of the Bankruptcy Code. The Plan will be implemented by the Trustee and the Creditors in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.

30.     Section 1123(a)(6) of the Bankruptcy Code requires that a plan provide for modifications of a debtor's charter to the extent of any impact on the debtor's equity.  However, pursuant to sections 3.4(b)(2) and 5.7 of the Plan, on the Effective Date all Interests in the

-11-

Debtors, all stock options, all warrants, and any instrument evidencing or creating any

indebtedness or obligation of the Debtors shall be cancelled and extinguished.  Therefore, section

1123(a)(6) of the Bankruptcy Code is inapplicable here.

31.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan contain

only provisions that are consistent with the interests of creditors and equity security holders and

with public policy with respect to the manner of selection of any officer, director, or trustee

under the plan.   The Plan provides that (a) ACR will dissolve on the Effective Date and

(b) Emerald will dissolve following the distribution of the Emerald Membership Interests to Kriti

and the satisfaction of the Allowed Administrative Claims.  Consequently, section 1123(a)(7) of

the Bankruptcy Code is satisfied.

E.    <u>The Proponents Have Fully Complied with the Applicable
      Provisions of the Bankruptcy Code as Required by Section 1129(a)(2).</u>

32.    Section 1129(a)(2) of the Bankruptcy Code requires that plan proponent

also "compl[y] with the applicable provisions of [the Bankruptcy Code]." *See* 11 U.S.C. §

1129(a)(2). The legislative history of this section explains that this provision is intended to

encompass the disclosure and solicitation requirements under sections 1125 and 1126.  See H.R.

Rep. No. 95-595 at 412, 95th Cong., 1st. Sess. (1977).

33.    The Proponents have fully complied with the applicable provisions of the

Bankruptcy Code, including, specifically, sections 1125 and 1126 of the Bankruptcy Code and

the Bankruptcy Rules governing notice, disclosure and solicitation in connection with the Plan.

All holders of Allowed Claims and Interests eligible to vote on the Plan received the solicitation

materials, which include the Plan and Disclosure Statement and a ballot (together, the

"**<u>Solicitation Materials</u>**").

34.     Section 1126 of the Bankruptcy Code sets forth the requirements for acceptance of the Plan.  Pursuant to section 1126, only holders of allowed claims in impaired classes that will receive or retain property under the Plan on account of their claims may vote on the Plan.  As set forth in the Trustee Declaration at paragraph 9, the Proponents solicited acceptances of the Plan from the holders of Allowed Claims and Interests in each Class under the Plan in light of the fact that each Class had the possibility of receiving distributions under the Plan if there were to be a Sale.

35.     Based on the foregoing, the Proponents submit that the requirements of section 1129(a)(2) are satisfied.

F.     The Plan Has Been "Proposed In Good Faith and Not by Any Means Forbidden by Law."

36.     Section 1129(a)(3) requires that a plan has been "proposed in good faith and not by any means forbidden by law."  *See* 11 U.S.C. § 1129(a)(3).  Although the term "good faith" is left undefined by the Code, the Second Circuit has held that the standard of good faith requires "a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) *quoting Manti Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935); *see also In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002); *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir. 1987).

37.     Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances surrounding the plan and requires "a fundamental fairness in dealing with creditors".  *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) *quoting In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. BAP 1986).   Some courts hold that the "important point of inquiry is the plan itself and whether such plan will fairly achieve a result

consistent with the objectives and purposes of the Bankruptcy Code". *See In re Granite Broad. Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) *quoting In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984) (distinguishing between "the good faith that is required to confirm a plan under Section 1129(a)(3) and the good faith that has been established as a prerequisite to filing a Chapter 11 petition for reorganization.") (emphasis omitted).  Other courts have taken the view that a debtor's pre-filing and post filing conduct as well as the feasibility of the plan itself should be considered.  *See Elsinore Shores*, 91 B.R. at 260; *Toy and Sport Warehouse, Inc.*, 37 B.R. at 141.

38.     The Plan satisfies both standards for good faith. The Plan is the product of arm's length negotiations among the Proponents, with input from other creditors and parties-in-interest, and provides for the orderly dissolution of the Debtors and distributions to creditors in accordance with the absolute priority scheme of the Bankruptcy Code.  Immediately following the appointment of the Trustee, the Proponents worked together toward a resolution of these Cases that would fairly allocate the assets available to the Trustee among the Debtors' creditor and equity constituents.

39.     The Proponents will proffer the testimony of the Trustee at the Confirmation Hearing that will show that the Plan is the result of arm's length, good faith negotiations between, among others, the Trustee and Kriti, and it represents a good faith endeavor to expeditiously wind down the Debtors' affairs and maximize the value of the Debtors' assets to facilitate the fair and efficient distribution of such assets to creditors. Accordingly, the Proponents submit that the Plan has been proposed in good faith and not by any means forbidden by law.

G.    The Plan Provides that Payments Made or to be Made for Services or
      Costs and Expenses are Subject to Court Approval (Section 1129(a)(4)).

40.    Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses of the plan proponents, the Debtors, the Trustee, or a person receiving distribution of property under the plan, be subject to approval of the Court as reasonable.  Under this subsection, any fees promised or received in connection with a chapter 11 case must be disclosed and approved, or subject to approval, by the court. *See In re Texaco, Inc.,* 84 B.R. 893, 907-08 (Bankr. S.D.N.Y. 1988) *appeal dismissed*, 92 B.R. 38 (S.D.N.Y.1988); *In re Resorts, Int'l, Inc.,* 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986); *In re River Vill. Assocs.*, 161 B.R. 127, 141 (Bankr. E.D. Pa 1993).

41.    The Bankruptcy Court has authorized the Trustee to retain professionals pursuant to various orders entered during the Case.  The orders authorizing the retention of these professionals expressly provide that payment of all fees and expenses of professionals are subject to review and approval by the Bankruptcy Court.  Moreover, section 2.3 of the Plan requires all professionals to file with the Bankruptcy Court final applications for fees and expenses within forty-five (45) days after the Effective Date.

42.    Court approval of payments for services and expenses is governed by various Code provisions, such as 11 U.S.C. §§ 328, 329, 330, 331 and 503(b), and need not be explicitly provided for in a Chapter 11 plan.  *See Resorts Intern., Inc.*, 145 B.R. at 476 *quoting In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988).  Accordingly, the procedures established for the Court's review and ultimate approval of fees, costs and expenses comply with section 1129(a)(4) of the Bankruptcy Code.

-15-

H.    The Proponents Have Disclosed All Necessary Information Regarding Directors, Officers
      and Insiders (Section 1129(a)(5)).

43.    Section 1129(a)(5)(A) of the Bankruptcy Code requires (i) the plan

proponent to disclose the identity and affiliations of any individual proposed to serve, after

confirmation of the plan, as an officer, director, or voting trustee of a debtor and (ii) the court to

find that the appointment to, or continuance in, such office of such individual, is consistent with

the interests of creditors and equity security holders and with public policy.

44.    Section 1129(a)(5)(B) requires the plan proponents to disclose the identity

of any insider that will be employed or retained by the reorganized debtor and the nature of any

compensation for such insider.  Section 101(30)(B) defines insider, in the case of a corporation,

to include directors, officers, persons in control of the Debtor, partnerships in which the Debtor

is a general partner, general partners of the Debtor, or relatives of any of the foregoing.

45.    Since the Plan provides for the liquidation and dissolution of the Debtors,

the Debtors will have no directors, officers or insiders after the Effective Date.  Accordingly,

section 1129(a)(5) does not apply.

I.    The Plan Does Not Contain Rate Changes Subject to the Jurisdiction
      of any Governmental Regulatory Commission (Section 1129(a)(6)).

46.    Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a

debtor whose rates are subject to governmental regulation following confirmation, that

appropriate governmental approval has been obtained for any rate change provided in the plan or

that such rate change be expressly conditioned on such approval.  Section 1129(a)(6) does not

apply as the Debtors do not conduct operations in a regulated industry and will be dissolved

pursuant to the Plan.

-16-

J.    The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).

47.    Section 1129(a)(7) of the Bankruptcy Code attempts to provide protection

to creditors and interest holders who are impaired under a plan and who have not voted to accept

such plan by imposing a "best interests of creditors" requirement.    Under that requirement,

holders of impaired claims and interests who do not vote to accept the plan must:

> receive or retain under the plan on account of such claim or interest
> property of a value, as of the effective date of the plan, that is not
> less than the amount that such holder would so receive or retain if
> the debtor were liquidated under chapter 7 [of the Bankruptcy
> Code] on such date

11 U.S.C. 1129(a)(7)(A)(ii).

48.    The "best interests" test focuses on individual dissenting creditors, rather

than classes of claims.    *See Bank of Am. Nat'l. Trust & Savings Assn. v. 203 N. LaSalle St.*

*P'ship.*, 526 U.S. 434, 442 & n. 13 (1999); *Leslie Fay*, 207 B.R. at 787.    The best interest

analysis requires that each holder of a claim or interest either accept the plan or receive or retain

property having a present value under the plan, as of the effective date of the plan, not less than

the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of

the Bankruptcy Code.    *See 203 N. LaSalle St. P'ship.*, 526 U.S. at 442 & n. 13; *United States v.*

*Reorganized C&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).    Accordingly, if the Court finds

that each non-consenting member of an impaired class will receive at least as much under the

Plan as it would receive in a chapter 7 liquidation, the Plan satisfies the best interests of creditors

test.    *See 203 N. LaSalle St. P'ship.*, 526 U.S. at 441 n.13; *In re Century Glove, Inc.*, 1993 WL

239489 (Bankr. D. Del. 1993).    Here, all creditors will receive as much or more under the Plan

than they would receive in a chapter 7 liquidation, and the "best interests of creditors" test is

satisfied as to all parties.    The holders of the Class 1 Kriti Claims are Proponents and have voted

-17-

in favor of the Plan.  As a result the best interests of creditors test is inapplicable to Class 1.

Each of the holders of Claims in Class 2 and Interests in Class 3 have voted to reject the Plan as

they will receive no distribution thereunder.  However, it is clear that those parties would also

receive no distribution if the Debtors were liquidated under chapter 7.

       49.    ARC has no creditors and no assets other than an alleged agreement to

acquire the Emerald Membership Interest.  Emerald's only meaningful asset is the Emerald

Membership Interest, i.e. the non-voting 70% interest in the equity of Ashley River II.  In light of

the fact that the Marina Property, i.e. Ashley River II's only meaningful asset, is worth

significantly less than the $14.6 million of debt on Ashley River II's balance sheet, the 70%

Emerald Membership Interest, has no equity value.  Accordingly, holders of Claims and Interests

in Classes 2 and 3 would receive no distribution in a chapter 7 liquidation.

K.    The Plan Provides for Payment in Full of All
      Allowed Priority Claims (Section 1129(a)(9)).

       50.    Section 1129(a)(9) of the Bankruptcy Code contains a number of

requirements concerning the payment of priority claims.  Specifically, unless the holder of a

particular priority claim agrees to a different treatment of such claim:

> a)    holders of claims entitled to priority under Section 507(a)(2) or (3) must receive cash in the allowed amounts of such claims on the effective date of the plan;

> b)    holders of claims entitled to priority under Section 507(a)(1), (4), (5), (6) or (7) must receive cash in the allowed amounts of such claims on the effective date of the plan or deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims; and

> c)    holders of tax claims entitled to priority under Section 507(a)(8) must receive on account of such claims regular installment payments in cash, of a total value as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later five years

-18-

> after the date of the order of relief and in a manner not less favorable than the most favored non-priority unsecured claim provided for by the plan.

11 U.S.C. § 1129(a)(9).

51.    The Plan meets the requirements of all three subsections of section 1129(a)(9).  Under Section 2.1 of the Plan, holders of Administrative Claims entitled to priority under Section 507(a)(1) shall receive either cash equal to the unpaid portion of such Allowed Administrative Claim or such other agreed upon treatment from the Administrative Claims Fund on account of such Allowed Administrative Claim in full satisfaction of such Allowed Administrative Claim.

52.    Likewise, section 2.4 of the Plan provides that each holder of an Allowed Priority Claim against the Debtor shall receive from the Administrative Claims Fund the full amount of such holder's Allowed Priority Claim with interest, but excluding any associated fees, costs or charges, accruing after the Effective Date.

53.    Based on the foregoing, the Plan treats all priority claims against the Debtor in accordance with the requirements of section 1129(a)(9) of the Bankruptcy Code.

L.    At Least One Class of Impaired Claims Has Accepted the Plan (Section 1129(a)(10)).

54.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one Class of impaired Claims, "determined without including any acceptance of the plan by any insider."  *See* 11 U.S.C. § 1129(a)(10).  Notwithstanding Longman's arguments to the contrary, the Plan clearly satisfies this requirement through the acceptances of the Plan by Class 1.

55.    Kriti possesses a secured claim in the amount of approximately $1,678,023 as of the Petition Date.  Kriti made the election pursuant to § 1111(b)(2) of the Bankruptcy Code to have its entire claim treated as a secured claim.

-19-

56.     Pursuant to the Plan, Kriti has agreed to fund the payment of Allowed Administrative Claims, including the fees of the Trustee and his professionals.  These fees will undoubtedly be significant and further erode Kriti's ability to recover its damages from Longman's fraud.  As a result, even if the Kriti Claims would otherwise be unimpaired on account of its retention of its collateral, such retention of collateral will come at a significant cost to Kriti.

57.     Longman cites to *In re 183 Lorraine St. Assocs.*, 198 B.R. 16 (Bankr. E.D.N.Y. 1996) for the proposition that a secured creditor retaining its collateral is not impaired. However, the *Lorraine* Court specifically stated that the secured creditor in that case would be impaired if it retained its collateral under the plan subject to the debtor's retention of $5,000 to be used to satisfy other creditors' claims.  *Id.* at 30.  Unlike in *Lorraine*, the value of the collateral in this case has been determined already, and it is clear that Kriti will not be able to recover the cost of the Administrative Claims from a sale of the Marina Property pursuant to the Plan.  Therefore, this Court can determine now that Kriti is impaired and entitled to vote on the Plan.

M.     The Plan Is Not Likely to Be Followed by Liquidation or the
        Need for Further Financial Reorganization (Section 1129(a)(11)).

58.     As a condition to confirmation, Bankruptcy Code section 1129(a)(11) requires that the proponents of a plan show that confirmation is not likely to be followed by the liquidation of the debtor or the need for further financial reorganization, unless such liquidation or reorganization is a component of the Plan.  The Plan provides for the liquidation and dissolution of the Debtors in the manner and on the terms set forth in the Plan.  Accordingly, the Proponents submit that the requirements of Bankruptcy Code section 1129(a)(11) are inapplicable in the Case.

-20-

N.    All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).

59.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid on the effective date of the plan or that provision be made for their payment.  The Plan provides that all unpaid U.S. Trustee Fees incurred before the Effective Date shall be timely paid by the Debtor in the ordinary course as such U.S. Trustee Fees become due and payable.  See Plan at § 2.2.  Moreover, the Plan provides for the liquidation and dissolution of the Debtors and the closure of the Case shortly after the Effective Date so it is expected that no further U.S. Trustee Fees shall become due and payable.  Thus, the Proponents submit that the Plan complies section 1129(a)(12).

O.    The Plan Must Adequately and Properly Treat Retiree Benefits (Section 1129(a)(13)).

60.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the continued payment of retiree benefits for the duration of the period that the debtor has obligated itself to provide such benefits.  The Debtors do not, and did not prior to the Petition Date, maintain a retiree benefits plan.  Thus, section 1129(a)(13) of the Bankruptcy Code is inapplicable here.

P.    The Plan Satisfies the "Cram Down" Requirements
       Under Section 1129(b) of the Bankruptcy Code.

61.    Notwithstanding that Classes 2 and 3 have rejected the Plan, the Bankruptcy Court may confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims, as otherwise required by section 1129(a)(8).  Under section 1129(b), the Bankruptcy Court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not

"discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. *See* 11 U.S.C. § 1129(b).

Q.    The Plan Does Not Discriminate Unfairly

62.    Section 1129(b)(1) prohibits discrimination between classes only if it is unfair. The absolute priority rule of section 1129(b)(2)(B)(ii) of the Bankruptcy Code prohibits junior creditors and equity holders from receiving any distributions in cases, like this, where senior classes of creditors are not being paid in full. *See generally 203 N. LaSalle St. P'ship.*, 526 U.S. at 444. Thus, the holders of Claims in Class 2 and Interests in Class 3 are not being unfairly discriminated against; rather, their treatment under the Plan is dictated by the plain language of the Bankruptcy Code.

R.    The Plan is Fair and Equitable

63.    Section 1129(b) of the Bankruptcy Code sets forth the definition of the phrase "fair and equitable." *See* 11 U.S.C. § 1129(b)(2). In addition to the requirements enumerated in section 1129, cases have interpreted the "fair and equitable" standards to include the requirement that no class senior to the dissenting class can receive more than a 100% recovery on its allowed claims. *See e.g.*, *Granite Broad.*, 369 B.R. at 140. Because the Plan does not provide for the payment of more than 100% of the Kriti Claims, the Plan is, by definition, "fair and equitable" insofar as Classes 2 and 3 are concerned. Accordingly, the Proponents submit that the Plan satisfies the "fair and equitable" test for the non-accepting Class and should be confirmed under the Bankruptcy Code's "cram down" procedure.

**The Plan's Release, Injunction, And Exculpation Provisions, Are Appropriate.**

64.    Section 1123(b) of the Bankruptcy Code identifies the discretionary provisions that may be included in a plan. For example, a plan may, among other things:

(a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee or other representative of claims or interests; and/or (d) provide for the assumption or rejection of executory contracts and unexpired leases. In addition to the enumerated provisions, section 1123(b) of the Bankruptcy Code also provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."

65.    Here, the Plan includes various discretionary provisions that are consistent with the discretionary authority vested under section 1123(b) of the Bankruptcy Code. For example, the Plan impairs certain Classes of Claims and Interests and leaves others unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan. In addition, the Plan contains provisions implementing certain releases and exculpations, discharging claims and interests and permanently enjoining certain causes of action. Each of these provisions are proper because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtor, the estate and the Case and (e) are consistent with the relevant provisions of the Bankruptcy Code and Second Circuit law. Such provisions are discussed in turn below, but, in summary, satisfy the requirements of section 1123(b).

A.    The Debtor Release Is Appropriate.

66.    The Plan, as amended, provides for release by the Trustee and the Debtors (the "**Estate Release**") of certain claims against (a) the Proponents, their predecessors,

successors and assigns (whether by operation of law or otherwise), affiliates, current and former

members, equity holders, officers, directors, employees, managers, shareholders, financial

advisors, attorneys, accountants, investment bankers, consultants, agents and Professionals

(collectively, the "**Released Parties**") provided, however, that "Released Parties" is not intended

to include, nor shall it include Stuart Longman, the Gayla Longman Family Irrevocable Trust

u/t/d 1/2010, any pre-petition members, officers or directors of either of the Debtors, or any

affiliate of Stuart Longman other than Ashley River II.

67.    Section 1123(b)(3)(A) specifically provides that a plan may provide for

the settlement or adjustment of any claim or interest belonging to the debtor or the estate. Indeed,

it is well settled that a debtor is authorized to settle or release its claims through a chapter 11

plan.  *See Adelphia*, 368 B.R. at 263 n.289, 269 (stating that "Debtors have considerable leeway

in issuing releases of any claims the Debtors themselves own").

68.    In reviewing releases in a plan, courts use the "best interests of the estate"

standard for approval of a settlement under Bankruptcy Rule 9019[3] or require a showing that

granting such releases is a valid exercise of the debtor's business judgment.[4]

69.    The Estate Release is clearly in the best interests of the Debtors' estates

and a sound exercise of the Trustee's business judgment. Following the appointment of the

Trustee, the Creditors approached the Trustee to discuss potential methods for bringing this case,

and the Creditors' decade-long legal disputes with Emerald and Longman, to a conclusion.  By

---

[3] *See generally Bally Total Fitness*, 2007 WL 2779438 at *12 ("[t]o the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, 2005 WL 1278094 at *11 (Bankr. S.D.N.Y. 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)).

[4] *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d. Cir. 2010) (approving a debtor release under business judgment standard: "[t]he releases and discharges of claims and causes of action by the Debtor, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtor's business judgment, and are fair, reasonable and in the best interests of the estate.") (footnote omitted).

-24-

the time of the Petition Date, the Creditors had expended hundreds of thousands of dollars attempting to enforce their Judgment, i.e. significantly increasing the damages created when Longman and Emerald initially misappropriated Kriti's investment in Ashley River II.  As a result, the Creditors made it a condition to any agreement with the Trustee that any path lead to true finality of the disputes.  The Trustee's agreement to provide releases was a significant incentive for the Creditors to participate in the negotiations and compromises that led the Creditors to (a) permit the Trustee to market the Marina Property for sale, (b) agree to fund the Administrative Claims necessary to conduct the Cases, and (c) propose the Plan, which together provided the potential for distributions to general unsecured creditors.

70.     Absent the consent of the Creditors, the Trustee had no ability to market or sell the Marina Property or otherwise monetize whatever value the Emerald Membership Interest may have had. The Estate Release reflects the important contributions, concessions and compromises made by the Released Parties throughout this Case. The Proponents submit that the Estate Release reflects a reasonable balance of the risk and expense of litigation, on the one hand, against the benefits of resolution of disputes and issues, on the other hand, removing what could otherwise be potentially substantial impediments to the successful conclusion of the Case.[5]

71.     The Estate Release is in the best interest of the Debtors' Estates and well within the Trustee's business judgment because the Estate Release is an integral part of the negotiated Plan. The Trustee does not believe material causes of action exist against any of the Released Parties, a conclusion supported by the fact that the parties have previously extensively litigated any potential claims between them. Preserving causes of action against the Released

---

[5] *See In re Allegiance Telecom, Inc.*, No. 03-13057 (RDD) (Bankr. S.D.N.Y. June 10, 2004) [Docket No. 1481] Conf. Order, at ¶¶ 60-61 ("avoidance of long and complicated litigation is one of the principal rationales for Debtor entering into settlements with creditors") *citing In re Baldwin United Corp.*, 43 B.R. 888 (Bankr. S.D. Ohio 1984); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 188-89 (2d Cir. 1985); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

Parties would likely result in little, if any, benefit, but could result in material harm to the Trustee's efforts to conclude the Case, as the Plan is predicated on the Estate Release. In fact, the Trustee is confident that if he had insisted on preserving claims and causes of action against the Released Parties, the Plan would not have been possible.

72.    In sum, these Cases would not be where they are today – on the verge of confirming a chapter 11 plan that will bring a decade of litigation and these contested Cases to a conclusion, without the participation and consent of the Released Parties.  Therefore, for the reasons set forth herein, the Estate Release should be approved.

B.    The Exculpation Provision Is Appropriate.

73.    Section 8.4 of the Plan contains an exculpation provision (the "**Exculpation**"). Courts evaluate exculpation provisions based upon a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[6] Generally speaking, the effect of an appropriate exculpation provision is to set a standard of care of gross negligence or willful misconduct in future litigation for acts arising out of the restructuring.[7] Additionally, where a court finds that a plan has been proposed in good faith and meets the other requirements of confirmation, approval of an exculpation provision is appropriate, and sets the standard of liability for those involved in the negotiation and

---

[6] *See Bally*, 2007 WL 2779438 at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Worldcom, Inc.*, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. 2003) (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501 (S.D.N.Y. 2005) excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[7] *See Calpine*, 2007 WL 4565223, at *10 finding that an exculpation provision that did not relieve any party of liability for gross negligence or willful misconduct and was appropriate); *Enron*, 326 B.R. at 501 (holding that an exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

formulation of that plan.[8] Exculpation clauses appropriately prevent collateral attacks against

parties that have acted in good faith to help facilitate a debtor's reorganization. Courts have

specified certain parties that generally are appropriate candidates for exculpation, including

where the exculpation is consensual and properly noticed or parties to "unique transactions" who

"contribute substantial consideration to the reorganization."[9]

74.    Here, the Proponents proposes to exculpate the Released Parties whose

contributions and concessions have made the Plan possible. The Plan provides, however, that no

Exculpated Party will be immune from liability that is determined by a Final Order to arise out of

conduct that constituted gross negligence or willful misconduct.[10]   Such exculpation provisions

are routinely approved in plans of reorganization in cases in this jurisdiction.[11]

75.    The proposed Exculpation is uncontested. The Proponents respectfully

submit that this Court has an ample record before it to conclude that the Exculpated Parties are

entitled to the Exculpation proposed in the Plan. The Exculpated Parties all either share an

identity of interests with the Debtors or participated actively in the negotiations and

---

[8] *See Worldcom*, 2003 WL 23861928, at *28.

[9] *See Adelphia*, 368 B.R. at 268.

[10] *See* Plan, Section 8.4.

[11] *See e.g., Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtor's restructuring, including, without limitation the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, [Docket No. 386] (same); *In re Oneida Ltd.*, No. 06-10489 (ALG) (Bankr. S.D.N.Y. Aug. 30, 2006) [Docket No. 387] (approving exculpation provision precluding liability for "any pre-petition or post-petition act or omission in connection with, or arising out of, the Disclosure Statement, the Plan or any Plan Document, including any Bankruptcy Court orders related thereto, the solicitation of votes for and the pursuit of Confirmation of this Plan, the Effective Date of this Plan, or the administration of this Plan or the property to be distributed under this Plan"); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Jan. 14, 2009) [Docket No. 774] (approving exculpation provision precluding liability arising from "any Claim related to any act or omission in connection with, relating to, or arising out of the Debtor's in or out of court restructuring efforts . . . or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases . . . ., including . . . the Plan Sponsorship Agreement . . . or any other agreement").

compromises necessary to develop a feasible and confirmable Plan. In light of the record in these Cases, the protections afforded by the Exculpation are reasonable and appropriate.  Further, in light of the carve-out for gross negligence and willful misconduct, the standard of care established by the Exculpation is entirely consistent with and appropriate under applicable law.[12] The Exculpation provision is not a mandatory release of all liability, but instead establishes the appropriate standard of liability with respect to the parties exculpated.

C.      The Injunction Provision Is Appropriate.

76.      Pursuant to its terms, the Plan permanently enjoins all Entities from bringing any action that is released pursuant to the Plan or the Confirmation Order (the "**Injunction**").[13] The Injunction provision is necessary to preserve and enforce the Releases and the Exculpation and is narrowly tailored to achieve that purpose. The Injunction is a key provision of the Plan because it enforces the Releases and Exculpation that are centrally important to the Plan.[14]  Thus, the Court should approve the Injunction provision to the same extent it approves the Releases and the Exculpation.

77.      Accordingly, the Proponents submit that the discretionary provisions of the Plan are consistent with and permissible under section 1123(b) of the Bankruptcy Code. In light of the foregoing, because the Plan fully complies with section 1122 and 1123 of the

---

[12] See, *e.g., Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision that covered prepetition lenders, DIP lenders, creditor committees and their members, and the respective affiliates of each except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *In re DJK Residential LLC*, No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct); *Bally*, 2007 WL 2779438, at *8 (same).
[13] *See* Plan, Section 8.6.
[14] *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (court may approve injunction provision in settlement contained in plan of reorganization where such provision "plays an important part in the debtor's reorganization plan").

-28-

Bankruptcy Code, the Proponents submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**The Longman Objection Is Unsupported by Facts and Should be Overruled**

78.     The Longman Objection argues, primarily, that (a) the Trustee should have pursued the dissociation option under the Operating Agreement, (b) the Plan undervalues the Marina Property and (c) there is no impaired accepting class.  All of these arguments have fatal flaws that should be apparent by now.[15]

A.     <u>Dissociation Would Serve No Purpose</u>

79.     Longman would have the Court believe that the Operating Agreement would magically return the "Voting Rights" to the Emerald Membership Interest in the event of a dissociation.  That Longman cannot point to anything in the Operating Agreement that actually would cause such a result is telling.  In fact, it is clear from the document, and even from the language cited by Longman, that dissociation would not reinstate the Voting Rights.

80.      Section 11.3 of the Operating Agreement, which governs the disposition of a Member's interests following a Dissociation, provides that the Company or the non-Dissociating Members shall have the opportunity to acquire a Dissociating Member's "Membership Share".

81.     The Operating Agreement defines "Membership Share" to include "all of the rights of a Member under this Agreement and under the Act, including, but not limited to, a Member's Financial Rights and *Voting Rights*".  (Operating Agmt. at ¶ 1.1(r) (emphasis added)).  However, as this Court is aware, Emerald's Voting Rights were stripped in 2005 on account of

---

[15] The impairment issue is addressed above.  See ¶¶ 54-57.

Longman and Emerald's misconduct towards the Creditors.   As a result, the Emerald's Membership Share only includes Financial Rights.

82.    Further, the Operating Agreement clearly contemplates that a Member may have a non-voting Membership Share.   In section 11.3(b), the Operating Agreement provides that the Membership Share shall be valued without discount for, among other things, "voting versus non-voting interests."   It would make little sense for the Operating Agreement to specifically address the valuation issues relating to the Voting Rights of a Membership Share, but silently effect the reinstatement of Voting Rights previously forfeited or stripped. Additionally, at no point does section 11.3 refer to "Voting Membership Shares", which the Longman Objection seeks to distinguish.

83.    The Trustee analyzed the dissociation option shortly after his appointment and determined that dissociation served no purpose, as it would result in the Trustee continuing in the ownership of the Emerald Membership Interest in the same form as it existed upon his appointment.

B.    The Value of the Marina Property Has Been Clearly Established

84.    The Marina Property is not worth $24.5 million.  There is no evidence that supports such a current valuation.

85.    The Marina Property is worth approximately $8 million.   There is substantial evidence that supports such a valuation.  This evidence includes:

> a)    The marketing process the Trustee just conducted that resulted in a high bid of $8.5 million.   That bid was premised upon a lengthy due diligence process, as well as a lengthy rezoning and permitting period. The bid was to be supported only by a $25,000 fully refundable deposit.
>
> b)    An appraisal completed on January 31, 2015 that concluded that the Marina Property had a current value of $7.96 million (the "**2015 Appraisal**").

-30-

> c)      A marketing process conducted during 2014 (voluntarily resulted in proposals ranging in value from $6.3 million to $9.3 million, each of which was subject to contingencies for due diligence and permits and approvals.[16]

> d)      The three most recent appraisals conducted prior to the Petition Date (the "**Pre-Petition Appraisals**") found that the Marina Property was decreasing in value even after absorbing the impact of the 2009 market collapse.  Between October 2009 and July 2012, three appraisals saw the suggested value of the Marina Property go from as high as $17.25 million to as low as $8.7 million.[17]

86.      Longman does nothing more than (a) second guess the Court-approved marketing process conducted by the Trustee based on the results thereof and (b) attempt to re-write the 2005 Appraisal.  Despite ample opportunity and incentive to do so, Longman still submits <u>no</u> evidence contradicting any of the evidence submitted by the Proponents.

87.      Longman has repeatedly stated throughout the Cases that he would be retaining his own appraiser imminently, but no such appraiser has been retained and no competing appraisal is available to contradict the 2015 Appraisal or the Pre-Petition Appraisals.

88.      Additionally, while the Marina Property could be acquired pursuant to the Plan for $18 million, Longman failed to bid despite insisting that the Marina Property is worth $24.5 million or more.  That is, Longman declined the opportunity to make an easy $6.5 million at the expense of the Kriti.  No explanation is included in the Longman Objection for Longman's decision not to bid for the Marina Property.

89.      Also of note is that the Longman Objection states that "the property has not since been re-appraised to reflect the recovery of the real estate market."  Of course, this is blatantly untrue.  The real estate market collapse occurred in 2009, and the Marina Property was

---

[16]   There was one outlier bid for $12 million that neither the brokers marketing the Marina Property nor the Creditors believed was a credible bid that was likely to close.

[17]   It is worth noting that even a sale price of $17.25 million would likely be insufficient to result in a distribution to the Emerald Estate after satisfaction of (a) the costs of such a sale, including broker's commissions, (b) the debts on Ashley River II's balance sheet and (c) the return of capital contributions to Ashley River II by Kriti.

appraised in February 2011, July 2012 and January 2015.  In each instance, the resulting value (a) declined from the prior appraisal and (b) was insufficient to result in any recovery to Emerald.

90.    Finally, Longman suggests that even if the value is only $8 million, Emerald is entitled to receive 70% of that amount.  This Court is obviously aware that the Emerald Membership Interest retains a junior priority in Ashley River II's capital structure to the approximately $14.6 million of debt on Ashley River II's balance sheet, and Emerald is not entitled to receive anything on account of its equity interest until, among other things, Ashley River II's debts are satisfied.  Clearly, those debts are not being satisfied currently, and Emerald's equity interests are out of the money.

## CONCLUSION

For all of the foregoing reasons, the Proponents submit that the Plan satisfies all of the requirements of confirmation set forth in the Bankruptcy Code and respectfully requests that the Court confirm the Plan.

Dated: October 9, 2015
        New York, New York

**EMMET, MARVIN & MARTIN, LLP**

/s/ Thomas A. Pitta
Thomas A. Pitta, Esq.
120 Broadway, 32nd Floor
New York, New York 10271
(212) 238-3000 (Telephone)
(212) 238-3100 (Facsimile)

**COUNSEL FOR KRITI RIPLEY, LLC AND ASHLEY RIVER PROPERTIES II, LLC**

**GAZES LLC**

/s/ Ian J. Gazes
Ian J. Gazes, Esq.
151 Hudson Street
New York, NY  10013
(212) 765-9000 (Telephone)
(212) 765-9675 (Facsimile)

**COUNSEL FOR IAN J. GAZES, AS TRUSTEE FOR EMERALD INVESTMENTS, LLC AND ASHLEY RIVER CONSULTING, LLC**