Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - x

4    In the Matter of:

5    ASHLEY RIVER CONSULTING, LLC,      CASE NO. 14-13406-mg

6          Debtors.

7    - - - - - - - - - - - - - - - x

8    In the Matter of:

9    EMERALD INVESTMENTS, LLC,          CASE NO. 14-13407-mg

10          Debtors.

11   - - - - - - - - - - - - - - - x

12                          U.S. Bankruptcy Court

13                          One Bowling Green

14                          New York, New York

15

16                          October 14, 2015

17                          10:08 AM

18

19   B E F O R E :

20   HON. MARTIN GLENN

21   U.S. BANKRUPTCY JUDGE

22

23

24

25   ECRO:   JP/KH

1    HEARING Re: (CC: Doc# 34, 38) Approval of Disclosure

2    Statement and Joint Plan of Liquidation

3

4    HEARING Re: (CC: Doc# 57, 61) Approval of Disclosure

5    Statement and Joint Plan of Liquidation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

1   A P P E A R A N C E S :

2

3   WHITE & WOLNERMAN

4       Attorneys for Gayla Longman Irrevocable Trust

5       950 Third Avenue

6       11th Floor

7       New York, NY  10022

8

9   BY:  DAVID Y. WOLNERMAN, ESQ.

10

11  EMMET, MARVIN & MARTIN LLP

12      Attorneys for Kriti Ripley LLC and Ashley River

13      120 Broadway

14      New York, NY  10271

15

16  BY:  THOMAS A. PITTA, ESQ.

17

18  GAZES LLC

19      Chapter 11 Trustee

20      151 Hudson Street

21      New York, NY  10013

22

23  BY:  IAN J. GAZES, ESQ.

24

25

Page 4

1   U.S. DEPARTMENT OF JUSTICE

2         Office of the United States Trustee

3         U.S. Federal Office Bldg.

4         201 Varick Street

5         Suite 1006

6         New York, NY   10014

7

8   BY:   RICHARD C. MORRISSEY, ESQ.

9

10   SCHULTE ROTH & ZABEL LLP

11         Attorneys for the Debtors

12         919 Third Avenue

13         New York, NY   10022

14

15   BY:   KAREN S. PARK, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  We're here in Ashley River Consulting

4    LLC, 14-13406 and Emerald Investments LLC, 14-13407.  Can I

5    have the appearances, please?

6              MR. PITTA:  Good morning, Your Honor, Thomas Pitta

7    at Emmet, Marvin & Martin on behalf of Kriti Ripley LLC and

8    Ashley River Properties II LLC.  With me in court today is

9    David Williams, the managing partner of Kriti Ripley LLC.

10             THE COURT:  Thank you.

11             MR. GAZES:  Good morning, Your Honor, Ian Gazes,

12   I'm the Chapter 11 Trustee.

13             THE COURT:  Thank you.

14             MR. WOLNERMAN:  Good morning, Your Honor, David

15   Wolnerman, White & Wolnerman, PLLC on behalf of the Gayla

16   Longman (ph) Family Irrevocable Trust.

17             MS. PARK:  Good morning, Your Honor, Karen Park,

18   Schultz Roth & Zabel for same.

19             THE COURT:  Thank you.

20             MR. MORRISSEY:  Good morning, Your Honor, Richard

21   Morrissey for the U.S. Trustee.

22             THE COURT:  All right.  Thank you, Mr. Morrissey.

23             Mr. Pitta.

24             MR. PITTA:  Good morning, Your Honor.  We're here

25   to enter a confirmation of the first amended joint plan of

Page 6

1    liquidation, and that was proposed in this case by my

2    clients, Kriti Ripley and Ashley River Properties II, LLC

3    together with Ian Gazes as the Chapter 11 Trustee.

4           We filed the first amended plan on October 9th,

5    last Friday, Your Honor, together with a declaration of Mr.

6    Gazes in support of confirmation, a memorandum of law in

7    support of confirmation as well.

8           The memorandum of law relies on Mr. Gazes'

9    declaration, his prior report of the bidding results in this

10   case, as well as two prior declarations that were filed by

11   Mr. Williams in this case, one in support of our initial

12   motion to dismiss the case, as well as the declaration that

13   was filed in connection with the bid procedures motion, Your

14   Honor.

15          Yesterday we filed a draft of a proposed order

16   confirming the plan.  Just one thing I did want to point out

17   is that the primary change in the first amendment plan from

18   the initial plan that had been filed was to strip out the

19   third party releases.  In light of the bidding results, you

20   know, it was clear that they were not appropriate, and so we

21   decided to take them out voluntarily.

22          Your Honor, objections to the plan have been filed

23   by the Gayla Longman Family Trust, as well as by Schulte.  I

24   would point out that the Schulte objection was filed at 3

25   o'clock yesterday afternoon.

Page 7

1          THE COURT:  It's untimely, but it just simply

2    joins in a portion of the objection filed by the Longman

3    Trust.

4          MR. PITTA:  Understood, Your Honor.

5          Your Honor, it seems to me in looking at the

6    objections, that the primary issue that we have here is the

7    question has been raised regarding whether there's an

8    impaired accepting class under this plan.  And Your Honor,

9    of course, may have other issues that you think you want to

10   address, but I think that's the one that stuck out to me in

11   looking at this as the primary obstacle to confirming this

12   plan.

13         THE COURT:  That's certainly one of the objections

14   that the Longman Trust asserted.  It also asserted that the

15   disclosure statement is inadequate because it failed to

16   address the issue of Emerald's voting rights potentially as

17   a result of a disassociation.

18         In your confirmation memorandum, you address the

19   issues raised regarding the disclosure statement,

20   specifically a discussion of the disassociation, and

21   indicate that it would proffer testimony by Mr. Gazes

22   without his consideration of the effect of his consideration

23   of the disassociation argument.

24         I don't take proffers in connection with a

25   contested confirmation hearing.  So testimony would be

1   required and one of the things I want to -- this is one of -

2   - of course, the situation here is with respect to the

3   disclosure statement and disassociation is that your client,

4   Mr. Pitta, the consent is the only member of the consenting

5   class, it fully knows what the story is.  There's no issue

6   about whether there's been adequate disclosure to your

7   clients on this issue of whether voting rights can somehow

8   be captured or not.  And as to the unsecured class, they

9   voted against.

10          MR. PITTA:  They did.  And, Your Honor, they also

11   are receiving nothing under the plan and are deemed to

12   reject probably.  But we solicited votes, because there was

13   a potential for a distribution.

14          THE COURT:  So just --

15          MR. PITTA:  So I think --

16          THE COURT:  Just stop.  The issue of the adequacy

17   of disclosure is not getting much traction from me because

18   all of you here fully understand the issue.  It does seem to

19   me that I need to hear testimony regarding whether the

20   trustee's evaluation, whether there was merit in the

21   disassociation argument, and whether assuming it was valid,

22   it would have any impact whatsoever on the outcome in this

23   case.

24          Obviously the issue of whether Kriti is -- whether

25   it's class is an impaired class, you know, is both an issue

Page 9

1    of fact and law.  The only authority, the only real

2    authority that Longman Trust has cited in support of its

3    argument is Judge Glasser's decision in 183 Lorraine Street

4    Associates, which is at 198 B.R. 16, EDNY 1996, and you

5    certainly addressed in your memorandum why you think that

6    the case is distinguishable indeed in the context here,

7    where there was an effort to sell the property, unsuccessful

8    effort to sell the property for less than $18 million strike

9    price, and Kriti's agreement early on essentially to fund

10   the administrative costs in the case.

11          Whether that creates the impairment, certainly

12   Judge Glasser in Lorraine Street Associates, in part,

13   addresses the issue, said well it couldn't decide at that

14   point whether under one of three scenarios, the creditor,

15   secured creditor would be impaired and cram down would be

16   possible.  But it couldn't, since there hadn't been a sale -

17   - an effort to sell the property, he couldn't determine

18   whether that class was impaired or not.

19          And your argument is, we know that here.

20          MR. PITTA:  Right.  And he did say that in the

21   context that we have here, the creditor would be.

22          THE COURT:  I'm mindful of that.  I've got the

23   opinion right in front of me and I --

24          MR. PITTA:  Yes.  So --

25          THE COURT:  -- read it over again this morning.

1              Let me ask a couple of questions of both sides.

2    First, Mr. Wolnerman, are you planning to put on any

3    witnesses in support of -- you didn't put in a declaration

4    at all.  You filed an objection, but you didn't put in any

5    evidence at all.  Are you planning to call any witnesses in

6    connection with the confirmation hearing?

7              MR. WOLNERMAN:  It's not our intention, Your

8    Honor.

9              THE COURT:  Okay.  Do you intend to cross-examine

10   any of the plan proponents witnesses?

11             MR. WOLNERMAN:  We do, Your Honor.

12             THE COURT:  Okay.  You know, these -- none of

13   these issues comes to a surprise to you or anybody else that

14   you raised many of these same issues at the time of the

15   bidding procedures motion and before that.  So none of it's

16   -- it's not that you can argue that there's any surprise in

17   their arguments or issues they raised.

18             Are you prepared -- if Mr. Gazes testifies and the

19   -- bear with me a second.  And Mr. Williams testifies, are

20   you prepared to cross-examine them today?

21             MR. WOLNERMAN:  I prefer to do it on another day

22   but.

23             THE COURT:  Well, you know, why -- did you seek to

24   take their depositions?

25             MR. WOLNERMAN:  No, Your Honor.

1          THE COURT:  Okay.  Are you prepared to call them

2      today, Mr. Pitta?

3          MR. PITTA:  If I need to do that, I will, Your

4      Honor.

5          THE COURT:  Well, you know, in a contested

6      confirmation hearing where the objector -- objectors,

7      plural, have -- seems to me have raised both factual and

8      legal issues.  As to the facts, I want to have an adequate

9      factual record on which to proceed.  You can offer the

10     declarations of Mr. Gazes and Mr. Williams, but those

11     declarations don't cover all of the issues that are raised

12     by the objection.  And indeed in your brief, you talked

13     about making a proffer.  I don't accept proffers.  So

14     somebody's got to get on the witness stand and raise their

15     hand and swear to tell the truth and be subject to cross-

16     examination.

17         MR. PITTA:  Your Honor, I think that we would be

18     looking to rely on the declarations, but I would be happy to

19     put Mr. Gazes on the stand to testify to the issue of his

20     consideration of the disassociation option and his

21     determination to not pursue it.

22         I'm not sure that there's really other contested

23     issues of fact here.  I think there's arguments about law,

24     but I think that the facts are fairly --

25         THE COURT:  Let me do this.  Mr. Wolnerman, what

Page 12

 1   do you believe are the contested issues of fact that the

 2   Court has to resolve, in order to rule on the confirmation

 3   of the plan?

 4            MR. WOLNERMAN:  Well, I think that there are a

 5   number.  One is whether or not the Class 1 is impaired.  The

 6   second would have to do with the disassociation notice, if

 7   that is a viable option, and I guess the third and final is

 8   whether in the value of up to or the debtor's 70 percent

 9   interest in that entity.

10            THE COURT:  And are you --

11            MR. WOLNERMAN:  Your Honor, one of the things that

12   -- you know, we may call Mr. Longman.

13            THE COURT:  Is he here?

14            MR. WOLNERMAN:  He is not here.  You know, I --

15            THE COURT:  Well, this is the hearing, you know,

16   if you had a witness you were supposed to have them here and

17   ready to call them.

18            MR. WOLNERMAN:  Only with respect to the sale,

19   Your Honor, because, you know, one of the statements that I

20   would like to make is that Mr. Longman would pay something

21   for his 70 percent interest, his non-voting interest,

22   whether that be a dollar, $10, $1,000 or something other,

23   and he's not here to back that up, but --

24            THE COURT:  Go ahead.

25            MR. WOLNERMAN:  -- that's my statement.

1    THE COURT:  Well, why isn't he here?  This was the

2    hearing -- the hearing was properly noticed.  If you had

3    witnesses that you were intending to call -- you didn't put

4    in an affidavit.

5    MR. WOLNERMAN:  And as I started, Your Honor, I

6    wasn't intending to call a witness.

7    THE COURT:  Okay.

8    MR. WOLNERMAN:  That's the only statement as to

9    value, but I don't believe that that's our burden.

10   MR. PITTA:  Your Honor, the only response I would

11   have to that is this case is ten months old.  At no point in

12   this case, has Mr. Longman been precluded from proposing a

13   plan, he had exclusivity, and then when a trustee was

14   appointed, exclusivity terminated.  We're ten months in and

15   Mr. Longman has made zero efforts to propose a plan or

16   anything -- take any steps towards being prepared to do so.

17   THE COURT:  I believe at the time of the bidding

18   procedures hearing, there was a colloquy in which I made

19   clear that if Mr. Longman by himself or with any affiliates

20   or investors wish to bid on Ashley River II, he could do

21   that.  He hasn't.

22   Earlier in this case, in opposition to the motion

23   to dismiss, Mr. Longman put in an affidavit saying he

24   believed the property was worth $30 million.  On multiple

25   occasions, Mr. Wolnerman said that Longman would engage an

1   appraiser to appraise the property.  It never happened.  It

2   could have at any time.

3           I suppose the proponent's argument is that the

4   best test of the value of the property is what it would

5   bring at the market.  There was bidding procedures approved

6   by the Court, and a process that was undertaken.

7           MR. PITTA:  Your Honor, if the property is worth

8   $30 million, our bidding procedures would have handed Stuart

9   Longman $12 million.

10           THE COURT:  Well, if it was worth $30 million, I

11   assume someone would've come in and offered it, more than

12   the $18 million strike price.

13           MR. PITTA:  But vis a vis Mr. Longman, if he knows

14   that, he had his opportunity.

15           THE COURT:  Indeed in one of my prior opinions,

16   because there have been two, one granting the motion to

17   appoint the Chapter 11 Trustee, one to approve the bidding

18   procedures, Ms. Park acknowledged on the record that unless

19   the property, Ashley River II sold for more than $18 million

20   unsecured creditors, Schulte Roth being the largest of them

21   would recover nothing.  That was acknowledged, that's how

22   the $18 million strike price came about.

23           Unless the property sold for more than the 18

24   million, unsecured creditors would recover nothing.

25   Emerald's non-voting 30 -- 70 percent ownership interest

1   would recover nothing.  And that was -- that's been clear

2   before today.  And, you know, I do want to hear -- Mr.

3   Gazes' declaration does address the issue of the auction.

4   Mr. Wolnerman may have cross-examination he wants to do

5   further about it, but with respect to --

6           MR. PITTA:  So with regard to --

7           THE COURT:  Just stop a second.  You know, Mr.

8   Wolnerman raises three issues, whether the claim -- Kriti's

9   claim is impaired, and that I think is both an issue of fact

10  and law.  What I've been told is, I don't know what

11  administrative expenses have been incurred to date, Kriti

12  agreed to pay, fund the case essentially, but I don't know

13  what that means at this point.

14          Your brief, Mr. Pitta, argues that even if the --

15  I believe this is your argument, that even if the

16  disassociation notice were effective, Emerald at most would

17  have a 70 percent non-voting interest.  It wouldn't

18  resurrect voting rights.

19          MR. PITTA:  Correct.  In addition, Your Honor, I

20  would also point out that whether Emerald's voting or non-

21  voting rights, whether their 70 percent interest has a

22  voting or non-voting interest does not change the fact that

23  it is a horribly underwater position that still has no

24  value.

25          THE COURT:  Right.  Because if the property

Page 16

1    doesn't sell for more than $18 million they would recover

2    nothing; isn't that true?

3              MR. PITTA:  Right.  So the voting --

4              THE COURT:  Mr. Wolnerman is shaking his head no,

5    but I'll let him explain why that's so.

6              MR. WOLNERMAN:  The voting interest doesn't change

7    the fact that it's way out of line.

8              THE COURT:  And as to the value of ARC II and

9    Emerald, if the value of ARC II is less than $18 million,

10   does Emerald have any value?

11             MR. WOLNERMAN:  No.  And I think that that issue

12   is addressed on a declaration of Mr. Williams in connection

13   with the bid procedures motion that goes --

14             THE COURT:  He goes through the Allen sheets, he

15   builds the debt, shows what the accumulated -- what the debt

16   is and the capital arrangements.  Let me hear -- before we

17   move forward, let me hear from -- Mr. Wolnerman, you

18   identified the three issues.  Why does the disassociation

19   make a difference?

20             If Ashley River II is not worth more than $18

21   million, why does the disassociation notice make any notice

22   whatsoever?

23             MR. WOLNERMAN:  Your Honor, because I think that

24   that's kind of -- muddies the waters.

25             THE COURT:  It doesn't muddy.  Answer my question.

Page 17

```
 1              MR. WOLNERMAN:  I'm trying to answer your

 2    question, Your Honor.

 3              THE COURT:  Don't tell me it muddies the water,

 4    tell me why you think it makes a difference.

 5              MR. WOLNERMAN:  Because there are two procedures,

 6    Your Honor, one that was pursued here, which was to sell a

 7    hundred percent in ARC II.

 8              THE COURT:  Which you couldn't do.

 9              MR. WOLNERMAN:  Which I could not do.

10              THE COURT:  You didn't have the ability to do it,

11    Mr. Gazes didn't have the ability to do it.  The only way

12    there was any ability to sell the property ARC II was with

13    the agreement of Kriti, agree?

14              MR. WOLNERMAN:  Agreed.

15              THE COURT:  Okay.

16              MR. WOLNERMAN:  There was a second possibility

17    though, Your Honor.  That instead of selling a hundred

18    percent of ARC II, 70 percent of ARC II would be sold.

19              THE COURT:  70 percent of nothing is nothing.

20              MR. WOLNERMAN:  Well, that --

21              THE COURT:  ARC II is worth $8 million, 8 and a

22    half million dollars.  Emerald's non-voting interest was

23    worthless.

24              MR. WOLNERMAN:  No.

25              THE COURT:  Why not?
```

1           MR. WOLNERMAN:  Because if the property is worth

2     $8 million, then under the association provision, assuming

3     that that's what the appraisal process would bring about, $8

4     million would be put to ARC II and then to Kriti to purchase

5     this property at 70 percent of $8 million, at $5.6 million.

6     That -- the disassociation provision does not take into

7     consideration the amount of ARC II's debts or anything else.

8     It is a pure 70 percent of whatever the appraisers come out.

9     If it's 8 million --

10          THE COURT:  Nonsense.

11          MR. WOLNERMAN:  No, that's what --

12          THE COURT:  ARC II has been found by arbitrators

13    to have -- you tried to recharacterize the debts because

14    Kriti and affiliates had made additional capital

15    contributions.  You tried unsuccessfully to recharacterize

16    the amount of the debt, you failed.

17          MR. WOLNERMAN:  Your Honor, I did not fail, that

18    issue was pushed off to confirmation --

19          THE COURT:  No, no, no, no, I'm talking about in

20    the arbitration.  Arbitrations plural.  I mean, this issue

21    was addressed and decided against your client in one or both

22    of the arbitrations.  I don't remember which one now.

23          MR. WOLNERMAN:  Which issue are we talking about

24    because I'm not --

25          THE COURT:  Well --

1          MR. WOLNERMAN:  The issue of disassociation has

2     never been --

3          THE COURT:  No, not the disassociation, but the

4     amount of the debt that Kriti is owed was at least as of the

5     date of the arbitration was decided.  Do you agree?

6          MR. WOLNERMAN:  There were certain debts that were

7     decided but that --

8          THE COURT:  Certain debts were decided?

9          MR. WOLNERMAN:  Your Honor, it is irrelevant.  It

10    is irrelevant because the operating agreement under the

11    association provisions of the operating agreement, there is

12    not a mention of ARC II's debts.  There's no set-off.  In

13    fact, Your Honor, the operating agreement says that the

14    price shall be determined without set-off, and I can read

15    Your Honor the language.

16         THE COURT:  I know what the language is, Mr.

17    Wolnerman.

18         MR. WOLNERMAN:  Then I don't understand the

19    question, Your Honor.

20         THE COURT:  Okay.  Here, let's go.  Call your

21    first witness, Mr. Pitta.

22         MR. WOLNERMAN:  Your Honor, there are a couple of

23    points that I wanted to respond to --

24         THE COURT:  Go ahead.

25         MR. WOLNERMAN:  -- that were made as well.

 1           There are a couple of things that we've gotten off

 2    track about.  One of them --

 3           THE COURT:  You're off track.

 4           MR. WOLNERMAN:  That may be.

 5           THE COURT:  Since the start of this case.

 6           MR. WOLNERMAN:  One of the issues that I --

 7           THE COURT:  Go call your client and have him come

 8    down here.  Where is he?

 9           MR. WOLNERMAN:  Your Honor, I can call my client.

10           THE COURT:  Where is he?

11           MR. WOLNERMAN:  I don't know.  I don't -- I'm not

12    calling him as a witness, I'm not --

13           THE COURT:  All right.  What's your point?  Let me

14    hear your points.

15           MR. WOLNERMAN:  My point is that upon the

16    appointment of a trustee, this Court or the parties have

17    said that Mr. Longman is not the fiduciary here.  He's not

18    the one who's going to run this case.  So being told time

19    and time again Mr. Longman didn't get an appraisal, where is

20    the trustee's appraisal.

21           THE COURT:  Well, you said you were going to get

22    an appraisal.

23           MR. WOLNERMAN:  And you asked the trustee to get

24    an appraisal and that was not done.

25           THE COURT:  Instead he marketed the property, the

1   whole property which couldn't have been done without the

2   agreement of Kriti.

3           MR. WOLNERMAN:  At $18 million.  You don't know if

4   the property is worth $17 million.

5           THE COURT:  At $17 million you'd get nothing.

6           MR. WOLNERMAN:  No, Your Honor, I would not get

7   nothing.

8           THE COURT:  All right.  What's your next point?

9           MR. WOLNERMAN:  I would get 70 percent --

10          THE COURT:  Tell me what your next point is.

11          MR. WOLNERMAN:  I would get 70 percent.

12          THE COURT:  Tell me what your next point is.

13          MR. WOLNERMAN:  There's been no finding regarding

14   ARC II's debt.  There are certain issues.  Some of the

15   issues that we had raised beforehand was whether or not the

16   capital contributions would go down, but that's beside the

17   point.

18          Your Honor, I think we made it very clear in our

19   papers and the arbitration awards are very clear, I

20   understand that's not the result that certain parties would

21   like, but what was lost in the arbitration were voting

22   rights, not voting membership interest.

23          THE COURT:  There were specific findings regarding

24   the debt.  The -- one of the remedies that was awarded in

25   the arbitration was stripping Emerald of voting rights, but

Page 22

1    there were -- there's much more in that arbitration.   What

2    else?   We're going to get on with the evidence.   Last point.

3             MR. WOLNERMAN:   Okay.   My last point, appraised

4    value shall mean the fair market value as --

5             THE COURT:   Okay.   I know what it says.

6             MR. WOLNERMAN:   No, Your Honor, I'd like to read

7    that into the record.

8             THE COURT:   I know exactly what it says.

9             MR. WOLNERMAN:   Your Honor, I'd like to make my

10   point.

11            THE COURT:   Sit down.

12            MR. WOLNERMAN:   I note for the record that I'm be

13   shrugged down.   This is --

14            THE COURT:   I'm fully familiar with what the

15   language on appraisal in the event of disassociation says.

16   You don't need to read it to me and take the time.

17            Call your first witness, Mr. Pitta.

18            MR. PITTA:   Your Honor, my --

19            THE COURT:   Sit down.

20            MR. PITTA:   Your Honor, we call Ian Gazes.

21            THE COURT:   If you'd raise your right hand and be

22   sworn, Mr. Gazes.

23                    IAN GAZES, WITNESS, SWORN

24            THE CLERK:   Thank you.

25            THE COURT:   All right.   Go ahead, Mr. Pitta.

1          MR. PITTA:  Just a second, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. PITTA:

4    Q    Good morning, Mr. Gazes.

5    A    Good morning, Mr. Pitta.

6    Q    You're the Chapter 11 Trustee for Emerald Investments

7    LLC and Ashley River LLC, correct?

8    A    I am.

9    Q    Mr. Gazes, upon your appointment as the Chapter 11

10   Trustee in this case, were you made aware that a

11   disassociation notice under the operating agreement

12   governing -- let me back up.

13          Are you aware that Emerald Investments LLC is a member

14   of Ashley River Properties II LLC?

15   A    I am.

16   Q    And are you aware that there's an operating agreement

17   governing the ownership and participation of the members in

18   Ashley River Properties II LLC?

19   A    Yes, I am very well aware of it.

20   Q    Upon your appointment as the Chapter 11 Trustee, were

21   you made aware that purportedly prior to the appointment of

22   a trustee, Emerald Investments LLC, at the direction of

23   Stuart Longman had served a disassociation notice under that

24   operating agreement upon the Kriti Ripley LLC?

25   A    Yes.  He did serve such a notice I believe just prior

Page 24

1    to my appointment as trustee in the case.  I did review the

2    notice and I also reviewed the operating agreement and the

3    arbitration award, at which time the voting rights were

4    stripped from Mr. Longman's ability to vote as a member of

5    the entity.

6        At that time, we researched what my ability was to

7    resurrect those voting rights, if there was such a

8    resurrection possibility, since there was a time constraint

9    and a lack of funds for payment of appraisal processes, in

10   addition to many appraisals having already been done, I

11   elected to withdraw the notice without prejudice, so that I

12   may spend some time in my office reviewing whether the

13   disassociation process would somehow, in some way, resurrect

14   the voting rights that were stripped from Emerald.

15       And we understood that research.  We spent a good deal

16   of time looking at cases, look at the arbitration award,

17   looking at the historical data, which involved almost ten

18   years of litigation.  And we determined that based upon the

19   operating agreement and the pre-existing history and the

20   awards, that the disassociation process would not resurrect

21   voting rights.  It was law of the case, that Mr. Longman had

22   never served one before, or had ever asserted such a

23   position before, and that the best way to determine the

24   value of the property would be to ask the Kriti entity to

25   authorize me to sell a hundred percent of the property,

1    which would bring in exactly what the value would be.

2         Although the parties had agreed, and I also agreed,

3    having reviewed all the debt allocations, that we needed at

4    least $18 million to cover the debt of the company.  We

5    advertised the property as an asking $18 million.  And I

6    insisted upon the asking word, which would imply to any

7    potential bidder, that if they wanted to offer $16 million,

8    that would not stop them from doing it.

9         It was never revealed to the public through my brokers,

10   Collier's International, that there was a reserve of $18

11   million on the property.  The Shulte firm had also requested

12   that we not put in a reserve.  I agreed with them, hoping

13   that if the property value offer had come in at 15 million

14   or 14 million and there were two bidders, we might be able

15   to hold an auction, at which time we can raise those bids

16   through the auction process.

17        This property was well advertised, put out I think to

18   the world.  We received only two offers which --

19             THE COURT:  Why don't you -- stop.  Let's ask

20   questions rather than -- okay.

21   Q    Mr. Gazes --

22             MR. PITTA:  May I approach the witness?

23             THE COURT:  Yes, please, go ahead.

24   Q    I'm going to hand you a document.

25             THE COURT:  You need to do more than identify.

Page 26

1          MR. PITTA:  What I've handed the witness is the

2     objection filed by the Gayla Longman Irrevocable Trust.

3     Q    Do you recognize the document, Mr. Gazes?

4     A    I'm sorry?

5     Q    Do you recognize the document?

6     A    Yes, I do.

7     Q    I have a couple of pages there.  An exhibit to that

8     objection is the operating agreement of Ashley River

9     Properties II LLC; is that correct?

10    A    That's correct.

11    Q    Okay.

12         THE COURT:  Mr. Wolnerman?

13         MR. WOLNERMAN:  No objection, Your Honor.

14         THE COURT:  No, do you have it, I just want to

15    make sure.

16         MR. WOLNERMAN:  I brought my own copy.

17         THE COURT:  Okay.  That's fine.

18         MR. WOLNERMAN:  I thought he was offering it as an

19    exhibit.

20         THE COURT:  Are you offering the operating

21    agreement?

22         MR. PITTA:  I'm not offering it.

23         THE COURT:  Okay.  Go ahead, ask your questions.

24    BY MR. PITTA:

25    Q    Mr. Gazes, on page 3 of the operating agreement, can

1    you read the definition of membership chair?

2    A    In subparagraph small little R, "membership share shall

3    mean all rights of a member under this agreement and under

4    the Act, including but not limited to, a member's financial

5    rights and voting rights."

6    Q    Okay.  And, Mr. Gazes, can you read down at letter Z,

7    definition of voting rights?

8    A    "Voting rights shall mean the right of a member to vote

9    on any manner as provided in this agreement or under the

10   Act.  Each member's votes shall be a percentage, expressed

11   as a fraction, the numerator of which in such member's

12   membership shares, and the denominator of which is the total

13   voting membership shares owned by the members."

14   Q    Mr. Gazes, are you aware of the status of Emerald

15   Investments LLC's voting rights under this agreement?

16   A    There are no voting rights under this agreement for

17   Emerald based upon the arbitrator's award.

18   Q    Okay.  If you could turn to page 33, which I've tabbed

19   there as well.  And actually one more page to 32, see

20   Section 11.3, the right to buy upon disassociation.

21            THE COURT:  I'm sorry, you trailed off.

22            MR. PITTA:  I'm sorry, I'm losing my voice, Your

23   Honor.

24            THE COURT:  Okay.

25   Q    On page 32, there's a section, 11.3, the right to buy

1    upon disassociation, right?

2    A    That's correct.

3    Q    And you reviewed these provisions in connection with

4    your analysis of whether to proceed with the disassociation

5    option?

6    A    Absolutely.

7    Q    Okay.

8    A    Many times.

9    Q    And if you'd turn to page 33, there's a section on the

10   purchase price under disassociation; is that correct?

11   A    That's correct.

12   Q    And do you understand what the purpose of the

13   establishment of the purchase price in this agreement is?

14   A    I do.

15   Q    And what is that?

16   A    Well, the purchase price would have been the result of

17   several appraisals, the average of which would have resulted

18   in what the value would be attributable to the association,

19   the party who was selling the interest.

20   Q    Okay.  And under subsection B, there's a second

21   paragraph there that begins, "the purchase price shall be

22   the appraised value as designed herein, of the membership

23   share," correct?

24   A    That's correct.

25   Q    Is that membership share an ownership interest in

Page 29

1   Ashley River Properties II LLC?

2   A    It is.

3   Q    Is it an ownership share directly in the marina

4   property that is owned by Ashley River Properties II LLC?

5   A    I'm not sure I understand the question.

6          THE COURT:  Rephrase that.

7   Q    Ashley River Properties II LLC is the owner of the

8   marina property that we had offered for sale.

9   A    That's correct.

10  Q    Do the members of Ashley River Properties II directly

11  own the marina property, or do they --

12  A    No, they --

13  Q    They own through Ashley River Properties II LLC?

14  A    They do not.  They own an interest in the entity.

15  Q    So is it your understanding that following an appraisal

16  process, the purchase price that would be offered to the

17  other members of the LLC, or the LLC in the first instance,

18  would be the appraised value of the shares in Emerald -- I'm

19  sorry, in Ashley River Properties II?

20  A    That's correct.

21  Q    And is it your understanding that the value of these

22  shares, the equity in Ashley River Properties II LLC is

23  encumbered by being junior to the debts of Ashley River

24  Properties II LLC?

25  A    Of course.

Page 30

1   Q    So if an appraiser had valued the underlying marina

2   property at $8 million, and I will stipulate that 70 percent

3   of $8 million is $5.6 million, would Emerald be entitled to

4   receive $5.6 million?

5   A    No.

6          THE COURT:  Why not?

7          THE WITNESS:  Because the debt of the Ashley River

8   II exceeded the $8 million appraisal.  Therefore, the

9   membership interest would have a zero value.

10  BY MR. PITTA:

11  Q    The disassociation provisions -- are you aware of

12  anything in the operating agreement that would reinstate the

13  voting rights of Emerald Investments LLC upon the effect of

14  a disassociation?

15  A    I haven't found any semblance of any evidence that that

16  would happen.

17  Q    And the operating agreement provides certain rights of

18  parties to acquire the membership share.  If none of those

19  parties acquire the membership share, what happens to it?

20  A    I don't recall, I'd have to go back to the agreement.

21  Q    You're on page 33 of the operating agreement, correct?

22  A    That's correct.

23  Q    There's a paragraph above subsection B that begins "if

24  none of the associating members --" and I'll read it.  "If

25  none of the associating members accept the offer to purchase

Page 31

1    the disassociating membership share within 30 days after

2    receipt of written notice by them, then the disassociating

3    membership share should be transferred to the guardian

4    conservator or legal successors of the disassociating

5    member.

6         "Upon such transfer, the company and non-associating

7    members shall admit the transferee as a member of the

8    company."

9    A    That's correct.

10   Q    So if none of the parties acquire the membership share

11   of Emerald, does that refresh your recollection as to whom

12   it would go to?

13   A    Yes, it does.

14   Q    And who would that be?

15   A    It would be a third party who would become a member.

16   Q    The disassociating member in this case, do you recall

17   who that was?  Who sent the disassociation notice?

18   A    Emerald did.

19   Q    So this paragraph says, that the disassociating

20   membership shall be transferred to the legal successor of

21   the disassociating member.

22   A    That's correct.

23   Q    Are you the legal successor of Emerald, as the trustee?

24   A    Well, I would -- I could be deemed that, yes.

25   Q    If I were to stipulate, for purposes of argument, that

1    the voting rights of Emerald would be reinstated by virtue

2    of disassociation, does that change your opinion as to

3    whether disassociation serves a purpose for this estate?

4    A    It would not change my opinion at all.

5    Q    Do you believe that a voting interest in Ashley River

6    Properties II LLC, a 70 percent voting interest in Ashley

7    River Properties II LLC has any value to the estate?

8    A    It has no value to my knowledge.

9              THE COURT:  Why is that?

10             THE WITNESS:  Because you would have a third party

11   wishing to become a member and be saddled with a 14 to $18

12   million debt load, considerable capital contribution which

13   has not been made by Emerald.  I can't imagine that anybody

14   would want that kind of a situation going into a partnership

15   with an unknown party, having no value, with the company

16   being considerably under water, and subject to immense

17   capital contribution loss.

18             THE COURT:  Go ahead, Mr. Pitta.

19             MR. PITTA:  Nothing further, Your Honor.

20             THE COURT:  Cross-examination.

21             MR. WOLNERMAN:  Thank you, Your Honor.

22             THE COURT:  Let me just, before you start, what

23   we're going to do is I have a very short matter at 11

24   o'clock, it's 10:48.  Start your cross-examination now, I'll

25   call the other matter, it'll only take a few minutes, but I

1    just want you to know about it now, okay?

2              MR. WOLNERMAN:  I appreciate that.

3                        CROSS-EXAMINATION

4    BY MR. WOLNERMAN:

5    Q    Mr. Gazes, I believe you were just asked what happens -

6    - what would happen in the event of disassociation if the

7    members in the company didn't purchase it, didn't purchase

8    the Emerald's interest in ARC II, what would happen?  I

9    believe you testified that you didn't know; is that correct?

10   A    No, I didn't testify I didn't know.

11   Q    So can you just explain what it is that you testified?

12   A    Can you -- is it possible to --

13             THE COURT:  No, it isn't possible to read it back.

14             THE WITNESS:  I believe my answer was, I don't

15   recall, I'd have to look at the agreement.

16   Q    If I can draw your attention to the same document you

17   were looking at, the operating agreement, 11.3(c), that's on

18   page 34.  Are you there?

19   A    I am.

20   Q    Do you see the last -- the first paragraph, the last

21   sentence, "If any party fails to appoint"?  Can you read

22   that to me?

23   A    You're in subparagraph B entitled purchase price

24   (disassociation)?

25   Q    Purchase price (disassociation), correct, on the

1    carryover on page 34 right before subsection C.

2    A    Okay.  And what's the question?

3    Q    Can you read that section to me, that sentence, "If any

4    party fails to appoint" from there?

5    A    "If any party fails to appoint an appraiser within the

6    time required herein, the purchase price determined by the

7    appraiser appointed by the other party shall be conclusive

8    and binding upon the seller and purchaser(s), their personal

9    representatives, legal representatives, heirs, successors,

10   and assigns."

11   Q    And I'm sorry, I had you look at the wrong section, my

12   fault.  If you could turn to 11.3(a) on 33, the last

13   paragraph before subsection B, "If none --"

14           THE COURT:  Just bear with me a second, okay?

15           MR. WOLNERMAN:  Sure.

16           THE COURT:  Just tell me where again you're

17   looking?

18           MR. WOLNERMAN:  I'm on page 33, it's the carryover

19   from Section 11.3(a).

20           THE COURT:  Yes, go ahead.

21   BY MR. WOLNERMAN:

22   Q    Do you see the paragraph that begins, "If the non-

23   disassociating members accept"?

24   A    Yes.  I'm on page 33, right above is subparagraph 3.

25   "If none of the disassociating members accept the offer to

Page 35

1   purchase the disassociating membership share within 30 days

2   after receipt of written notice by them, then the

3   disassociating membership share shall be transferred to the

4   guardian, conservator, or legal successors of the

5   disassociating member.  Upon such --"

6   Q    That's fine, thank you.

7        Mr. Gazes, are you the legal successor?  Would you be

8   the legal successor of the debtor if it were the

9   disassociating member?

10   A    Who is the disassociating member?

11   Q    Assuming that its Emerald, the Debtor Emerald.

12   A    I believe I would be.

13   Q    But you don't have the definitive answer?

14        THE COURT:  He just said he believed he would be,

15   go ahead, ask your next question.

16   Q    Is it your belief that in the event of the

17   disassociation of Emerald in which neither of the non-

18   associating members accepted the offer, that you would then

19   be the legal representative and holding Emerald's shares?

20        MR. PITTA:  Asked and answered.

21        THE COURT:  Sustained.

22   Q    Mr. Gazes, did you ever get an appraisal for this

23   property?

24   A    I received several appraisals.

25   Q    Did you, yourself, order an appraisal for this

1    property, an independent appraisal on behalf of this estate?

2    A    I did not order an appraisal for the property.

3    Q    Thank you.

4         Mr. Gazes, are you familiar with the idea with the

5    concept of financial interest, a financial right as that

6    term is defined under the operating agreement?

7              THE COURT:  I'm sorry, I lost the train.  Ask it

8    again.

9    Q    The question that I asked is, Mr. Gazes, are you

10   familiar, are you aware of what the concept, what the

11   definition of a financial right is, as defined in the

12   operating agreement?

13   A    I'm afraid I don't understand what you mean by the

14   concept of financial interest.

15   Q    What does financial right mean under the operating

16   agreement?

17   A    In what context?

18   Q    In a definition context as Section 1.1.O, how is that

19   defined in the operating agreement?

20   A    There is no definition here for financial interest.

21   Q    Financial rights.

22   A    It's defined in the agreement.

23   Q    And is it members' rights to receive a distribution.

24   A    It defines what their distribution would be.

25   Q    Financial rights defines what the distribution to be,

Page 37

1    or does it define what --

2    A    It says, the right of each member to share in the

3    profits and losses of the company, and the right to share in

4    distributions.  I'm paraphrasing.

5    Q    Is there a distinction between a voting right and a

6    voting membership share under the operating agreement?

7    A    They both have different definitions.

8    Q    Is that a yes?

9    A    They're defined in the agreement.

10   Q    Mr. Gazes, what is a voting right?

11   A    A voting right is defined in the agreement in

12   subparagraph C, which I believe I read into the record

13   already.

14   Q    And how does that, in your opinion, how does that

15   differ from a voting membership share?

16   A    I don't know that there is a difference.

17   Q    So you're saying that those are two of the same things?

18   A    I've answered the question.

19           THE COURT:  Answer it again.

20           THE WITNESS:  What's the question?

21   Q    The answer -- the question is, in your opinion, what is

22   the distinction between voting rights and voting membership

23   interests?

24   A    The voting rights are subsumed into what the voting

25   membership interest is.

1    Q    Now, you've testified before that in the prepetition

2    arbitrations, the Debtor, Emerald, had lost its voting

3    rights.

4    A    That's correct, that's correct.

5    Q    Are you aware of any reference in arbitration or

6    elsewhere that references a loss of the debtor's membership

7    -- voting membership interest?

8    A    I don't recall whether there was specific language to

9    that effect.

10    Q    But wouldn't that directly bear on whether or not the

11    estate can recapture its voting rights, something that you

12    said you researched multiple times, and that you were clear

13    at the end, that that couldn't possibly retake the voting

14    rights?

15            MR. PITTA:   I think it calls for a conclusion.

16            THE COURT:   Sustained.

17    Q    Mr. Gazes, is it your recollection that in prepetition

18    arbitration, that the arbitrator specifically says that

19    Emerald shall not lose its membership interest?

20    A    I believe it did say that.  I don't remember the exact

21    wording.

22    Q    And the definition of membership interest is what?

23    Membership share, I'm sorry.

24    A    The definition of voting membership share shall mean

25    each member's voting membership shares listed on Exhibit A

Page 39

1    attached hereto.

2    Q    Membership share.

3              THE COURT:  Is that a question?

4              MR. WOLNERMAN:  I may have been looking at the

5    different definitions, I'm looking at membership share R,

6    page 3.

7              THE WITNESS:  I'm sorry, I don't understand.

8    Q    How is membership share defined?

9    A    Voting membership shares, is that what you're asking

10   me?

11   Q    No, just membership share.

12             THE COURT:  Page 3, small R.

13             THE WITNESS:  Oh, I'm sorry, I didn't see that.

14   Membership share shall mean all the rights of a member under

15   this agreement and under the Act, including but not limited

16   to a member's financial rights and voting rights.

17   BY MR. WOLNERMAN:

18   Q    And those membership shares were not lost, they were

19   specifically preserved as part of the arbitration.  What was

20   lost were the voting rights.

21   A    The membership interest was not lost.  The voting

22   rights for that membership interest was taken away from Mr.

23   Longman.

24   Q    And, if you can --

25   A    What is the Longman Trust.

Page 40

1   Q    Do you know if the voting membership shares were

2   forfeited or lost in any place?

3   A    Could you repeat that?  I don't think I understand.

4              MR. PITTA:  It'd be helpful if he'd put a document

5   in front of him, Your Honor.

6              MR. WOLNERMAN:  He has a document in front of him.

7              MR. PITTA:  I mean the arbitration award, Your

8   Honor.

9              THE COURT:  Do you want to see the arbitration

10  awards?

11             THE WITNESS:  I would, Your Honor, since he's

12  referencing.

13             MR. WOLNERMAN:  I don't have additional copies.

14             THE COURT:  Let's stop.  Stop.  We're going to

15  take a brief recess while I call the next matter.  Mr.

16  Gazes, you can step down.  Mr. Wolnerman, maybe you can

17  point -- somebody find him the arbitration award, point to

18  him what you wanted to ask about, so when he comes back on

19  the witness stand, he'll have it in front of me, okay?

20             THE WITNESS:  Thank you, Your Honor.

21             MR. WOLNERMAN:  I'm going to reserve my questions

22  for when he gets back on the stand.

23             THE COURT:  Yeah, okay.  Go ahead.

24             THE WITNESS:  Thank you.

25         (Recessed at 10:59 a.m.; reconvened at 11:22 p.m.)

1          THE COURT:  Okay.  I'm recalling Emerald

2     Investments and Ashley River Consulting.

3          Mr. Gaze, why don't you --

4          THE WITNESS:  I understand that I'm still under

5     oath.

6          THE COURT:  You're still under oath, correct.  Let

7     me just -- okay.  Go ahead, Mr. Wolnerman.

8          MR. WOLNERMAN:  Thank you, Your Honor.

9          THE COURT:  Cross-examination resumes.  Go ahead.

10         MR. WOLNERMAN:  Yes, I only have a few more

11    questions.

12    BY MR. WOLNERMAN:

13    Q    Mr. Gaze, I think where we left off, I was asking or

14    wanted to ask, is it your understanding that in the course

15    of the prepetition arbitrations, that Emerald was found to

16    continue to own 70 percent of its membership share?

17    A    That's my recollection, yes.

18    Q    And, Mr. Gaze, am I correct in asserting that shortly

19    after your appointment, you had met, on more than one

20    occasion, with Mr. Longman?

21    A    That's correct.

22    Q    Did Mr. Longman ever offer to pay for the appraisal on

23    behalf of the estate?

24    A    He did offer.  Never produced the funds.

25    Q    Was there an agreement being worked out amongst --

Page 42

1    between the trustee and --

2    A    There was an agreement that --

3         THE COURT:  No, let me hear the rest of the

4    question.

5         MR. WOLNERMAN:  Yes.

6    Q    Was there an agreement being worked out between the

7    trustee, Longman, maybe even other parties that had one of

8    the terms had to do with the appraisal?

9    A    My first call was to work out an agreement with all the

10   parties, and I initially approached Mr. Longman with regard

11   to that agreement, and spent weeks discussing the agreement,

12   and I sent the form agreement over to your office and never

13   heard back from you --

14   Q    No, that wasn't my question.

15   A    -- until about four or six weeks later.

16   Q    Mr. Gaze, my question was, was the proposed appraisal

17   that Mr. Longman said he would pay on behalf of the estate,

18   was that a term -- was not part of one of those agreements.

19   A    Yes, it was.

20   Q    And were any of those agreements ever finalized?

21   A    No.

22   Q    Thank you.

23        Going back to the disassociation provisions, in the

24   event of a disassociation, an appraisal of the company, of

25   ARC II, is it your understanding that any discounts get

Page 43

1    applied?

2    A     What kind of discounts?

3    Q     Any kind of discount.

4           THE COURT:  I don't understand the question.

5           MR. WOLNERMAN:  Okay.  So maybe we can step back.

6    Q     Is it your understanding that the disassociation

7    procedure, process under the operating agreement at the

8    beginning is some sort of appraisal process?

9    A     That's correct.

10   Q     And there are appraisers, more than one possibly that

11   are to be retained, and then an appraisal produced.

12   A     I believe it calls for three appraisals if the parties

13   don't agree.

14   Q     And that appraisal ultimately, there will be an average

15   I think that's what you testified before.

16   A     I don't remember the formula, but there was some

17   formula as concerns what the ultimate price would be based

18   on the three appraisals.  So although the third appraisal

19   may be the final one, and that might have been the binding

20   one, I don't recall.

21   Q     In reaching this appraisal, is it your understanding

22   that the appraisers would use something called fair market

23   value as defined under the operating agreement?

24   A     Whatever the agreement provided for, that's the kind of

25   appraisal that would've been required.

1    Q    Okay.  So let me draw your attention back to page 33,

2    section 3, purchase price.

3    A    Yes.

4    Q    Can you read to me the second sentence of the second

5    paragraph in Subsection B, beginning with "appraised value

6    shall mean"?

7    A    "Appraised value shall mean the fair market value as

8    defined below of the membership share obtained by agreement

9    of two appraisers, one appointed by the seller, and one

10   appointed by 51 percent of the remaining members on behalf

11   of the company."

12   Q    Now, in reaching that fair market value appraisal, is

13   it your understanding that the appraiser is authorized under

14   this agreement, to deduct any amount for lack of

15   marketability, minority interest, lack of voting, debt?

16   A    You're asking me two different things.  The appraisal

17   has to do with the value of the company, not of the 70

18   percent interest.

19   Q    I understand that.  So when the appraiser puts together

20   an appraisal of the hundred percent of ARC II, is it your

21   understanding that the appraiser is allowed to then deduct

22   the amount of ARC II's debts from the appraised value?

23   A    Again, I think you're mixing apples with oranges.  The

24   appraiser is only to give value, the appraiser doesn't then

25   value the value of the membership interest.  The agreement

Page 45

1    is what guides on the membership interest value.

2    Q    Again, I'd offer you to answer my question.  My

3    question was, in reaching that appraised value, does the

4    appraiser have any authorization to reduce, whatever value

5    they reach, based on ARC II's debt?

6            MR. PITTA:  Your Honor, it's a 40-something paged

7    document, is there a provision in here that he wants to

8    point him to?

9            THE COURT:  If he can answer it, he'll answer it.

10   The objection is overruled.  Are you able to answer the

11   question, Mr. Gazes?

12           THE WITNESS:  No, I'm not, Your Honor, I'm sorry.

13           THE COURT:  Ask your next question.

14   BY MR. WOLNERMAN:

15   Q    And you're not sure after studying and researching it?

16           THE COURT:  Ask your next question, objection is

17   sustained, ask another question.

18   Q    If I can draw your attention to page 33, Subsection B,

19   the second paragraph, the sentence right after the one you

20   read.  Isn't it true that that provides that in reaching the

21   fair market value, that no discounts from an RA interest,

22   lack of marketability or other similar discounts, included

23   but not limited to those related to undivided interest in

24   real estate, voting versus non-voting interest, blockage,

25   key person or portfolios shall be taken into account?

Page 46

1   A     That's what it says.

2   Q     So my question to you, is in reaching your conclusion,

3   I think this is what -- you correct me if I'm wrong, I

4   believe what you had testified before was that in the event

5   of a disassociation, that even assuming that the estate got

6   the voting rights back, that the value, Emerald's value, the

7   value of 70 percent interest in ARC II would still be

8   worthless, because you would have to deduct the amount of

9   ARC II's debt; is that correct?

10  A     I don't -- you're paraphrasing what my answer was.  I

11  don't recall using that language, so I can't answer that

12  question.

13          MR. WOLNERMAN:  Your Honor, I'm going to ask the

14  question again then.

15          THE COURT:  No, you're not.  Ask another question.

16          MR. WOLNERMAN:  I will.  I'm going to ask the

17  question that Mr. Pitta asked.

18  Q     Is assuming that there was a disassociation event, and

19  assuming that the result of that disassociation event, was

20  that Emerald was to recapture its voting rights, is it your

21  opinion that Emerald's 70 percent interest in ARC II would

22  have value?

23  A     It's my opinion that it would not have value.

24  Q     You value it at zero?

25  A     Or negative.

Page 47

1   Q   And you got to that conclusion by deducting the amount

2   of ARC II's debt; isn't that correct?

3           THE COURT:  Your position is that he's supposed to

4   pay $5.6 million dollars when the interest, the membership

5   interest is worthless.  That's the most ridiculous I've

6   heard.  Ask another question.

7           MR. WOLNERMAN:  Your Honor, I take exception to

8   that.

9           THE COURT:  Well, take all the exception you want.

10   Ask another question.

11           MR. WOLNERMAN:  That's exactly what the operating

12   agreement calls for.

13           THE COURT:  Ask another question, ask a question.

14           MR. WOLNERMAN:  I asked my question, I'd like my

15   answer.

16           THE COURT:  Overrule -- the objection is

17   sustained.  Ask another question.

18           MR. WOLNERMAN:  I have no further questions, Your

19   Honor.

20           THE COURT:  Ms. Park, do you wish to cross-

21   examine?

22           MS. PARK:  No, thank you.

23           THE COURT:  Okay.  Redirect.

24           MR. PITTA:  I'll be brief, Your Honor.

25           THE COURT:  I do want to hear about the

Page 48

1    administrative expenses.

2            MR. PITTA:  I'll get to that.

3            THE COURT:  Okay.

4                        REDIRECT EXAMINATION

5    BY MR. PITTA:

6    Q    Mr. Gazes, Mr. Wolnerman just read a sentence to you

7    from Section 11.3.B in that second paragraph that said, "No

8    discounts for minority interests, lack of marketability, or

9    other similar type discounts shall be taken," correct?

10   A    That's correct.

11   Q    Would you consider the amount of debt that comes before

12   the equity in a company to be a similar discount to whether

13   the equity in their company is marketable or has voting

14   rights?

15   A    No, I would not.

16   Q    Is it your understanding that the capital structure of

17   the company, the equity comes behind the debt.

18   A    That's correct.

19   Q    And that has nothing to do with whether the shares are

20   marketable or has voting rights?

21   A    That's correct.

22            MR. WOLNERMAN:  Objection.

23            THE COURT:  Overruled.

24   Q    Mr. Gazes, you're the proponent or co-proponent of the

25   first amended joint plan of liquidation, correct?

1    A    I am.

2    Q    You're generally familiar with the terms of the plan.

3    A    I am.

4    Q    What does the plan provide with respect to payment of

5    administrative claims?

6    A    Kriti has agreed to fund the Chapter 11 administration

7    expenses a hundred percent.

8    Q    So whatever allotted administrative expenses there are,

9    Kriti has agreed to pay upon confirmation of the plan.

10   A    That's correct.

11   Q    Do you have any sense, as of today, what the amount of

12   the administrative claims that you expect there to be?

13   A    I believe that the administration expenses for

14   professionals to date are around $80,000, and plus a United

15   States Trustee quarterly fees, which are about, I believe,

16   around 3 to $3,500.

17   Q    So the -- you expect the total administrative expenses

18   to be in excess of $90,000?

19   A    I do.   Subject to Court approval of costs.

20   Q    You're aware of a case called 183 Lorraine Street

21   Associates has been referenced in this matter as a --

22              THE COURT:  We're not going to get into issues of

23   law with testimony.

24              MR. PITTA:  I just want to get to a fact issue.

25   Q    Are you familiar with the facts of that case generally?

1   A    Difficult to follow but I'm familiar.

2   Q    Do you recall that in that case, the secured creditor

3   had agreed to contribute $5,000 to a junior class of --

4   A    To the general unsecureds, yes.

5   Q    In your opinion, do you think that the contribution

6   that's been promised by Kriti in this case is significantly

7   greater than that, and leads to a real impairment of their

8   claim?

9   A    I believe so.

10        MR. PITTA:  That's all I have.

11        THE COURT:  Let me ask, Mr. Pitta, are you

12  offering Mr. Gazes' declaration which is dated October 9th,

13  2015, it's Declaration of Ian Gazes, Chapter 11 Trustee for

14  Emerald Investments, LLC and Ashley River Consulting LLC in

15  support of confirmation, the first amended joint plan of

16  liquidation?

17        MR. PITTA:  I am, Your Honor.

18        THE COURT:  Any objection?

19        MR. WOLNERMAN:  No objection.

20        THE COURT:  All right.  The declaration is

21  admitted into evidence.

22        Mr. Gazes, when did you withdraw the notice of

23  disassociation?

24        THE WITNESS:  I remember that there was a time

25  limitation on which the disassociation notice took effect,

Page 51

1    so I did it, I believe within a week or two weeks of my

2    appointment.

3              THE COURT:  Okay.

4              THE WITNESS:  But I did it without prejudice.

5              THE COURT:  Any further questions?

6              MS. PARK:  Your Honor, can I ask -- I'd like to

7    ask one question based on the questions asked --

8              THE COURT:  Go ahead, Ms. Park.

9                        CROSS-EXAMINATION

10   BY MS. PARK:

11   Q    Good morning, Ms. Gazes.

12   A    Good morning.

13   Q    Just one question with respect to the question related

14   to the admin expenses contributed by his client.  Is it your

15   view that the admin expenses put in by Kriti, the funding of

16   those expenses, is that a part of its secured claim?

17             MR. PITTA:  That calls for a conclusion, Your

18   Honor.

19             MS. PARK:  Well, the question that was asked that

20   I heard, was that it meant to lead his conclusion that led

21   to impairment of the secured claim, so it's a follow-on of

22   that question.

23             THE COURT:  Do you have the question in mind?

24             THE WITNESS:  I'm sorry, Your Honor?

25             THE COURT:  Ask your question again, Ms. Park.

Page 52

1   BY MS. PARK:

2   Q    Is it your view that the admin expenses and the funding

3   of that contributed by Kriti forms a portion of its secured

4   claim?

5              MR. PITTA:  Objection to form then, Your Honor.

6              THE COURT:  Overruled.  If you have a view on it.

7              THE WITNESS:  I've never really thought about it.

8   I don't believe so.

9              MS. PARK:  Thank you.

10             THE COURT:  Okay.

11             MR. WOLNERMAN:  Can I ask something?

12             THE COURT:  Go ahead, Mr. Wolnerman.

13                      RECROSS-EXAMINATION

14   BY MR. WOLNERMAN:

15   Q    Mr. Gazes, what value does Kriti's contribution of

16   admin claims, payment of admin claims, what is attributed to

17   this estate?  There are agreements to pay your fees going

18   forward, what benefit does it not have to creditors or the

19   estate?

20   A    Well, administration expenses are creditors in the

21   case, so for me, it has significant value.

22   Q    So general unsecured creditors, does that have any

23   value?

24   A    No, it does not.

25   Q    Did this process provide any value to general unsecured

1    creditors?

2    A    No, did not.  It could have, but it did not.

3    Q    If Kriti did not agree to fund your administrative

4    expenses, how would you have maximized the value on behalf

5    of this estate?

6    A    I probably would have had a 363 or requested for a 363

7    sale of the property.

8    Q    On which property?

9    A    Of the debtor's interest, 70 percent.

10   Q    Even though you believe that has no value.

11   A    That's correct.  That would have demonstrated the no

12   value if that's the way it turned out.  So I would have had

13   the ability to close the case.

14              THE COURT:  Mr. Pitta?

15              MR. PITTA:  Nothing further for this witness, Your

16   Honor.

17              THE COURT:  All right.  You can step down, Mr.

18   Gazes.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  Call your other witness, Mr. Pitta.

21              MR. PITTA:  Your Honor, I believe at this point,

22   we'll be relying on the declarations.

23              THE COURT:  Do you want to offer -- you haven't

24   offered the declarations.

25              MR. PITTA:  So I would like to offer the

Page 54

1    declaration of David Williams in support of both the motion

2    for an order dismissing debtor's cases, or in the

3    alternative granting relief from the automatic stay, which

4    is Docket No. 23 in this case.

5              And the declaration of David Williams in support

6    of the motion for an order approving marketing, bidding and

7    sale procedures in connection with a joint plan of

8    liquidation under Docket No. 61, both of course, references

9    to the Emerald docket, Your Honor.

10             THE COURT:  Any objection?

11             MR. WOLNERMAN:  No objection, Your Honor.

12             THE COURT:  All right.  The two declarations of

13   David Williams, ECF Dockets No. 23 and 61 will be admitted

14   into evidence.

15             MR. PITTA:  And finally, Your Honor, one pick-up

16   as well, is that we would offer for evidence the trustee's -

17   - Chapter 11 trustee's report of bidding and sale for the

18   marina property, the trustee's auction report which was

19   filed at Docket No. 91 in this case.

20             THE COURT:  Any objection?

21             MR. WOLNERMAN:  No objection.

22             THE COURT:  All right.  Trustee's report ECF

23   Docket No. 91 is in evidence.  Do you rest, Mr. Pitta?

24             MR. PITTA:  Yes, Your Honor.

25             THE COURT:  All right.  Mr. Wolnerman, do you wish

1    to present any evidence?

2           MR. WOLNERMAN:  No, Your Honor.

3           THE COURT:  All right.  Let's hear closing

4    argument.  Mr. Pitta.

5           MR. PITTA:  Your Honor, as I went through earlier,

6    we believe that the facts of this case fall squarely within

7    the portion of 183 Lorraine Street where the judge there

8    found that a secured creditor who receives his collateral

9    under the plan, but who agrees to pay junior creditors is

10   impaired and not is receiving the full value of its

11   collateral.

12          We therefore believe based on that, that there is

13   an impaired class that accepted this plan, which is Class I,

14   the Kriti claim class.  Kriti has a judgment for $1.7

15   million and all the evidence in this case suggests that on

16   account of that it's getting zero dollars and contributing

17   cash to the case, so we do think there is an impaired

18   accepting class.

19          Your Honor, shortly after the case was filed, we

20   sought a dismissal of the case.  And Your Honor declined

21   that and appointed a trustee and said it stay in Chapter 11.

22   And let's try and get to a resolution in Chapter 11 with a

23   trustee, an impartial third party who you thought would be

24   able to negotiate with the parties, because the parties, as

25   they existed, one of your findings of your trustee opinion

Page 56

1    was that the parties couldn't work together.

2             So upon the trustee's appointment, we went to work

3    on trying to reach a deal with the trustee.  immediately

4    after his appointment, we provided extensive background

5    information to him, financials of Ashley River Properties to

6    both with respect to the assets, i.e., the historical bids

7    or bidding information for the marketing processes that had

8    happened in the past, various appraisals that had been done

9    on the property, as well as all the debt documentation.

10            All the debt documentation that was submitted in

11   connection with Mr. Williams' declaration on the bid

12   procedures was provided --

13            THE COURT:  That are exhibits to his --

14            MR. PITTA:  They're exhibits to his declaration.

15   All that information was provided to the trustee.  As soon

16   as it could be compiled after his appointment.

17            We spent a fair amount of time with the trustee

18   and his counsel going over that information, getting them to

19   understand how the debt bridged from the 2010 arbitration

20   award to where it is today.  We don't think that there is

21   any legitimate question as to those debts.  Nobody has ever

22   sought to cross-examine Mr. Williams or provide any evidence

23   to the contrary for the fact that as of December 31, 2014,

24   that Ashley River Properties II worth approximately $14.6

25   million.

1        In addition, the trustee said, I need to know what

2   I have here, I need to know what the value is.  And we said,

3   well, we just had an appraisal done two months ago, and we

4   said --

5        THE COURT:  That's the $7.9 million appraisal.

6        MR. PITTA:  The $7.9 million.  In addition we told

7   him just last year we had professional brokers market this

8   thing, and the bids came in between 6 and 9 million with one

9   $12 outlier that apparently nobody thought was credible, but

10  even so, it was $12 million, it still wasn't enough.

11       In addition we showed him the history of

12  appraisals of this property.  And Mr. Longman and his

13  counsel continue to point to an eight year old appraisal

14  before the world fell apart, that said this thing was worth

15  20 something million dollars.

16       Prior to the $7.9 million appraisal that we

17  received in January or February of this year, there were

18  three intermediary appraisals, all of which took place after

19  the market collapsed in 2009.

20       Those appraisals, which are in the record, Your

21  Honor, show the value decreasing each time the property was

22  appraised.  And in no instance, did the maximum value found

23  under any of those appraisals in no instance would that

24  value inure to the benefit of the Emerald estate.

25       Every bit of evidence, save for one eight year old

1      appraisal that's been contradicted four times by appraisals

2      and two times by marketing processes, says that this

3      property simply is not worth what everybody once hoped it

4      would be.  It's worth about $8 million.

5                  THE COURT:  Is it underwater today?  I mean, what

6      happened in the recent floods?

7                  MR. PITTA:  It's actually fine, Your Honor.  They

8      apparently lost one tree, so they were quite lucky.

9                  So we presented all of this to the trustee, and he

10     said, okay, but what do I have, what evidence do I have.

11     And we agreed, which we didn't have to do, we could've just

12     come back before you and said, you know what, Judge, we want

13     relief from the stay now, or we want to dismiss the case now

14     and have a trustee, we didn't.

15                 THE COURT:  Now, really I denied the motion to

16     dismiss without prejudice.

17                 MR. PITTA:  Yes, and we could have come back and

18     we didn't.  Instead what we did was say, you know what,

19     let's reach a commercial and reasonable deal.  Let's give

20     this trustee an opportunity to figure out if we're right, or

21     Mr. Longman is right, we'll give you the keys, we'll let you

22     hire the brokers, and you go figure out what the value of

23     that property is.

24                 And if it comes back that there's value to this

25     estate, you can have it.  We will sell the property.  But if

Page 59

1    it comes back that this estate has no existing equity in the

2    debtor in in Ashley River Property II well then let's

3    finally bring this all to a conclusion.

4            We've got ten years or more of litigation between

5    these parties.  Litigation that the South Carolina Supreme

6    Court described as a pattern of abusive litigation by Mr.

7    Longman.  Well, the trustee came in, and say, okay, that

8    makes sense, let's bring this to an end, I don't continue to

9    the charade that's gone on for a long time here.

10           Let's figure out what the value is, and if there's

11   value, I get it, and if there's not, then we'll turn over

12   the shares in accordance with the absolute priority rule.

13   The secured creditor gets its property.

14           The trustee retained Colliers, as a result of the

15   discussions and the objections that were raised to the bid

16   procedures motion, we extended the bidding period.  We ran a

17   full process, Mr. Gazes' declaration details the work, that

18   Colliers did at his insistence.  The extensive marketing

19   where this property was put in front of thousands of

20   potential investors, untargeted lists that Colliers retains,

21   as well as just more general public advertising.

22           And the result of that work was to confirm what my

23   client unfortunately already knew, is that this property

24   simply doesn't have the value that people hoped it once did.

25           And so here we are, and we have what's an

Page 60

1    unfortunate conclusion to this case, nobody likes to see a

2    case where unsecured creditors are getting nothing, and the

3    trustee's just turning over property.

4           But anything else, any other result would simply

5    be permitting Mr. Longman and Shulte, his former counsel,

6    who were the parties that engaged in the ten years of

7    litigation, or Shulte for a portion of it, to extract some

8    value on account of value that doesn't exist at their claim

9    level.

10          Mr. Longman has equity in Emerald Investments LLC,

11   that's all he has.  He's not even a creditor, so he sits

12   behind about $3 million of unpaid legal fees, Emerald

13   Investments, all of which was used to litigate against my

14   client.  So he's clearly out of the money.

15          But we also know that the lawyers who got

16   themselves into an unfortunate position with an unfortunate

17   client are also out of the money here.

18          Shulte does have a judgment against Mr. Longman,

19   and they can go chase him down.  I wish them good luck.  But

20   there's no value to this estate.

21          And I think that based on the evidence that's

22   before the Court, there's significant facts to back that up.

23   The Gazes' declaration details the efforts that were

24   conducted to ascertain that value.  And the Williams'

25   declaration, particularly the bid procedures one, details

Page 61

1    the debts that burden Emerald's equity in Ashley River

2    Properties II.

3         Your Honor I think accurately got the point about

4    disassociation, which is that somehow Mr. Longman believes

5    that by disassociating himself from Ashley River Properties

6    II, his equity somehow leapfrogs the debt and he should be

7    paid a portion of I guess what you would call the enterprise

8    value of --

9         THE COURT:  Oh, I suppose a question is, did the

10   trustee exercise appropriate business judgment in deciding

11   to withdraw the notice of disassociation, proceed to

12   negotiate with Kriti, and reach an agreement as to the

13   marketing of the real property as opposed to just membership

14   interest.  And it seems to me that that's an issue that I

15   need to decide if the trustee acted in good faith with

16   knowledge of -- after reasonable inquiry, with knowledge of

17   the facts and circumstances, and his legal evaluation, did

18   he exercise appropriate business judgment in withdrawing the

19   notice of disassociation, because he's testified that's what

20   he did.

21        If that's the case, it seems to me that the whole

22   brouhaha of whether -- you have to go down the road of

23   figuring out what happens with disassociation, whether you

24   recover back voting rights, or not recovering voting rights,

25   whether the -- Emerald's voting or non-voting equity

Page 62

1    interest had any value to the estate, because he's the

2    trustee for the estate, that seems to me to be the issue

3    that I need to focus on.  Do you agree or disagree with

4    that?

5            MR. PITTA:  I agree in part, Your Honor, that's a

6    preliminary agreement.  I think that even if you were to

7    find that the trustee didn't do everything he should have to

8    investigate disassociation, the operating agreement is in

9    evidence, it's before Your Honor.  And as a simply legal

10   matter, there's no basis for finding what Mr. Longman would

11   have, you believe here.

12           Which is that by disassociating from this LLC and

13   his 70 percent equity ownership in this LLC, he would be

14   somehow be able to leapfrog the creditors of the LLC, and --

15           THE COURT:  Your position is that Kriti's

16   affiliates are entitled to be repaid their debt and the

17   arbitration determined it was debt not recharacterized as

18   equity.

19           MR. PITTA:  That's not my position, that's the

20   arbitrator's.

21           THE COURT:  That was the arbitrator's, and that's

22   -- you know, that's a final judgment.  It was confirmed, the

23   arbitration award was confirmed to determine that those were

24   valid debts, and your position is those debts had to be

25   repaid before equity interests received anything.

1          MR. PITTA:  I think that's simple black letter

2     law, Your Honor.

3          Mr. Wolnerman argued, pointing to Section 11.3(b)

4     of the operating agreement, the disassociation section, but

5     you can't discount the membership interest and he pointed to

6     a provision here that says, "no discounts for minority

7     interests, lack of marketable, or other similar type

8     discounts."

9          THE COURT:  He gets a hundred percent of nothing.

10         MR. PITTA:  Correct.  The amount of debt that sits

11    on the company's balance sheet is not --

12         THE COURT:  A hundred percent of the 70 percent of

13    nothing.

14         MR. PITTA:  Right.  The amount of debt that sits

15    on a company's balance sheet ahead of equity is not a

16    similar type discount to marketability or voting rights of

17    those equity interests.

18         In addition to that, the disassociation provision

19    in 11.3(b) of the operating agreement sets a purchase price

20    upon disassociation.  And what it says, is that the purchase

21    price shall be the appraised value, as defined herein, of

22    the "membership share."

23         Now, the membership share is defined as all the

24    other rights of a member under this agreement and under the

25    Act, including but not limited to a member's financial

Page 64

1   rights and voting rights.

2          The arbitration decision specifically stripped Mr.

3   Longman of the voting rights.  So all that's left in the

4   membership share is the member's financial rights.

5          THE COURT:  And Mr. Gaze as the Chapter 11 trustee

6   controls those.

7          MR. PITTA:  Correct.  But so what the

8   disassociation says is that a membership share is what's in

9   play upon a disassociation.  Mr. Longman and his counsel

10  point to a distinction between voting rights and voting

11  membership shares.  And I think they have it backwards.

12         Voting membership shares is within voting rights.

13  If you look at the definition of voting rights, each

14  member's voting rights shall be a percentage expressed as a

15  fraction, a numerator of which is such member's voting

16  membership shares, and the denominator of which is the total

17  voting membership shares owned by all the members.

18         So voting membership shares is a piece of voting

19  rights which was taken by the arbitrators as confirmed by

20  the judgment in the New York Supreme Court.  If what the

21  disassociation provisions do is to put the membership share

22  in play, it doesn't say I believe anywhere in Section 11.3,

23  anything about the voting membership share.  It talks about

24  the membership share.  And the membership share consists of

25  among other things voting rights.

1           So if the membership share and thus the voting

2     rights of the member are in play in this case, this member

3     has no voting rights.  They've been taken away.  And so all

4     that can be transferred upon a disassociation, to whomever

5     it goes, are the financial rights of the member.

6           Your Honor, I think in terms of the objection of

7     the disclosure statement, we address it in our brief.

8     What's required is -- well, I'll take a step back and say,

9     that the Bankruptcy Code says you can't solicit votes

10    without an appropriate disclosure statement.

11          Here as to the dissenting classes are technically

12    deemed to reject this plan at this point, I'm not sure that

13    that's all that relevant.  But beyond that, what the cases

14    say is that it's -- what you need to have in there is

15    information that would be helpful.  And here, I don't think

16    Mr. Longman could complain that he didn't have enough

17    information in the disclosure statement to determine what to

18    do.

19          This isn't a case where we have thousands of

20    creditors, and you've got somebody coming and saying,

21    there's a lot of people out there that don't necessarily

22    know what they're doing here.  This is a case that literally

23    has four parties in interest, three of whom have actually

24    been active plus the trustee.  You have my clients, Mr.

25    Longman, Shulte Roth and Young Garren (ph) as the trustee

Page 66

1    for Thalen Reed (ph) who has not participated in the case at

2    all.

3            THE COURT:  He's the trustee for who?

4            MR. PITTA:  Thalen?

5            THE COURT:  Yes.

6            MR. PITTA:  All of the parties who voted on this

7    plan are (indiscernible) on this plan, have been actively

8    involved in this case.  They know the issues, they've all

9    been previously argued and briefed.  I don't think that the

10   lack of an inclusion clearly vis a vis Mr. Longman, the lack

11   of inclusion of the disassociation provisions was not a

12   factor in his vote because he briefed the issue in his

13   objection, so.

14           THE COURT:  Well, look, the reality is that from

15   day one of this case, Mr. Longman has done everything he can

16   possibly do to derail this case, to delay it, that was

17   certainly central to my decision ordering the appointment of

18   a Chapter 11 trustee.  It's revisited again in the opinion

19   granting the motion to approve the bidding procedures.  So

20   there's been no -- I guess -- well, there's been no doubt

21   from the start, from day one, what Mr. Longman and he is the

22   sole trustee of the Gayla Longman Irrevocable Trust, what

23   his objectives in this case have been from day one.  And

24   he's acted consistently with that throughout.

25           I think I have your arguments, Mr. Pitta.

1          MR. PITTA:  Yes, Your Honor.

2          THE COURT:  Mr. Gazes, do you want to be heard

3     very quickly?

4          MR. GAZES:  Yes, Your Honor.  I just wanted to add

5     with a little bit of clarification with regard to the

6     exercise of this appropriate business judgment.  At that

7     point in time in reviewing that would be my determination

8     whether to reinstate the notice of disassociation or

9     otherwise just not --

10          THE COURT:  You withdrew it without prejudice.

11          MR. GAZES:  That's right.

12          THE COURT:  You -- my understanding of your

13     testimony, you considered what the best course of action

14     would be to maximize the value of the estate.

15          MR. GAZES:  That's correct.

16          THE COURT:  Rather than seeking to reinstate it,

17     you negotiated.

18          MR. GAZES:  That's correct.  And probably so, I

19     began my negotiations with Mr. Longman and then Kriti.  So

20     that's where my negotiations began.

21          THE COURT:  Thank you.

22          MR. GAZES:  Thank you.

23          THE COURT:  All right.  Counsel.

24          MR. WOLNERMAN:  Thank you, Your Honor.  I'd like

25     to start with just what I perceive as maybe a fundamental

1   confusion.  I've heard this notion of leapfrog now a couple

2   of times, and I frankly don't understand what that means.

3           The intent of the disassociation provision, which

4   is -- that's what was Longman's intention from day one, as

5   he made clear, and I made clear on the record from day one.

6           THE COURT:  Well, he didn't make clear.  I --

7           MR. WOLNERMAN:  You asked me, and I --

8           THE COURT:  Oh, I did, because you didn't raise

9   it, I raised it with you on day one, it was clear to me what

10  your gambit was in filing the Chapter 11 case.  I raised it,

11  you acknowledged that was correct.

12          MR. WOLNERMAN:  Yes.  So from day one, we've had

13  that decision.  The leapfrogging is a fundamental confusion.

14          THE COURT:  Let me ask you this, is there

15  something in any of the documents that prevented the Chapter

16  11 trustee from withdrawing the notice of disassociation?

17          MR. WOLNERMAN:  You mean the documents?

18          THE COURT:  Yeah.  The uncontradicted testimony is

19  -- stop, let me ask my question.  The uncontradicted

20  testimony, uncontroverted testimony is that the Chapter 11

21  trustee shortly after his appointment withdrew without

22  prejudice the notice of disassociation.  And my question to

23  you is, is there anything that you can point to that

24  prevented the Chapter 11 trustee from doing what he did?

25          MR. WOLNERMAN:  Only his fiduciary obligations,

1    Your Honor.

2              THE COURT:  Okay.  So if he --

3              MR. WOLNERMAN:  As the estate representative.

4              THE COURT:  Okay.  And you agree that if he acted

5    consistently with his fiduciary duty as trustee, he had the

6    authority to withdraw the notice of disassociation, correct?

7              MR. WOLNERMAN:  Correct.

8              THE COURT:  Okay.

9              MR. WOLNERMAN:  Back to my leapfrog argument, what

10   we've been trying to accomplish is not to give equity

11   something in -- before unsecured creditors, it's not to give

12   equity or Longman anything before anybody else.  What we

13   tried to accomplish was to have the estate realize value, is

14   that its voting rights could be returned to the estate,

15   which continues to be our position that contractually that's

16   what the operating agreement says.

17              That if value could be returned to the estate, now

18   you have an asset that can be sold.  You don't have an

19   asset, that is a 70 percent non-voting, you know, $1 or $10

20   asset.  You now have a 70 percent controlling voting

21   interest in what is -- let's call it $8 million, not that

22   the estate made its own appraisal of that.

23              THE COURT:  It's your position that payment of

24   legitimate debts of ARC River II don't come ahead of the

25   membership interests receiving anything?

1            MR. WOLNERMAN:  Correct, that is exactly what the

2    operating agreement says.

3            THE COURT:  That's nonsense.  No, it does not say

4    that.  That's absolute nonsense.  Your position is that your

5    client should have received $5.6 million for an absolutely

6    worthless membership interest, the agreement doesn't say

7    that, you haven't pointed to language in it that says it.

8    It's a ridiculous position.

9            MR. WOLNERMAN:  Your Honor, again, I'm not arguing

10   that my client should get anything pursuant to the

11   disassociation provision.  That is the fundamental confusion

12   that I'm trying to address.  It's that the estate should get

13   its 70 percent voting interest.  And whether or not -- what

14   is it worth, it's worth $8 million.  And pursuant to the

15   operating agreement --

16           THE COURT:  Not if there's 14 and a half million

17   dollars of debt ahead of it.

18           MR. WOLNERMAN:  But that's not --

19           THE COURT:  If the -- look, all right, make your -

20   -

21           MR. WOLNERMAN:  That's the deal they struck.

22           THE COURT:  Well, you're wrong, but go ahead,

23   that's your position, I understand your position, it's flat

24   out inconsistent with the documents, it's flat out

25   inconsistent with any view of economic reality.  It's not

Page 71

1    what the agreement says, I understand your argument.

2             MR. WOLNERMAN:  Your Honor, the arbitrators were

3    very well aware of the operating agreement and the terms

4    that were used.  It used the term membership share as a

5    thing that was preserved, and voting rights as a thing that

6    was lost.  Voting membership share was never lost.

7             THE COURT:  Okay.  Make your next point.

8             MR. WOLNERMAN:  On the impairment issue, on the

9    eve of bankruptcy, Kriti was ready to foreclose on this

10   property, the plan provides them exactly that belief.  Where

11   they were on the day before filing, that is where they find

12   themselves today.

13            THE COURT:  No, it isn't.  Because they exercised

14   an 1111(b) option and their entire debt, whatever the value

15   is treated as secured, it's not bifurcated, and the evidence

16   -- the uncontroverted evidence establishes that the value of

17   the property was worth substantially less than the amount of

18   their secured claim, and they've agreed to pay

19   administrative expenses and applying Judge Glaser's Lorraine

20   decision, his analysis would apply here, because there's no

21   remaining question as to what the value of the underlying

22   property is.  Go ahead.

23        (Pause)

24            MR. WOLNERMAN:  Your Honor, just I think all the

25   points were made, just to conclude.  One thing that we've

Page 72

1    said early on is that the two major players in this case is

2    Kriti on the one side and Longman on the other side.

3              I understand that my client has a --

4              THE COURT:  Shulte Roth would feel otherwise,

5    because your client owes them a lot of money.

6              MR. WOLNERMAN:  I do.  I think Shulte Roth

7    unfortunately has been caught in the middle.

8              THE COURT:  They haven't been caught in the

9    middle, they -- anyway that's -- they're the largest

10   unsecured creditor.

11             MR. WOLNERMAN:  Notwithstanding Longman's arguably

12   colorful past, and you know, again nothing -- what he's been

13   accused of in this case happened almost a decade ago, you

14   know, we decided not to appeal the trustee's appointment.

15   We -- frankly we thought it was unwarranted, but

16   nevertheless, to have a third party in here and to

17   independently deal with the situation was something that I

18   frankly welcomed.

19             And what --

20             THE COURT:  It didn't seem that way at the time,

21   but.

22             MR. WOLNERMAN:  What we have is a man with a

23   colorful past whose interest is perfectly aligned with the

24   estate, because he does not seek one penny until everybody

25   else gets paid in full.

1          THE COURT:  If he had been right when he said in

2     the declaration that the property was worth $30 million, and

3     it was exposed to the market with an adequate marketing

4     process, if $30 million had been achieved, Mr. Longman would

5     have gotten a recovery.  It didn't happen.

6          MR. WOLNERMAN:  No, Your Honor, because instead

7     what happened was that one party who has an interest in

8     making sure that nobody gets anything, that was the party

9     that was empowered.  There was some conversation about Kriti

10    handing over the keys to the trustee.  The way that we see

11    things is that the trustee handed over the keys to Kriti.

12         THE COURT:  You know, the options I faced at the

13    beginning of the case was lifting the stay and allowing the

14    judicial foreclosure to go forward in South Carolina, it was

15    about to happen the day after you filed the Chapter 11

16    petitions that stopped it, and I have no question that the

17    opportunity to obtain greater value was achieved through the

18    marketing process, the bidding procedures, the -- in this

19    court than a sheriff conducting a sale on a courthouse steps

20    of the property in South Carolina, which you were one day

21    away from.

22         MR. WOLNERMAN:  Your Honor, we stand here today in

23    exactly the same position, so I'm not sure -- it looks like

24    six of one-half dozen to me.

25         THE COURT:  Because the market has shown that the

Page 74

1    property wasn't worth $18 million --

2           MR. WOLNERMAN:  Correct.

3           THE COURT:  -- or anywhere near, not even half of

4    it, and that's the amount that had to be achieved for any

5    recovery, the value of membership interests.

6           MR. WOLNERMAN:  Your Honor, this was part of our

7    argument in the first place is that the bid procedures, the

8    process that was set up, in the first place, was a sham.

9           THE COURT:  Okay.  You lost on that already.

10          MR. WOLNERMAN:  And we have notice of appeal.

11          THE COURT:  I know.  Well, you don't have a notice

12   of appeal, you withdrew the appeal.

13          MR. WOLNERMAN:  We withdrew the appeal.  We feel

14   that that was a sham transaction, this transaction was only

15   possible --

16          THE COURT:  Tell me why it was a sham transaction?

17          MR. WOLNERMAN:  Because you cannot sell a business

18   for $18 million with $18 million worth of debt, that is not

19   going to happen.

20          THE COURT:  If it's worth $30 million you sure

21   can, it would've been a sale free and clear, the property

22   would've been sold for 18 million.  For 30 million, if your

23   client was right, the 18 million in debt would have gotten

24   paid off, equity interests would have recovered money, there

25   was no sham about it.  What was the sham about it, tell me.

Page 75

1          MR. WOLNERMAN:  I just told you.  That just proves

2     that point.

3          THE COURT:  You did?

4          MR. WOLNERMAN:  It proves the point that if

5     there's $18 million worth of debt then no one's going to pay

6     $18 million for it.  That is the sham.

7          THE COURT:  Is that right?  If the property was

8     worth 30 million, nobody would pay it?

9          MR. WOLNERMAN:  They said it's worth 8 million and

10    they sold -- they put it up for sale for 18 million.  My

11    client is not the fiduciary here.

12          THE COURT:  Your client filed an affidavit in this

13    court stating that the value of the property was $30

14    million, and they said, okay, we don't think so, the most

15    recent appraisal that Kriti got was $7.9 million, your

16    client said it's 30 million, let's expose it to the market,

17    go through the marketing process, following the usual

18    bidding procedures, that's what was approved in two non-

19    qualifying bids, the highest of which was 8 and a half

20    million dollars with many conditions, et cetera, no deposit,

21    okay, demonstrated that it wasn't worth the debt.

22          And you call that a sham --

23          MR. WOLNERMAN:  Your Honor --

24          THE COURT:  -- you can characterize anyway you

25    want, that's just not reality.

1          MR. WOLNERMAN:  If I may.  In our bid procedures

2     objection, we laid out exactly what we thought was a sham,

3     it was just not --

4          THE COURT:  Let's not reargue the bidding

5     procedures, just argue confirmation.

6          MR. WOLNERMAN:  The confirmation process and the

7     bid procedure process go hand in hand, Your Honor.  If you

8     don't allow parties to do due diligence, then they're going

9     to have conditions of their sale that they want to do due

10    diligence.

11         THE COURT:  There was nothing in the bidding

12    procedures that prevented a party from doing due diligence.

13         MR. WOLNERMAN:  Sure there is, Your Honor.

14         THE COURT:  Okay.  We're not going to argue about

15    due diligence -- about the bidding procedures.  You reserved

16    -- you preserved your right on appeal in that, you dismissed

17    the appeal because it was an interlocutory order.  You'll --

18    you know, you'll get your chance in some other court if you,

19    you know, preserve your rights, go ahead.  I don't want to

20    hear bidding -- I ruled on the bidding procedures previous,

21    I wrote an opinion.  I approved the bidding procedures, the

22    process went forward, it didn't result in a sale.

23         MR. WOLNERMAN:  At the end, there is no indication

24    of what the debtor's 70 percent in ARC II is.  There's been

25    no valuation, there's been a sale for $18 million, there's

1   been no separate valuation.  We take the position that Kriti

2   is not impaired, the fact that they decided to pay admin

3   claims basically to pay the trustee to hand over the keys,

4   to give them exactly what they would have gotten in the

5   foreclosure process, that's -- that is artificial

6   impairment.

7              THE COURT:  Next argument.

8              MR. WOLNERMAN:  Their claim should be -- okay,

9   thank you, Your Honor.

10              THE COURT:  Do you have anything else you want to

11   say, go ahead?

12              MR. WOLNERMAN:  No, that's it, Your Honor.

13              THE COURT:  Ms. Park.

14              MS. PARK:  Thank you for hearing from me, Your

15   Honor, Karen Park for the record, Shulte Roth & Zabel.

16              We -- I appreciate you hearing from me because we

17   do know that our joinder was untimely filed as Your Honor

18   pointed out.  We decided to file after reviewing the

19   confirmation brief, we just filed on a couple days after the

20   objection deadline.

21              And we rise -- I rise, you know, after all this

22   talk about the value and the process, in a bankruptcy court

23   to raise actual bankruptcy law, but we do believe that the

24   proponents have an issue with impairments.  And I know

25   you've heard from Mr. --

Page 78

1              THE COURT:  You relied on Lorraine Street

2     Associates case.

3              MS. PARK:  That's right.

4              THE COURT:  And that's the only authority that you

5     point to on the issue of whether Kriti, et al are impaired,

6     correct?

7              MS. PARK:  That's correct.

8              THE COURT:  Okay.

9              MS. PARK:  I'm joining in --

10             THE COURT:  And because they exercised their

11    1111(b) option, the election, the entire amount they're owed

12    is treated as secured, correct?

13             MS. PARK:  Yes.

14             THE COURT:  And I think they acknowledge that but

15    for the agreement to pay all administrative expenses, they

16    wouldn't be impaired.  If that's what makes them impaired,

17    was the agreement exercised -- you know, agreed to quite a

18    while ago that they would fund all administrative expenses

19    in the case.

20             MS. PARK:  That is correct, as a matter of fact.

21             THE COURT:  So the issue of law is whether Kriti,

22    et al are impaired, that class, Class 1 is impaired based on

23    the amount that they're going to pay for administrative

24    expenses.

25             MS. PARK:  I think that's right.

1           THE COURT:  And Lorraine is the only case you cite

2     to in support of your argument that Class 1 is not impaired.

3           MS. PARK:  In fact, it's also the only case that

4     Kriti cites to, to support its argument, the funding of the

5     admin expenses creates an impairment.  And that's why I

6     rise, just to point out that in that case, the corollary

7     that the $5,000 payment was coming directly out of the sale

8     proceeds in that case.  This is a voluntary payment backed

9     by agreement, as everyone has acknowledged, Kriti has funded

10    to pay for this process.

11          And so what we would say is --

12          THE COURT:  If they hadn't agreed to pay for the

13    process, you acknowledged at an earlier hearing that unless

14    the real property was sold for 18 million unsecured

15    creditors would not recover anything, you being the largest

16    of them.

17          MS. PARK:  That was our understanding, yes.

18          THE COURT:  So by their -- there wouldn't have

19    been any money to go through this process if they hadn't

20    agreed to pay the administrative expenses.  There was no

21    money in the estate, do you agree?

22          MS. PARK:  I think that's probably right, and as a

23    factual matter.

24          THE COURT:  So unlike the $5,000 that was involved

25    in Lorraine Street Associates, Mr. Gazes' testimony the

Page 80

1    number is somewhere around 80,000 so far, obviously that has

2    to be allowed by the Court, but this is not a de minimus

3    amount and Judge Glasser didn't seem, you know, he says, at

4    198 B.R. F30, "however unlikely it may have been the Class

5    2's claim would have been satisfied through sale of the

6    premises.  Such a determination could not have been made

7    until the value of the premises was established.  Since an

8    event could -- since such an event could only occur after

9    confirmation of a plan, this Court cannot say as a matter of

10   law, Class 2 was impaired under the plan.  Moreover, the

11   degree to which Class 2 would have been impaired was

12   minimal."

13          That's the $5,000 and then he talks about

14   artificial impairment.  So we're not talking about the de

15   minimus amount, the $5,000 that was involved in Lorraine,

16   and because pursuant to the bidding procedures, the

17   marketing process took place here, we don't have the

18   uncertainty of knowing whether there was enough value in the

19   property.  Do you agree with that?

20          MS. PARK:  We don't take issue with the valuation

21   or the process quite frankly.

22          THE COURT:  All right.

23          MS. PARK:  But our issue is, it's more a legal

24   point that they have not met the 1129(a)(10) standard.  In

25   this case, the 5,000 was on a few hundred thousand dollars

Page 81

1    of debt.  Here, we have a claim of 1.8 million -- 80 million

2    -- excuse me, 80,000 whether that's de minimus over that

3    amount, I mean, that's maybe a finding that, you know,

4    somebody could do.

5           But what we would say is, the judge -- Judge

6    Glasser does go on to say that courts have disfavored, have

7    looked upon with disfavor artificial impairment of claims,

8    and we think Mr. Gazes has, you know, has testified that he

9    doesn't think that the 80,000 or whatever the number ends up

10   being is on account of the secured claim and constitutes

11   impairment.

12          So one would argue that --

13          THE COURT:  He didn't say that.  No, no, you added

14   something.  That wasn't his testimony.  But --

15          MS. PARK:  Fair enough, fair enough.  He -- the

16   question I asked whether it was --

17          THE COURT:  You asked --

18          MS. PARK:  -- (indiscernible) secured claim.  And

19   he said no.  And we would -- and so we would say that

20   doesn't constitute an impairment.  To the extent it does,

21   it's artificial impairment --

22          THE COURT:  All right.

23          MS. PARK:  -- that (indiscernible).  The one last

24   thing I would just point out for the record is, to the

25   extent our firm participated in the history of dealings and

Page 82

1    the arbitration, it was as counsel to the participants, we

2    did not ourselves participate.  I just wanted to make that

3    clear.

4              THE COURT:  Oh, I understand.  You had the

5    misfortune of representing the unsuccessful party in the

6    arbitration.

7              MS. PARK:  Correct.

8              THE COURT:  Okay.  I fully understand that.

9              MS. PARK:  Thank you, Your Honor.

10             THE COURT:  I don't want to hear any reply.  I'm

11   going to take it under submission, and I'll issue an opinion

12   or an order in due course.

13             Thank you very much.

14   (Proceedings were concluded at 12:18 p.m.)

15                            * * * * *

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                            WITNESSES

4    WITNESS                  BY                    PAGE

5    IAN GAZES                MR. PITTA             23

6                             MR. WOLNERMAN         33

7                             MR. PITTA             48

8                             MS. PARK              51

9                             MR. WOLNERMAN         52

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 84

```
 1                          CERTIFICATE

 2    I, Sheila G. Orms, certify that the foregoing is a true and

 3    accurate transcript from the official electronic sound

 4    recording.

 5    Sheila Orms    Digitally signed by Sheila Orms
                     DN: cn=Sheila Orms, o, ou,
                     email=digital1@veritext.com,
 6    _____c=US_____
                     Date: 2015.10.22 17:16:34 -04'00'

 7    SHEILA ORMS, APPROVED TRANSCRIBER

 8

 9    DATED:  October 22, 2015

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501
```